IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
RECEIVED
Mar 03, 2025
FIFTH CIRCUIT

| | |
|---|---|
| EXXON MOBIL CORPORATION, | |
| Petitioner, | |
| v. | No.: |
| OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION | OSHRC Docket No.: 22-0809 |
| *and* | |
| VINCE MICONE, Acting Secretary of Labor, | |
| Respondents. | |

## PETITION FOR REVIEW

Exxon Mobil Corporation ("ExxonMobil") hereby petitions the court pursuant to 29 U.S.C. § 660(a) for review of a final order of the Occupational Safety and Health Review Commission ("OSHRC") in OSHRC Docket No. 22-0809. Specifically, ExxonMobil petitions for review of the portions of the Decision and Order that affirmed Citation 1, Item 1, instance b.

The alleged violation at issue in this matter concerns ExxonMobil's refinery in Baytown, TX, and 29 U.S.C. § 660(a) permits ExxonMobil to file its petition in

the United States Court of Appeals with jurisdiction where the violation is alleged to have occurred.

An Administrative Law Judge ("ALJ") issued a decision in this case on November 22, 2024, and the decision was docketed on December 3, 2024. ExxonMobil filed a Petition for Discretionary Review on December 19, 2024. OSHRC did not direct the case for review, and the ALJ's order became OSHRC's Final Order on January 2, 2025. 29 U.S.C. § 661(j) and 29 C.F.R. § 2200.90(d).

A copy of OSHRC's Notice of Final Order is attached as Exhibit A, and a copy of the ALJ's Decision and Order is attached as Exhibit B.

Date: March 3, 2025

Respectfully submitted,

/s/ *Micah Smith*
Micah Smith
Richard Raile
Baker & Hostetler LLP
msmith@bakerlaw.com
(202) 861-1500
1050 Connecticut Ave, N.W.
Suite 1100
Washington, DC 20036

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the following **PETITION FOR REVIEW** electronically and by first class mail upon:

Louise M. Betts
Heather R. Phillips
Counsel for Appellate Litigation
Office of the Solicitor
U.S. Department of Labor
Office of the Solicitor
Room S4004
200 Constitution Ave, N.W.
Washington, DC 20210

Ricky Brooks, President
United Steel Worders (USW) Local 13-2001
ExxonMobil Baytown Complex
311 S. Highway 146
Baytown, TX 77520

John X. Cerveny
Executive Secretary
Occupational Safety and Health Review Commission
1120 20th Street NW, 9th Floor
Washington, DC 20036

This 3rd day of March 2025.

_/s/ *Micah Smith*_
Micah Smith
Counsel
BakerHostetler
msmith@bakerlaw.com
(202) 861-1638
1050 Connecticut Ave, N.W.
Suite 1100
Washington, DC 20036

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

| | |
|---|---|
| EXXON MOBIL CORPORATION, <br><br> Petitioner, <br><br> v. <br><br> OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION <br><br> *and* <br><br> VINCE MICONE, Acting Secretary of Labor, <br><br> Respondents. | No.: <br><br> OSHRC Docket No.: 22-0809 |

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Parties

- Petitioner, Exxon Mobil Corporation. Exxon Mobil Corporation has no parent corporation, and no publicly held company owns 10% or more of its stock.

- Respondent, Occupational Safety and Health Review Commission.

- Respondent, Vince Micone, Acting Secretary of Labor.

<u>Attorneys</u>

- For Petitioner Exxon Mobil Corporation:

  Micah Smith
  Richard Raile
  Baker & Hostetler LLP
  1050 Connecticut Ave, NW
  Suite 1100
  Washington, DC 20036

  _/s/ *Micah Smith*_
  Micah Smith
  Attorney of record for
  Exxon Mobil Corporation

# Exhibit A



United States of America
**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**
1120 20th Street, N.W., Ninth Floor
Washington, DC 20036-3457

Office of the
Executive Secretary

Phone: (202) 606-5400
Fax:    (202) 606-5050

SECRETARY OF LABOR,

    Complainant,

    v.

EXXON MOBIL BAYTOWN REFINERY,

    Respondent,

    and

UNITED STEEL WORKERS (USW) LOCAL 13-2001,

    Authorized Employee Representative.

OSHRC Docket No. 22-0809

## NOTICE OF FINAL ORDER

    The Respondent's Petition for Discretionary Review in the above cited action was received by the Commission on December 19, 2024. The case was not directed for review. **Therefore, the decision of the Administrative Law Judge became a final order of the Commission on January 2, 2025.** Commission Rules 90(b)(2) and 90(d), 29 C.F.R. §§ 2200.90(b)(2) and 2200.90(d); Section 12(j) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 661(j).

    **ANY PERSON ADVERSELY AFFECTED OR AGGRIEVED WHO WISHES TO OBTAIN REVIEW OF THE DECISION OF THE ADMINISTRATIVE LAW JUDGE MUST FILE A PETITION FOR REVIEW WITH THE APPROPRIATE FEDERAL COURT OF APPEALS WITHIN 60 DAYS OF THE DATE OF THE ABOVE FINAL ORDER DATE.** *See* Section 11 of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 660; Fed. R. App. P. 15.

FOR THE COMMISSION,

Dated: January 3, 2025

John X. Cerveny
Executive Secretary

DOCKET NO. 22-0809

NOTICE IS GIVEN TO THE FOLLOWING:

Louise M. Betts, Counsel for Appellate Litigation
Heather R. Phillips, Counsel for Appellate Litigation
Office of the Solicitor, U.S. DOL
200 Constitution Ave., NW, Room S4004
Washington, DC 20210

John Rainwater, Regional Solicitor
John M. Bradley, Attorney
William T. Nash, Attorney
U.S. Department of Labor, Office of the Solicitor
525 S. Griffin Street, Suite 501
Dallas, TX 75202

Micah Smith, Esq.
BakerHostetler
1050 Connecticut Ave, N.W., Suite 1100
Washington, DC 20036

Lindsay A. DiSalvo, Esq.
Conn Maciel Carey LLP
5335 Wisconsin Avenue, NW, Suite 660
Washington, DC 20015

Charles V. Pyle, III, Esq.
Exxon Mobil Corporation
22777 Springwoods Village Parkway
N1.4A.474
Spring, TX 77389

Ricky Brooks, President
United Steel Workers (USW) Local 13-2001
ExxonMobil Baytown Complex
311 S. Highway 146
Baytown, TX 77520

Sharon D. Calhoun, Administrative Law Judge
Occupational Safety and Health Review Commission
1924 Building - Room 2R90
100 Alabama Street, S.W.
Atlanta, GA 30303-3104

# Exhibit B



United States of America
**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**
1924 Building – Room 2R90, 100 Alabama Street, S.W.
Atlanta, Georgia 30303-3104

Phone: 404-562-1640                                                                                    Fax: 404-562-1650

## <u>NOTICE OF DECISION</u>

**In Reference To:**
**Acting Secretary of Labor v. Exxon Mobil Baytown Refinery**
**OSHRC Docket No. 22-0809**

1. *Enclosed is a copy of the Court's decision.* The entire record, including this decision, shall constitute the report of this Administrative Law Judge pursuant to section 12(j) of the Occupational Safety and Health Act of 1970 (the Act), 29 U.S.C. § 661(j). The Judge's report, which includes this decision, will be filed with the Commission's Executive Secretary on **November 26, 2024**. See Commission Rule 90(b), 29 C.F.R. § 2200.90(b)1. The Executive Secretary will then issue a "Notice of Docketing of Administrative Law Judge's Decision" that notifies all parties of the date that the Executive Secretary dockets the Judge's report, and that will state the date by which a party must file a petition for discretionary review.

2. *Commission final order.* The decision shall become a final order of the Commission thirty (30) days from the date the Executive Secretary dockets the decision unless a Commission member directs review of the Decision within that time. See Section 12(j) of the Act; Commission Rule 90(f), 29 C.F.R. § 2200.90(f).

3. Party adversely affected or aggrieved by the decision.

> A party adversely affected or aggrieved by the decision of the Judge may seek review by the Commission by filing a petition for discretionary review with the Executive Secretary at any time following the serviced of the judge's decision on the parties but no later than 20 days after the date of docketing of the Judge's report.

Commission Rule 91(b), 29 C.F.R. § 2200.91(b). The Executive Secretary's address is as follows:

**Executive Secretary**
**Occupational Safety and Health**
**Review Commission**
**One Lafayette Centre**
**1120 20th Street, N.W. – 9th Floor**
**Washington, D.C. 20036-3419**

The full text of the rule governing the filing of a petition for discretionary review is Commission Rule 91, 29 C.F.R. § 2200.91.

4. *Correction of errors in the Judge's report.* Up to the time that either the Commission directs review of the decision or the decision becomes a final order of the Commission, a request to correct

clerical errors arising through oversight or inadvertence in the decision or in other parts of the Judge's report shall be filed with the undersigned Judge, by motion, pursuant to Commission Rule 90(b)(4)(i), 29 C.F.R. § 2200.90(b)(4)(i).  Motions shall conform to Commission Rule 40, 29 C.F.R. § 2200.40.

5.  *Relief from default.* Requests for relief from default or for reinstatement of the proceeding may be filed with the undersigned Judge, by motion, until the date the Executive Secretary dockets the Judge's report. See Commission Rule 90(c), 29 C.F.R. § 2200.90(c). Motions shall conform to Commission Rule 40, 29 C.F.R. § 2200.40.

6.  *Filing with Executive Secretary*. Except for motions filed to correct errors in the Judge's report discussed in paragraph 4 above, on or after the date the Executive Secretary dockets the Judge's report, all documents shall be filed with the Executive Secretary. See Commission Rule 90(d), 29 C.F.R. § 2200.90(d).

**Judge Sharon D. Calhoun**
Atlanta, GA

**Date: November 22, 2024**

**CERTIFICATE OF SERVICE**

This is to certify that the *Notice of Decision* with a copy of the *Decision and Order* was electronically served to the parties listed below by electronic mail on November 22, 2024.

OSHRC Docket No.: **22-0809**

**For the Acting Secretary:**

John Rainwater, Acting Regional Solicitor
U.S. Department of Labor
Office of the Solicitor
525 S. Griffin Street, Ste.201
Dallas, TX 75202
Attn: William T. Nash, Esq.
Attn: John M. Bradley, Esq.
Nash.william.t@dol.gov
Bradley.john.m@dol.gov
Mitchell.deanna.j@dol.gov
Docket.dallas@dol.gov

**For the Union:**

Ricky Brooks, President
United Steel Workers (USW) Local 13-2001
Exxon Mobil Baytown Complex
311 S. Hwy 146
Baytown, TX 77520
Rdbrooks4838@yahoo.com
usw13-2001@comcast.net

**For the Respondent:**

Lindsay A. DiSalvo, Esq.
Samuel S. Rose, Esq.
Valerie Butera, Esq.
Conn Maciel Carey LLP
ldisalvo@connmaciel.com
srose@connmaciel.com
vbutera@connmaciel.com
mconnors@connmaciel.com

Micah Smith, Esq.
Baker Hostetler
1050 Connecticut Avenue
Ste. 1000
Washington, DC 20036
msmith@bakerlaw.com

Charles V. Pyle, III, Esq.
Exxon Mobil Corporation
22777 Springwoods Village Parkway
N1.4A.474
Spring, TX 77389
Vic.pyle@exxonmobil.com

/s/ *Sherice M. Dunham*

**Sherice M. Dunham,** Legal Assistant
OSH Review Commission
1924 Building - Room 2R90,
100 Alabama Street, S.W.
Atlanta, Georgia 30303-3104
Phone:  404-562-1641
Fax:      404-562-1650
Email:  sdunham@oshrc.gov

3



United States of America
**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**
1924 Building - Room 2R90, 100 Alabama Street, S.W.
Atlanta, Georgia 30303-3104

| | |
|---|---|
| ACTING SECRETARY OF LABOR, | |
|     Complainant, | |
| v. | |
| EXXON MOBIL BAYTOWN REFINERY, | OSHRC Docket No. **22-0809** |
|     Respondent, | |
|   and | |
| UNITED STEEL WORKERS (USW) LOCAL 13-2001 | |
|     Authorized Employee Representative. | |

Appearances:

    John M. Bradley, Esq.
    Office of the Solicitor, U.S. Department of Labor, Dallas, TX
    For the Complainant

    Ricky Brooks, President, USW Local 13-2001, Baytown, TX
    For the Union

    Micah Smith, Esq., Special Counsel
    Baker Botts, LLP, Washington, DC
    Lindsay DiSalvo, Esq.
    Valerie Butera, Esq.
    Samuel Rose, Esq.
    Conn Maciel Carey, LLP, Washington, DC
    Charles Victor Pyle, III, Esq., Senior Counsel
    Exxon Mobil Corporation, Spring, TX
    For the Respondent

Before: Administrative Law Judge Sharon D. Calhoun

## DECISION AND ORDER

## INTRODUCTION

    ExxonMobil's Baytown complex, which produces a variety of refinery and chemical products, sits on hundreds of acres about 25 miles east of downtown Houston. The complex contains 27 distinct units, including the hydro-desulfurization unit (HDU), which mixes hydrogen,

sulfur, and naphtha. Early on the morning of December 23, 2021, three contractors were in the HDU swapping flange bolts when the pipe holding the flange ruptured. The release of hydrocarbons caused an explosion, which injured the contractors, and a fire, which burned for nearly eight hours. Three ExxonMobil process technicians responded to the fire. Each subsequently received a mental illness diagnosis from a provider and missed workdays. ExxonMobil declined to record these mental illnesses on the ground they were incorrect or not made by a physician or other licensed health care professional with appropriate training and experience. The union representing ExxonMobil's Baytown employees informed OSHA of the company's decision in March 2022. Following its investigation, OSHA issued a Citation and Notification of Penalty (Citation) on June 3, 2022. The Citation alleged an other-than-serious violation of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678 (Act), and the recordkeeping standard thereunder and proposed a $2,072 penalty.

## JURISDICTION AND COVERAGE

The parties acknowledge ExxonMobil timely contested the Citation on July 1, 2022. (Sec'y Br. at 16, Resp't Br. at 8; Joint Pre-Hr'g Statement ¶D.) The Court granted Exxon Mobil's motion to discontinue simplified proceedings on August 15, 2022. The Secretary filed the Complaint the following day, and ExxonMobil filed the Answer on September 6, 2022. Both ExxonMobil and the Secretary filed motions for summary judgment, and the Court denied these motions on May 16, 2023. The Court also denied on July 5, 2023, ExxonMobil's motions *in limine* to exclude certain medical documentation and limit evidence and testimony related to the HDU incident. The Court held a hearing October 31 to November 3, 2023, in Houston. The Secretary and ExxonMobil filed post-hearing briefs on January 29, 2024.

ExxonMobil admitted Commission jurisdiction over this matter pursuant to § 10(c) of the Act. (Compl. ¶1; Answer ¶1; Joint Pre-Hr'g Statement ¶D.) ExxonMobil also admitted it is an employer engaged in business affecting commerce under § 3(5) of the Act. (Compl. ¶2; Answer ¶5; Joint Pre-Hr'g Statement ¶D.) Therefore, the Court finds it has jurisdiction under § 10(c) of the Act and finds ExxonMobil is a covered employer under § 3(5) of the Act. Under § 12(j) of the Act and Commission Rule 90(a)(1), after hearing and carefully considering all the evidence and the arguments of counsel, the Court issues this Decision and Order, which constitutes its final disposition of the proceedings. 29 U.S.C. § 661(j); 29 C.F.R. § 2200.90(a)(1); *see also* Fed. R. Civ. P. 52(a).

OSHA alleges in Citation 1, Item 1, ExxonMobil violated 29 C.F.R. § 1904.29(b)(3), which states: "You must enter each recordable injury or illness on the OSHA 300 Log and 301 Incident Report within seven (7) calendar days of receiving information that a recordable injury or illness has occurred." Specifically, OSHA claims ExxonMobil failed to record diagnoses of work-related mental illnesses by licensed health care professionals resulting in days away from work and, in the cases of two employees, prescription medication on the 2022 OSHA 300 log or an OSHA form 301 within seven calendar days of the employee voluntarily providing the documentation to the employer. (Citation at 6.) However, an employer is not required to record an illness if it is a mental illness, which "will not be considered work-related unless the employee voluntarily provides the employer with an opinion from a physician or other licensed health care professional with appropriate training and experience (psychiatrist, psychologist, psychiatric nurse practitioner, etc.) stating that the employee has a mental illness that is work-related." 29 C.F.R. § 1904.5(b)(2)(ix). For Employees 1 and 3, the parties primarily dispute whether the providers were qualified to diagnose mental health illnesses. The parties also dispute whether Employees 1, 2, and 3 suffered recordable work-related mental illnesses. For the reasons indicated *infra*, the Court affirms Citation 1, Item 1, instance b with respect to Employee 2 and vacates Citation 1, Item 1, instances a and c with respect to Employees 1 and 3. The Court assesses a $691 penalty.

## BACKGROUND

This decision is the story of three ExxonMobil employees working overnight and into the morning of December 23, 2021, at the Baytown complex. Because each story is different, the Court begins by generally describing the event and then addresses each employee's role in the event and ExxonMobil's decision not to record the mental illness diagnosis for each.

In the HDU, ExxonMobil mixes high sulfur naphtha and hydrogen and sends the resulting process to reactors, where the hydrogen binds to the sulfur and removes it from the naphtha. (Tr. 65-66.) This reaction creates "clean low sulfur" naphtha, which "is sent over to [ExxonMobil's] other units to be turned into high octane" fuel.[1] (Tr. 66.) The night of the explosion and fire, ExxonMobil was running 64,000 barrels of naphtha through the HDU. (Tr. 66.) The previous night, a smaller incipient flange fire, nearly 10 feet high, broke out in the HDU at the location of the explosion. (Tr. 223.) The HDU is outdoors, and leaking flanges, their metal contracting in the cold

---

[1] It also creates a byproduct called hydrogen sulfide, which is "an extremely deadly gas." (Tr. 66.)

and expanding in the heat, would cause these fires. (Tr. 46, 223-24.) Because the equipment in the HDU was roughly 600 degrees Fahrenheit, ExxonMobil could not put cold water on the equipment, which would cause it to open. (Tr. 51.) Rather, ExxonMobil employees or contractors would place steam bands around the flanges to create a constant steam supply or use steam lances to snuff out the fires. (Tr. 51, 224.) ExxonMobil would then devise a repair strategy to fix the leak. (Tr. 224.) The night of the incident, contractors removed insulation from the pipe to which the flange was secured. (Tr. 47.) ExxonMobil permitted another group of contractors to perform a wire wrap on the flanges, which involved swapping the flange bolts. (Tr. 48, 50.) While they were working approximately 30 to 35 feet up in the air, the pipe ruptured, causing an explosion. (Tr. 50, 52, 1052.) The explosion set the HDU and a cooling tower located 80 yards away on fire. (Tr. 81.)

As a result of the explosion and fires, the HDU was inoperable. Part of the cooling tower collapsed into its basin and other parts were leaning over. (Tr. 80.) Charred pipe, debris, and insulation were in the HDU, and workers entering the unit needed air tanks due to benzene and other contaminants they could ingest or inhale. (Tr. 80.) ExxonMobil took more than five months to rebuild the HDU and began operating it again in June 2022, while using a temporary cooling tower through the summer. (Tr. 82.)

*Employee 1*

ExxonMobil hired Employee 1 as a process technician in September 2019. (Tr. 43-44.) In this role, he verified equipment and the levels of temperatures, process flows, and pressures in the units, including the HDU. (Tr. 44-45.) To do so, he manually manipulated electronic transfer catalysts, blew down equipment to ensure proper liquid levels, and ran samples to labs for testing. (Tr. 45.) He also opened and closed blowdowns, cleared process, isolated and took equipment out of service, and wrote permits for contractors. (Tr. 45.)

Around 12:40 A.M., Employee 1 sat in a cart with a screen observing the contractors when the explosion occurred about 50-60 feet from him. (Tr. 50-51.) Employee 1 attempted to run but a shockwave from the blast knocked him down. (Tr. 52.) He got up and ran to the control center to tell them to shut the unit down and to activate the deluge system to put water on the equipment. (Tr. 52-53.) The contractors were injured but alive, according to Employee 1. (Tr. 53.) He dragged one to an emergency response team truck. (Tr. 54.) One had shrapnel in his eye, another a broken leg, and the last contractor was burned. (Tr. 54-55.) The explosion knocked out certain electronics and burnt wires in the HDU, so Employee 1 could not use control center signals to remotely open

and close valves and shut down the HDU.[2] (Tr. 55-56.) Employee 1 and two other technicians left the control room and "grabbed valve wrenches." (Tr. 56.) They went to the south side of the HDU, where the battery limit valves were located. (Tr. 134.) These are the outermost valves in the HDU and control the flow of feed into the unit. (Tr. 134-35.) To cut the feed and slow the fuel source for the fire, Employee 1 and the two other technicians manually closed all twelve valves. (Tr. 56, 135.) Employee 1 testified the HDU sounded like a jet flying overhead despite his use of hearing protection. (Tr. 58-59.) The technicians also manually turned on pumps to drain liquid from a drum that was overfilling. (Tr. 56, 59.) At this time, Employee 1 noticed the cooling tower was "an orange inferno" and other things in the HDU were popping or exploding. (Tr. 56-57, 59.) The emergency response team evacuated Employee 1 and the other technicians to a safe zone. (Tr. 57.) They went to other units to ensure the fire did not spread. (Tr. 57.) Employee 1 did not go into the HDU with the fire team after the incident to identify additional valves to close. (Tr. 131-32.) He left the facility around 5:15 A.M. (Tr. 57.)

ExxonMobil team members requested Employee 1 back on the worksite the following day, but he told them he needed a few days off to "calm down a little bit." (Tr. 60.) He returned to work as scheduled on Monday, December 28, and checked in daily with ExxonMobil's medical team on-site, who were monitoring him for exposure to benzene, and he met with an employee assistance program therapist. (Tr. 61, 63.) However, later that week he received a Covid diagnosis and was out of work until Friday, January 6. (Tr. 62.) The following week, he met with OSHA and informed his supervisor he was taking time off to "time off to clear my head and get my head right." (Tr. 62)

On January 12, 2022, Employee 1 met with Dr. Jason Wang, his primary care physician since 2019. (Tr. 62, 102, 371.) Dr. Wang is a board-certified family medicine practitioner who has practiced for more than ten years. (Tr. 369-70.) He is qualified under his Texas medical license to

---

[2] Employee 1 testified to the difference between a controlled shutdown and uncontrolled shutdown. According to Employee 1, a controlled shutdown is a systematic approach to bringing the unit down safely, based upon existing procedures. (Tr. 120, 127.) It involves cutting feed to the unit, depressurizing the unit, and then maintaining these levels. (Tr. 127.) According to Employee 1, this can be achieved by manipulating valves from the control room to gradually reduce process levels and pressures. (Tr. 127.) To isolate the entire unit, process technicians isolate and blind valves. (Tr. 128.) During an uncontrolled shutdown, a piece of equipment fails and causes the unit's levels and pressures to fluctuate (Tr. 120.) When this happens, "you've got to just to do what you got to do to get it into a safe spot," Employee 1 testified. (Tr. 120.) According to Employee 1, process technicians were trained to effect controlled shutdowns, as well as uncontrolled shutdowns that were not "catastrophic." (Tr. 129-30.) He described the explosion and fire that night as "a catastrophic event." (Tr. 58.)

diagnose PTSD. (Tr. 374.) During this appointment, which lasted about 30 minutes, Employee 1 had a chest X-ray, physical examination, and filled out forms. (Tr. 103-04.) He also met with Dr. Wang for approximately 30 minutes, during which they discussed what had happened and Employee 1 answered a series of questions and discussed his physical and mental symptoms, such as his "anxiousness, inability to sleep." (Tr. 63, 382.) According to Employee 1, they also discussed the "[r]ecollection of that night being somewhat debilitating and not really allowing me to just be normal." (Tr. 63.)

Dr. Wang testified Employee 1 described the event and symptoms he was having, such as "negative recurrent intrusive thoughts, kind of like flashback type of symptoms, where it was causing him a lot of distress that he couldn't focus and he couldn't concentrate and he couldn't even go to work because of the event." (Tr. 371-72.) Dr. Wang also testified Employee 1 "couldn't really sleep, he was having nightmares," and he was "having kind of a negative mood." (Tr. 372.) Although Dr. Wang did not have the test in front of him, he relied on his clinical experience, applied the Diagnostic and Statistical Manual of Mental Disorders-5 (DSM-5) criteria for PTSD, and determined Employee 1 had this mental illness.[3] (Tr. 372, 385.) Dr. Wang recalled the criteria were a traumatic life-threatening event; intrusive thoughts, recurrent intrusive thoughts, or flashback of the event; negative cognitive issue or mood based upon the event; an arousal, such as a hypersensitivity; avoidance of situations; and then these symptoms affecting work and home life. (Tr. 385-86.) Specifically, Dr. Wang found Employee 1's symptoms met all criteria such that he had clinically significant disturbance and could not function at work and return to work. (Tr. 386, 388-89.) He trusted the honesty of Employee 1's answers during the assessment based upon "[h]is body language and my clinical experience." (Tr. 390.) Before the appointment concluded, Dr. Wang noted the diagnosis on an Individual Disability Report (IDR), which was then sent to Melissa McMillan, a nurse practitioner (NP) and member of ExxonMobil's Medical and Occupational

---

[3] The specific criteria for the DSM-5-TR test are: ((a) Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) enumerated ways; (b) Presence of one (or more) enumerated intrusion symptoms associated with the traumatic event, beginning after the event occurred; (c) Persistent avoidance of stimuli associated with the traumatic event, beginning after the event, as evidence by one of the enumerated avoidances or efforts to avoid; (d) Negative alterations in cognitions and mood associated with the traumatic event, beginning or worsening after it occurred, as evidenced by two or more enumerated factors; and (e) Marked alterations in arousal and reactivity associated with the traumatic event, beginning or worsening after the traumatic event occurred, as evidenced by two or more enumerated factors.) (Ex. R-6 at 2-3.)

Health team (MOH or medical team).[4] (Tr. 69, 70-71, 77, 105; Ex. C-8 at 1.) Dr. Wang also prescribed Trazodone and Zoloft, to help Employee 1 with his depression and sleep disruption. (Tr. 376; Ex. C-8 at 4.)

Dr. Wang assessed Employee 1 again on February 8. (Tr. 391.) They met for approximately 30 minutes, and Dr. Wang asked similar questions to assess Employee 1's progress and his prescriptions. (Tr. 136, 391-92.) Dr. Wang completed a second IDR for ExxonMobil, which again noted a PTSD diagnosis. (Ex. C-9.) On March 14, they met for a third time, and Dr. Wang released Employee 1 to full duty due to "his significant improvement in symptoms." (Tr. 390.) According to Dr. Wang, Employee 1 was, at this point, "cognitively able to do his job without having intrusive thoughts" although his symptoms had not "completely resolved." (Tr. 390-91.) The March 14 IDR transmitted to ExxonMobil states Employee 1's return to work date was March 17. (Ex. C-10 at 1.)

Members of ExxonMobil's medical team, such as McMillan, receive IDRs from providers and send company documentation of a potential work-related illness (called a 230) to the risk management and business line team. (Tr. 603-04, 608.) The business team then decides whether to record an illness in the company's OSHA logs and forms. (Tr. 603-04, 606-07.) Michael Shannon, who was the personnel safety-second line supervisor when the final IDR was submitted, received the 230 from the medical team. (Tr. 609-10.) Shannon, who had never recorded a mental illness, requested help from the medical team to assess Dr. Wang's experience and training. (Tr. 605, 610.) Dr. Ashiq Zaman, assistant regional operations occupational health manager for the U.S. Gulf Coast at the time, and Maya Timbs, an NP and occupational health manager for Baytown at the time, evaluated whether the provider met the requirements of the OSHA standard. (Tr. 610, 682, 802-03.) They searched publicly available information on the internet and Dr. Wang's provider website to assess his qualifications and to determine whether he held a board certification in psychiatry. (Tr. 683-84, 806-07.) Dr. Zaman and Ms. Timbs did not contact Dr. Wang about his qualifications, training, and experience. (Tr. 375-77, 684, 808-09.) They found no evidence Dr. Wang had a specialization or board certification in mental health and therefore he did not meet the requirements of the standard. (Tr. 685, 696-97, 808.) Based upon this recommendation and because

---

[4] Only the first page of the IDR was sent to Ms. McMillan. (Tr. 70-71; Ex. C-8,) This exhibit also contains an after-visit summary from Dr. Wang, which included physical vitals and prescribed medications. This portion of the exhibit was not turned over to ExxonMobil. (Tr. 72-73.)

Dr. Wang was not an enumerated provider under the standard, Shannon did not record Employee 1's PTSD diagnosis on either the 2022 OSHA 300 log or an OSHA form 301. (Tr. 613-15.)

*Employee 2*

Employee 2 has worked as a process technician and operator at ExxonMobil's Baytown complex since 2008. (Tr. 144-45.) The night of the incident, Employee 2 was working in the hydroformer unit, not the HDU, although he is qualified to work in both. (Tr. 205.) Employee 3 was driving Employee 2 from the HDU to drop off samples for testing at the laboratory, and they were about a quarter mile away when the explosion occurred. (Tr. 148-49.) They turned around and saw flames more than 150 feet tall rising above the other units, equipment, and towers. (Tr. 149.) Employee 3 turned the truck around and drove back towards the HDU and parked by another functioning unit. (Tr. 151-52.) On the radio, Employee 2 heard shouting to shut down the HDU, but he could not go to the physical unit, so he ran inside the control center, where employees operate the units. (Tr. 152.) In the control center, Employee 2 and other employees tried to account for employees working in the HDU. (Tr. 153-54.) Employee 2 also tried to read the emergency shutdown procedures to the operator, but he was in shock and could not carry them out. (Tr. 154-55.) Employee 2 realized they could neither control the fire nor shut down the HDU from the control center, but they needed to control the fuel supply to the unit. (Tr. 155-56.) John Tijerina, the outside supervisor on duty that night, asked if anyone could go out to keep a flare drum from filling with fuel. (Tr. 213-14.) In a flare drum, liquid sits at the bottom, while a flare burns vapor off the top. (Tr. 214.) If the drum fills up, liquid could reach the flares and cause a massive fire. (Tr. 214.) Employee 2 attempted to go to the west side of the HDU to blow the flare drum, but he could not get "anywhere near it." (Tr. 156-57.) However, he also noticed the cooling tower was on fire, which was "unimaginable." (Tr. 157.) At this point, Employee 3 picked him up in the truck at the flare drum and told him volunteers had been requested to isolate valves at the south pipe rack, where fuel lines enter the HDU, in order to "kill the source of the . . . fire." (Tr. 157.) He met other employees, including Employee 1 and process technician Ben Sanders, up at the south rack, which was a couple of stories above the ground and 100 to 150 feet from the fire. (Tr. 158.) They closed the valves and were descending from the rack, when they heard another "boom" and kept running. (Tr. 158-59, 215-17.)

ExxonMobil firefighters were now at the Unit, attempting to control the fires with water. (Tr. 159.) The water was not putting out the fire, but instead was merely keeping equipment cool

and keeping towers full of gas from collapsing. (Tr. 159.) Jared Sanders, a first line supervisor in a different unit and assistant fire captain that evening, testified the fire team needed to block new fuel sources and close valves to get the fire under control. (Tr. 933, 1010.) The console and fuels business team sent a list of valves to block and, for the fire team to do so, it needed volunteers familiar with the HDU to show them valve locations. (Tr. 1010-11.) According to Jared Sanders, the fire was contained to the HDU and the base of a tower at this time. (Tr. 1002-03; Ex R-5B (red cloud marking).) Employee 2 volunteered to enter the HDU and identify the valves. (Tr. 161-63.) The firefighters suited Employee 2 and Ben Sanders in appropriate level PPE, which included, self-containing breathing apparatus (SCBA), protective bunker gear, hood, and masks to wear under their helmets.[5] (Tr. 162, 1003-04.) Employee 2 and the firefighters entered the HDU and walked down the alleyway to the base of the reactor that had blown off in the explosion. (Tr. 162-63.) The unit was dark because the power was "knocked out," and flames were "streaking across the alleyway." (Tr. 163.) They reached the P609 hydrogen outlet valve, which was open and feeding the fire. (Tr. 163, 217.) Employee 2 pointed to the valve because the fire "was hot and roaring" and "too loud" to hear one another. (Tr. 163-64.) As the firefighters were almost done closing the valve, "the flames . . . started woofing on us" and the firefighters stopped. (Tr. 164.) Employee 2 feared the flame would go out and the vapor cloud around them would reignite, but they continued and finally closed it. (Tr. 164-65, 217-18.) Employee 2 and the firefighters then walked 20 feet closer to the fire through shin-high water to the second valve, called the L607 bypass valve, which was open an inch or so. (Tr. 165-66, 219, 228.) This valve is an "outlet valve, control valve that regulates the level" of feed for a 150-foot-tall tower, which was surrounded by flames. (Tr. 219.) The firefighters took approximately 20-30 seconds to close it and then walked Employee 2 towards the engulfed cooling tower, but Employee 2 motioned there was nothing they could do to keep it from burning. (Tr. 167.)

They brought Employee 2 out of the HDU to the emergency response team, which checked his blood pressure and heart rate at a waiting ambulance. (Tr. 167-68, 1025-26.) After 30 minutes in the ambulance, his vitals lowered to acceptable levels, and the fire, although still burning hot, was down to approximately 40 feet high. (Tr. 168, 220, 1025-26.) Jared Sanders testified that at this point, the audible level of the fire and its brightness had decreased because, as noted above, a

---

[5] Jared Sanders testified employees working outside, such as Employees 1, 2, and 3 and other process technicians, are required to wear required to flame-retardant clothing. (Tr. 972-73.)

hydrogen supply valve, which had been fueling the jet fire, had been blocked. (Tr. 1026-27.) According to Jared Sanders, unburned fuel, which was trapped in the pipes, needed to be burned off. (Tr. 1026-27.) Although Employee 2 had helped to close the south pipe rack valves, the control center noticed this had not helped cut the entire feed source to the fire and informed the emergency team the P609 bypass itself was still open. (Tr. 221-22.) Around 3:30 A.M., the firefighters helped Employee 2 don his protective bunker gear again and they went back into the HDU. (Tr. 168, 222.) The fire team needed Employee 2 to ensure no bypasses were open or valves were open or leaking. (Tr. 1027.) Employee 2 identified the P609 bypass for the firefighters, who closed it, as well as other valves. (Tr. 168, 222.) When Employee 2 and the firefighters exited the HDU, there were additional firefighters on-site who could assist with containing the blaze and hot zone around the HDU. (Tr. 170, 1006-08; Ex. R-5B (red dashes, H2Z depicting edge of the hot zone at 5:00 A.M.).) Jared Sanders testified he met with Employee 2 on the north side of the fire near the control center around 5:30 A.M. and he "mention[ed] that he had some family issues at the house that he was worried about affecting his mom." (Tr. 1028.) Employee 2, who did not testify to that conversation, said he left the complex around 5:00-5:30 A.M., while the fire was still burning. (Tr. 170, 222.)

Following the incident, Employee 2 met with ExxonMobil grief counselors to discuss his coping and anxiety. (Tr. 171-72.) He also discussed his stress, anxiety, and depression with Ms. Timbs on January 10 for 20-30 minutes at the ExxonMobil health clinic. (Tr. 178, 241-42.) Employee 2 used ExxonMobil's employee assistance program (EAP) to find Sydney Adams-Ordonio, a licensed clinical social worker (LCSW) and owner, clinical director, and psychotherapist at Kingwood Counseling Center. (Tr. 172-73, 468, 470.)

Ms. Ordonio has a bachelor's degree in interdisciplinary studies and a master's degree in social work, with a concentration in mental health.[6] (Tr. 468.) She opened Kingwood Counseling Center in 2006, where she sees patients, consults on cases, reviews reports, and completes administrative and business tasks. (Tr. 469-70.) Employee 2 saw Ms. Ordonio eight times between January and March 2022. (Tr. 470.) They discussed his anxiety, stress, mood, swings, and dreams, as well as coping strategies for dealing with them. (Tr. 175.) She found Employee 2 could not control his emotions, was depressed and fearful, and had anxiety, hypervigilance, and nightmares

---

[6] Ms. Ordonio testified the University of Houston did not offer a bachelor's degree in psychology when she graduated. (Tr. 468.) However, she took 30 credit hours of psychology classes and graduated as a member of the national honor society for psychology. (Tr. 468.)

stemming from the incident. (Tr. 471-73.) Initially, she diagnosed Employee 2 on January 17 as having adjustment disorder with anxiety rather than PTSD, because symptoms must persist for a month or more to diagnose PTSD, and a month had not passed since the incident. (Tr. 174, 177, 473-74; Ex. C-12.) She continued to assess Employee 2 and made the same diagnosis at his February 1 visit. (Tr. 176, 474; Ex. C-13.) By February 22, she suspected he was suffering from PTSD, and on his March 8 IDR, due to persistent symptoms, she added the PTSD diagnosis to his adjustment disorder with anxiety. (Tr. 474-75; Ex. C-15.) Her office faxed Employee 2's IDRs to ExxonMobil, and she also provided a clinical history and opinion stating her diagnosis. (Tr. 476; Ex. C-14 at 2.)

Regarding the PTSD factors, Ms. Ordonio testified Employee 2 met criterion A because he experienced a traumatic event and witnessed what he thought was the death of his coworkers. (Tr. 477.) She testified he met criterion B, intrusive symptoms, because he had "recurrent involuntary intrusive distressing memories" and "distressing dreams in which the content and/or the effect of the dream are related to the traumatic event." (Tr. 479.) He met criterion C, avoidance, because, among other things, he was avoiding stimuli associated with the event, such as external reminders, people, places, and conversations. (Tr. 479-80.) He met criterion D subfactors 2 (persistent and exaggerated negative beliefs or expectations about oneself, others, or the world), 3 (persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/ or others), 4 (persistent negative emotional state), 5 (markedly diminished interest or participation in significant activities), and 6 (feelings of detachment or estrangement from others). (Tr. 480-83.) He met criterion E, marked alterations in arousal and reactivity associated with the traumatic event, because he had irritable behavior, hypervigilance, exaggerated startle response, problems with concentration, and sleep disturbance. (Tr. 480-81.) Lastly, because the duration of Employee 2's symptoms had been more than a month, had caused him clinically significant distress or impairment, and were not attributable to other substances or conditions, Ms. Ordonio determined he met the remaining DSM-5 criteria for PTSD. (Tr. 481; Ex. R-6 at 3.)

Employee 2 also was seeing his primary care provider, Dr. Cesare Castillo, and his mental health therapist, Rachel Brown. (Tr. 434-35, 496.) Dr. Ceasario completed his residency in 2001 and has been a solo practitioner since 2008. (Tr. 433-34.) Dr. Castillo's Texas medical license permits him to diagnose mental health disorders, such as PTSD. (Tr. 440.) When Employee 2 first

saw Dr. Castillo after the accident, he told Dr. Castillo there had been an explosion at the plant, and he was seeing a therapist who had diagnosed him with PTSD. (Tr. 435.) Employee 2 asked Dr. Castillo for assistance filing a Family Medical Leave Act claim and applying for disability. (Tr. 435.) Employee 2 also completed a PHQ9 questionnaire, which tests for depression and is required by certain insurance plans. (Tr. 438, 456.) Dr. Castillo testified Employee 2 was "in tears, upset with what had happened," and "very anxious, was having issues with sleep, some insomnia." (Tr. 437.) He also was having difficulty focusing and concentrating and had recurrent thoughts of the explosion and did not want to go back to the same job due to the location triggering more anxiety. (Tr. 437-38.) Based upon Dr. Castillo's experience with veterans, Dr. Castillo believed the explosion had triggered these symptoms. (Tr. 438-39.) Dr. Castillo agreed with the PTSD diagnosis, completed and signed an IDR for Employee 2, and started him on medication. (Tr. 435-36, 445-46, 459; Ex. C-15.) He also completed Employee 2's FMLA paperwork and, after several subsequent appointments and consultations with Employee 2's other providers, released him back to work in October 2022. (Tr. 444.)

Ms. Ordonio recommended Employee 2 see Rachel Brown, LCSW, a mental health therapist at Kingwood Counseling Center. (Tr. 494.) Ms. Brown is permitted under Texas law to make mental health diagnoses. (Tr. 494, 502.) She specializes in treating "trauma and trauma-related disorders through . . . EMDR" (eye movement desensitization and reprocessing) "which is a treatment developed to treat trauma symptoms." (Tr. 495.) Ms. Brown testified there are eight phases of EMDR, which fall into three groups: (1) stabilization skills (breathing and calming nervous system); (2) target planning (identifying negative cognition and memories); and (3) moving past negatives through eye movement or tapping. (Tr. 500.) The goal of EMDR, according to Ms. Brown, is to activate the logical part of the brain rather than the emotional part to make the traumatic event become more like another memory than a trauma. (Tr. 500-01.)

During Employee 2's first visit with Ms. Brown, they discussed what he was struggling with and why he was seeking treatment. (Tr. 233, 496, 506-07.) Employee 2, according to Ms. Brown, was a good candidate for EMDR because he was dealing with a single traumatic incident. (Tr. 502.) Employee 2 described to Ms. Brown his symptoms, such as inability to eat and sleep well, inability to work, hypervigilance, state of fearfulness, and avoidance of anything related to work. (Tr. 496-97.) Ms. Brown, who did not use any questionnaires or diagnostics, applied the DSM-5 criteria and found Employee 2 had a "textbook case of PTSD." (Tr. 498-99, 507.) During

their 45-minute visit on March 15, Ms. Brown recorded the diagnosis on an IDR. (Tr. 189, 497-98, 506; Ex. C-16.)

ExxonMobil determined Ms. Ordonio, Ms. Brown, and Dr. Castillo were not qualified under the standard to diagnose recordable mental illnesses. Just as with the qualifications of Dr. Wang, Shannon asked Dr. Zaman and Ms. Timbs to determine whether these providers met the requirements of the standard. (Tr. 620-21.) First, they determined Ms. Ordonio was not one of the enumerated providers and found a LCSW "is sufficiently different" from the enumerated providers. (Tr. 709-10, 758, 826-27.) Although Dr. Zaman did not consider Ms. Ordonio's experience and training, Ms. Timbs testified she focused on adolescent mental health and possibly addiction, not adult mental health. (Tr. 710-11, 826-27, 831.) Similarly, Dr. Castillo was not an enumerated provider under the standard. (Tr. 728-29.) Ms. Timbs testified Dr. Castillo did not have a board certification in psychiatry, a mental health fellowship, or extensive PTSD training, although she did not call him to discuss his training and experience. (Tr. 843.) She was not aware he regularly treats veterans suffering from PTSD. (Tr. 844.) ExxonMobil did not contact Dr. Castillo about his credentials, opinion, or a second opinion. (Tr. 447.) Lastly, neither Dr. Zaman nor Ms. Timbs contacted Ms. Brown, who is also a LCSW, to discuss her training and experience. (Tr. 504-05, 758.)

However, while Employee 2 was seeing Ms. Ordonio, and after she diagnosed him with adjustment disorder and transmitted several IDRs, ExxonMobil "advised [him] that her credentials either aren't suffic[ient] or weren't the right credentials," and "they would need [him] to see someone with either a psychiatrist, a psychologist or psychiatric nurse practitioner" or "[s]ome[one] along those lines." (Tr. 178.) ExxonMobil did not contact Ms. Ordonio about her credentials or diagnosis. (Tr. 486.)

To that end, Employee 2 contacted Dr. Chelsea McCann, who was listed on the EAP portal and accepted his health insurance. (Tr. 179, 238-39, 323.) Dr. McCann is the owner of a practice called Nexus Assessment and Psychological Services. (Tr. 322.) She has an undergraduate degree in psychology and health science, and a master's degree and doctorate in clinical psychology. (Tr. 322.) She took classes on assessing and diagnosing trauma and had training in "inpatient psychiatric hospitals, prisons, juvenile facilities, all of which deal with individuals with trauma needs with a lot of experience assessing and diagnosing and treating trauma." (Tr. 328.) She has been practicing psychology independently since 2020, when she received her license. (Tr. 328,

343.) Before she received her license, she trained at a psychiatric hospital, juvenile facility, prison, and probation office under supervision. (Tr. 343-44.) Prior to opening her practice, she worked for the Harris County Juvenile Probation Department, primarily conducting forensic evaluations. (Tr. 322.) She had seen approximately 400-500 patients independently at the time of trial, and 200-250 patients at the time she examined Employee 2. (Tr. 344, 348.) She has assessed hundreds of patients for neurodevelopmental needs and mental health needs, including trauma, depression, and anxiety. (Tr. 328.)

Employee 2 visited Dr. McCann for the first time in early February 2022 and told her he had been involved in work-related trauma and wanted a PTSD assessment. (Tr. 323, 356.) During the first, hour-long appointment, Dr. McCann conducted a clinical interview, and Employee 2 shared his family, trauma, social, legal, substance abuse, psychiatric, medical, education, and work histories. (Tr. 323-24.) The questions were designed to create a baseline for his functioning prior to the incident. (Tr. 354.) According to Employee 2, during the second appointment, which was two hours long, Dr. McCann conducted personality tests, IQ tests, and asked approximately 700 questions about his symptoms and feelings. (Tr. 180-81.) According to Dr. McCann, she administered psychological assessments, such as "the Personality Assessment Inventory, which is a broad emotional and personality measure" that "[a]ssesses a variety of symptoms, how the person looks at themselves, how their openness to treatment is." (Tr. 324-25.) She also conducted two trauma measures, called the "Detailed Assessment of Post-traumatic Stress (DAPS) and the Trauma Symptom Inventory, 2nd Edition," as well as an assessment for depression. (Tr. 324.) DAPS, according to Dr. McCann is "an objective self-report measure where the client has items in front of him and it's a rating scale going over various post-traumatic stress symptoms." (Tr. 331.) These tests, according to Dr. McCann, had "validity scales" within measures, which "are used to make sure the client is responding consistently throughout testing and not engaged in impression management" and help the provider determine whether the client is putting forth an overly positive or negative impression. (Tr. 333-34.) Employee 2 was average on the scale. (Tr. 335.)

Dr. McCann applied the DSM-TR-5 criteria for PTSD and, based upon her clinical interview and assessments, she diagnosed Employee 2 with PTSD. (Tr. 325-26, 332; Ex. C-14 (Feb. 15 IDR).) She did not diagnose Employee 2 with any other mental health disorders. (Tr. 356.) During the third appointment, which was in March, McCann discussed and handed to Employee 2 the written psychological evaluation results, as well as an evaluation letter. (Tr. 325, 357.) This

nine-page evaluation "include[d] the clinical interview, the assessment measures, any diagnoses that were rendered and treatment recommendations." (Tr. 357.) The letter summarized her interactions with Employee 2, symptoms, treatment with other providers, and his work status. (Ex. C-21; Tr. 329, 359.) She also testified she transmitted the evaluation and letter to ExxonMobil. (Tr. 329, 358-59.) Following Dr. McCann's diagnosis and IDR submission, ExxonMobil asked Employee 2 to see another doctor chosen by the company to receive a second opinion. (Tr. 194.) Employee 2 told ExxonMobil he would not do so because Dr. McCann's diagnosis was, in his view, the second opinion after Ms. Ordonio's diagnosis. (Tr. 194.)

ExxonMobil determined Dr. McCann, as an enumerated provider, was qualified to render a mental illness opinion. (Tr. 620, 715.) The company's business unit, however, initiated an internal review of Dr. McCann's opinion, called a "233 process." (Tr. 628, 716-17.) According to Dr. Zaman, once the medical team receives this request from the business unit, it collects the relevant facts of the case and additional information, such as clinical records, for an outside provider to review. (Tr. 782; Ex. R-3.) After receiving the outside provider's opinion, the medical team then synthesizes the information into a clinical rationale and presents it to "independent" reviewer within the medical team (someone who has not been involved in the case). (Tr. 782, 910.) Lastly, the independent reviewer issues her decision regarding work-relatedness, which is signed by the medical team and returned to the business team. (Tr. 782.)

ExxonMobil, through intermediary Dr. Luke Lee, contacted Dr. Heather Joppich, a psychologist. (Tr. 565, 566-67, 714.) Dr. Zaman, through Dr. Lee, asked Dr. Joppich to review Employee 2's medical records, including IDRs from Ms. Ordonio and a summary of clinical visits, as well as incident information to determine whether Employee 2 suffered from PTSD stemming from the incident.[7] (Tr. 567, 579-80, 589-90, 718-19; Ex. C-22 at 1.) The medical team sent this information to Dr. Joppich on March 22. (Tr. 885-86.) Typically, the employee is also interviewed by the third-party specialist as part of the 233 process but, as noted above, Employee 2 declined to make himself available. (Tr. 632-33.) Dr. Joppich testified she did not understand the incident to be a traumatic event based on materials provided and conversation with Dr. Lee. (Tr. 574-75, 580.) Rather, the event was routine and Employee 2's response was within his training and duties to

---

[7] Dr. Joppich testified she did not receive the IDRs from Dr. McCann and Ms. Brown in the packet from Dr. Lee. (Ex. C-22 at 11, 13; Tr. 570, 585-86, 588-89.) However, according to Dr. Zaman, he "believed" all documentation provided from Employee 2 to ExxonMobil was given to Dr. Joppich. (Tr. 749.)

respond. (Tr. 573-74, 575, 597-98.) According to the summary of the incident provided to Dr. Joppich, "a release and fire occurred at the facility where [Employee 2] works" and his "activities assisting the fire team with isolations is [sic] within his training experience."[8] (Ex.C-22 at 2.) In her March 24, 2022, report, Dr. Joppich noted, "[p]er the employee's business line, the employee has performed these activities 'many times,' " and she concluded there was no evidence Employee 2 has PTSD based upon the DSM-5 criteria. (Ex. C-24 at 1.) In a second report, prepared at the request of Dr. Lee and dated June 20, 2022, Dr. Joppich added the events of that night did "not qualify as a traumatic event," and, in any event, the supporting records she received did not contain evidence of intrusion symptoms. (Ex. R-1 at 1-2; Tr. 593.) A 233 report was prepared based upon Dr. Joppich's opinion. (Tr. 768-69, 775-76, 908; Exs. R-2, R-3.)

Dr. Susan Craig was ExxonMobil's Assistant Regional Occupational Health Manager for Mexico and the U.S. and a 233 reviewer for the Americas in March 2022. (Tr. 842, 901.) Dr. Zaman requested Dr. Craig's review of the medical team's 233 work-relatedness report and sent a packet with business and medical information, including IDRs, diagnoses, and clinical notes to her. (Tr. 903-04.) Dr. Craig reviewed the 233 report and supporting documentation for Employee 2, but she did not review Dr. Joppich's March 24 opinion. (Tr. 905-06; Ex. C-24.) Instead, she reviewed a summary of the opinion's findings compiled by the medical team and agreed with Dr. Joppich's opinion. (Tr. 906.) Based on the summary of Dr. Joppich's opinion, timeline of events, nature of Employee 2's involvement, and medical rationale provided by Dr. Zaman, she determined Employee 2 did not have a work-related mental illness. (Exs. R-2 at 2, R-3 at 2-5; Tr. 908-09, 911.) On April 5, Ms. Timbs completed and signed the final 233 paperwork, noting Dr. Craig's determination, and sent it back to the business team. (Ex. R-2 at 1; Tr. 892.)

Employee 2 eventually returned to work in the same position. (Tr. 195.)

*Employee 3*

Employee 3 joined ExxonMobil as a process technician operator in 2015 and has since held that position. (Tr. 251-52.) He was working the night before the explosion during the first, incipient fire, which he helped put out with steam lances and steam hoses. (Tr. 253.) Rather than shut down the HDU, ExxonMobil employees stabilized it and maintained it until the contractors could torque

---

[8] According to Dr. Zaman, Employee 2 "did not share much about what happened during the incident nor that much about the symptoms that he was experiencing." (Tr. 715.) He also testified, "there were still gaps in our knowledge about what happened." (Tr. 716.) Based upon this limited information, Dr. Zaman testified, "I think we accurately conveyed the information that was voluntarily given to us and that we had available." (Tr. 748-49.)

or tighten the loose bolts causing the release and small fire. (Tr. 254.) The following evening, Employee 3 was driving Employee 2 and samples to the laboratory for testing when "the whole sky lit up." (Tr. 255.) Employee 3 turned around and saw flames from the HDU. (Tr. 255.) He could not figure out how to approach the unit, so he drove around it to the control center. (Tr. 255-56.) Employee 3 called over the radio to shut down the HDU, while Employee 1 was screaming over the radio to send paramedics. (Tr. 256.) Employee 3 did not see the injured contractors. (Tr. 294.) Employee 3 testified after he turned the truck around and returned to near the blast site, he felt as though he was "having a panic attack, anxiety attack" and "had been dealing with some issues prior to this and it definitely triggered a response." (Tr. 258.) He testified he wanted to help but he "knew [he] wouldn't be able to go in [the HDU wearing] fire equipment" so he took "care of the cooling tower." (Tr. 258.) The sound, according to Employee 3, "was intense," and "100-foot flames [were] roaring out of the equipment." (Tr. 258.)

While the order of the events is unclear, Employee 3 testified to the following actions once he reached the control center: Employee 2 exited the truck, and Employee 3 drove to the wooden cooling tower, which was already on fire. (Tr. 256.) Employee 3 turned on fire monitors, which shot water onto the tower. (Tr. 256-57.) On the other side of the tower were two flare drums, which hold excess produced gas and, at certain pressure, release the gas through flares. (Tr. 257, 290.) After Employee 2 retrieved his gloves and tools from the control center, Employee 3 testified he either drove Employee 2 to or met him at one of the drums. (Tr. 289.) The employees had been asked to pump down the excess gas on one of the drums, so Employee 2 started the pump. (Tr. 289-90.) Employee 3 was concerned the smoke and sparks would overheat and blow up the flare drum, so he directed another fire monitor at the flare drum to keep it cool. (Tr. 257.)

Although the valves needed to be manually closed, Employee 3 was unable to bring himself to do so. (Tr. 259.) However, Employee 2, as noted above, went back into the HDU to help close the valves. (Tr. 259, 290.) Over the radio, he learned Employee 2 and others were at the south pipe rack trying to isolate valves. (Tr. 262.) Employee 3 was then instructed to start the pumps for the spare cooling tower fan on the south side of the HDU. (Tr. 290.) Pumps pull water out of the basin of the cooling tower and circulate it up through a manifold to the top of the cooling tower. (Tr. 291.) Fans cool the water, which rains down over the tower as air draws across it. (Tr. 291.) After he started the cooling tower pumps, Employee 3 went to the fire monitor, which was directed at the cooling tower and then to check on the fire monitor directed at the flare drum. (Tr. 291-92.) He

went between the monitors to adjust their positions, but "it didn't matter in the end" and the cooling tower eventually collapsed. (Tr. 292-93, 308.) Eventually he gave up and returned to the control center. (Tr. 262.) Around 3:00 A.M., Employee 3's supervisor met him there and told him to go home. (Tr. 263.)

Employee 3 testified he was out of work and could not "function" after the incident. (Tr. 260.) "Whatever progress I had made in my previous medical condition was more than gone and I spent most days on the couch just shaking," he said. (Tr. 260.) He was out of work about six months. (Tr. 263.) During the first two months, he was unable to fall and stay asleep, could not stop thinking about the explosion, and felt stress about not going to work, caring for his children, and feared losing his recently purchased house. (Tr. 310-11.)

Employee 3 also suffered from pre-existing health conditions, and, in 2018, he was hospitalized for low sodium. (Tr. 268, 296.) This is caused by a condition called diabetes insipidus, which means his body does not create the anti-diuretic hormone. (Tr. 296.) He takes an artificial diuretic hormone to treat it. (Tr. 297.) He also suffered from low potassium incidents, which were triggered by stress and caused his muscles to seize up. (Tr. 268, 297.) Prior to the incident, he was experiencing anxiety-related symptoms because of the low potassium diagnosis. (Tr. 297.) He visited an emergency room numerous times leading up to the incident and after the incident for treatment for his potassium deficiency. (Tr. 268, 300.) Although he missed three months of work, from August through October 2021, due to the potassium deficiency, he did not miss any time due to his anxiety. (Tr. 297-98.)

Following the incident, Employee 3 tried to find a psychiatrist to help him with his anxiety and determine which medications he could take with his pre-existing conditions. (Tr. 266-67.) Eventually, he found a mental health practice and had a series of virtual appointments. (Tr. 264-65.) Steven Kim, a physician's assistant (PA), originally treated and diagnosed Employee 3 with PTSD in mid-January 2022. (Tr. 399-400, 409-10, 415.) Due to insurance issues, the practice transferred Employee 3 to Nikita Engineer, also a PA, who first saw Employee 3 on February 1. (Tr. 266-67, 399, 409; Ex. C-18.) Ms. Engineer has been working at Texas Behavioral Health since 2019, when she obtained her master's degree in PA studies with a concentration in psychiatry. (Tr. 397-98, 403.) Her Texas Physician Assistant Board and National Commission on Certifying Physician Assistants licensures allow her to diagnose PTSD. (Tr. 402-03.)

During their initial appointment, a telemedicine visit lasting nearly two hours, Employee 3

and Ms. Engineer discussed the explosion and how it affected him. (Tr. 304-05.) Employee 3 complained of a depressed mood and had residual anxiety, hypervigilance, flashbacks, and sleep disturbance, according to Ms. Engineer. (Tr. 400, 414.) She also testified Employee 3 said he would get irritable easily and was not able to feel happy. (Tr. 401, 414.) He told Ms. Engineer he felt anxious driving by the refinery and would be hesitant to go to dinner with co-workers because doing so would remind him of the explosion. (Tr. 401.) He also suffered sleep disturbances, such as nightmares and trouble falling and staying asleep. (Tr. 401-02, 414.) According to Ms. Engineer, Employee 3 "attributed the symptoms to the explosion at the refinery so we went with that," and he "said his symptoms had either started or worsened after the explosion." (Tr. 402.)

Ms. Engineer testified she considered this a follow up appointment, which generally lasts 25 minutes. (Tr. 401, 412, 416.) Ms. Engineer testified she worked with him to adjust his medication at the first appointment. (Tr, 399-400, 413.) She did not do a complete evaluation or re-evaluation of Employee 3 for PTSD or review the criteria with Employee 3 during the visit. (Tr. 417.) Rather, she went through the PTSD criteria in her head and in documentation while treating him. (Tr. 417-18.) She did not want him to rehash the explosion and have more flashbacks— precisely what she was trying to avoid. (Tr. 418-19.) According to Ms. Engineer, among other things, Employee 3 was exposed to the explosion, which is a traumatic event; he experienced flashbacks and nightmares, which are intrusive symptoms; he did not want to go to dinner with coworkers or back to work, which are avoidance of stimuli associated with the event; he was in a depressed mood, had persistent anxiety, and irritability, which are negative alterations; and he had clinically significant arousal symptoms, such as hypervigilance something bad was going to happen, anxiety when he entered work, and irritability. (Tr. 420-22.) Ms. Engineer testified she agreed with Mr. Kim's diagnosis based upon her review of Employee 3's records and her interactions with him and continued to treat Employee 3 for PTSD. (Tr. 402.) Mr. Kim had also diagnosed Employee 3 with Generalized Anxiety Disorder (GAD).[9] (Ex. C-14; Tr. 411.) GAD is not related to a particular situation; it is excessive worry and uncontrollable nervousness that inhibits functionality on an almost daily basis. (Tr. 411.) Although Ms. Engineer was unsure whether the incident caused Employee 3's GAD, she believed it was at least "exacerbated after the incident." (Tr. 412.) Ms. Engineer was unaware whether Employee 3 suffered anxiety issues prior

[9] Employee 3 testified Ms. Engineer originally diagnosed him with GAD. (Tr. 305.)

to the explosion. (Tr. 415.)

Ms. Engineer's medical assistant completed an IDR stating the diagnosis, which the practice then faxed to ExxonMobil. (Ex. C-18; Tr. 265, 398-99, 406.) Employee 3 met with Ms. Engineer several times, and she continued to fill out IDRs and evaluate whether he was ready to return to work. (Tr. 406, 410.) Ms. Engineer was aware of Employee 3's diabetes insipidus diagnosis and that it may have mental health implications due to dehydration and other medications prescribed to treat it. (Tr. 425-26.) According to Ms. Engineer, Employee 3 was anxious about hyponatremic episodes that had landed him in the hospital. (Tr. 425-26.) And this anxiety ratcheted up to another level after the explosion. (Tr. 426.) ExxonMobil did not contact Ms. Engineer about her diagnosis and credentials. (Tr. 405.)

During this period, Employee 3 also was talking to a therapist, who could not fill out an IDR, according to Employee 3, because she was not a doctor. (Tr. 270, 306, 406.) Eventually he saw a psychiatrist, Dr. Tarique Kowaja, who is his current doctor. (Tr. 268.) Dr. Kowaja did not testify, and there is no IDR signed by Dr. Kowaja in the record. In the months following the incident, Employee 3 also saw an endocrinologist, neurologist, kidney doctors, his PCP, and visited the ER several times for exhaustion, muscle contractions, a pounding heart, and low potassium. (Tr. 268-69.) Eventually, a "whole health" medical doctor, Dr. Wells, recommended a brain therapy called CERESET, which reprograms how the brain responds to stress. (Tr. 269-70, 300-02.) He also began taking Lexapro medication. (Tr. 268, 270.) Together, this therapy and medication allowed him to get through his health challenges and return to work after six months in June 2022. (Tr. 270, 301-02.)

ExxonMobil declined to record Employee 3's PTSD and GAD diagnoses. (Tr. 824.) Michael Shannon requested the assistance of Dr. Zaman and Ms. Timbs to determine whether Employee 3 suffered a recordable mental illness. (Tr. 610-11.) Upon receiving Ms. Engineer's IDR for Employee 3, Dr. Zaman and Ms. Timbs examined and assessed her qualifications to determine whether they were equivalent to a psychiatric nurse practitioner. (Tr. 700-01, 821.) Dr. Zaman testified they did so because PAs can similarly obtain a formal certificate in psychiatry. (Tr. 701-02.) Dr. Zaman and Ms. Timbs found Ms. Engineer did not have this qualification and it was therefore unnecessary to assess her training and experience diagnosing mental health disorders. (Tr. 703, 757, 821.) Dr. Zaman further testified he did not call Ms. Engineer to discuss her training and experience because there was no way of determining how much training and experience was

acceptable. (Tr. 730, 757.) Because ExxonMobil found Ms. Engineer did not have requisite qualifications under the standard, it determined Employee 3's illness was not work-related and declined to record her diagnoses for Employee 3. (Tr. 824.)

## ANALYSIS

To establish a violation of the Act and standards thereunder, "the Secretary must show by a preponderance of the evidence that (1) the cited standard applies, (2) there was a failure to comply with the cited standard, (3) employees had access to the violative condition, and (4) the cited employer either knew or could have known of the condition with the exercise of reasonable diligence." *Astra Pharm. Prods.*, 9 BNA OSHC 2126, at *4 (No. 78-6247, 1981), *aff'd in pertinent part*, 681 F.2d 69 (lst Cir. 1982). ExxonMobil argues it did not violate the recordkeeping standard.[10] The company also argues it did not have actual or constructive knowledge of the violative condition. Specifically, the company contends Employees 1 and 3 did not receive mental illness diagnoses from a physician or other licensed health care professional with the appropriate training and experience, and, in any event, these diagnoses were not for work-related mental illnesses. It also contends Employee 2's PTSD diagnosis was not recordable although he was diagnosed by an enumerated provider. Further, materials available to the company did not support his PTSD diagnosis. For the following reasons, the Court affirms the alleged violation as to Employee 2 (instance b) and vacates the alleged violations related to Employee 1's and 3's diagnoses (instances a and c).

### Compliance with the Standard

The fundamental dispute in this case is whether all the healthcare professionals, except one, who diagnosed the Employees with PTSD were qualified under the standard to do so. At the outset, the Court finds mental health diagnoses and opinions provided by psychiatrists, psychologists, and psychiatric nurse practitioners, who are the standard's enumerated practitioners, are recordable under the plain language of § 1904.5(b)(2)(ix). The Court, however, must also consider the "etc." after the enumerated professionals and determine what constitutes "appropriate training and experience" for "a physician or other licensed health care professional," such that their opinion stating the employee has a work-related mental illness is recordable. The Secretary would have the

---

[10] The parties do no dispute whether § 1904.29(a), § 1904.29(b)(3), and § 1904.5(b)(2)(ix) apply to this matter. Joint Pre-Hr'g Statement ¶E. The Court also finds the Occupational Injury and Illness Recording and Reporting Requirements, as promulgated on January 19, 2001, at 66 Federal Register 5916, apply to the cited condition, which is ExxonMobil's decision not to record mental illness diagnoses.

Court adopt a broad reading of this language, whereas ExxonMobil asks the Court to narrowly construe it.

The Secretary notes Subpart G of Part 1904 defines a physician or other health care professional as "an individual whose legally permitted scope of practice (i.e., license, registration, or certification) allows him or her to independently perform, or be delegated the responsibility to perform, the activities described by this regulation." 29 C.F.R. § 1904.46. The Secretary contends an OSHA letter of interpretation "clarifies" that " '[a]lthough Part 1904 does not specify what medical specialty or training is necessary, the definition of health care professional is intended to ensure that those professionals performing diagnoses, providing treatment and providing input for employer determinations about the recordability of certain cases are operating within the scope of their license, as defined by the appropriate state licensing agency.' " (Sec'y Br. at 24 (quoting OSHA Letter of Interpretation, Aug. 29, 2007, *Clarification of 1910.95 and 1904 regarding physicians' and audiologists' roles in determining work-relatedness of worker hearing loss*, https://www.osha.gov/laws-regs/standardinterpretations/2007-08-29).) The interpretation letter, according to the Secretary, establishes "healthcare professionals operating within the scope of their licensures," such as the ones who diagnosed the ExxonMobil employees with PTSD, "can provide input as to work-relatedness determinations." (Sec'y Br. at 24.) The Secretary asserts ExxonMobil's unsupported position would limit the number of licensed healthcare professionals qualified to make mental health diagnoses under the standard. (Sec'y Br. at 25.)

ExxonMobil contends physicians and licensed healthcare professionals diagnosing mental illnesses must have training and experience "equivalent" to that possessed by the enumerated professionals in order to provide a work-relatedness opinion of that mental illness under § 1904.5(b)(2)(ix). (Resp't Br. at 10-11.) Because the "etc." in the standard is undefined by OSHA, ExxonMobil asserts the Court must interpret it with reference to the dictionary, which states " 'it means others especially of the same kind.' " (Resp't Br. at 11 (quoting *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/etcetera).) To support its position, ExxonMobil also quotes a U.S. Court of Appeals for the Fifth Circuit case, noting " 'universally accepted English usages and meanings [of the term] are and others, and other things, and others of like kind or character' ", and therefore " 'etc. is not open-ended or unlimited in reach; it is limited by the specific examples in the list that it modifies.' " (Resp't Br. at 11 (quoting *Safeco Ins. Co. of Am. v. Rehab Specialists*, No. 93-2327, 1994 WL 144778, at *6 (5th

Cir. Apr. 7, 1994) (unpublished) (internal quotations omitted), *cert. denied*, 115 S. Ct. 319 (1994)).)
ExxonMobil also contends the preamble discussion shows OSHA intended to "ease the burden on
employers, and the standard does this by carefully limiting the categories of health care
professionals whose opinions may satisfy the exception to the provision that mental illnesses are
generally not work-related." (Resp't Br. at 12-13.) Applying the Secretary's interpretation of
"appropriate training and experience" to the non-enumerated providers in this case would,
according to ExxonMobil, "render[] the mental illness exception essentially meaningless." (Resp't
Br. at 15.) Furthermore, ExxonMobil's medical team made much at trial that it was looking for
qualifications in the form of a certification or specialization in mental health when it evaluated the
non-enumerated providers. (Tr. 684-85, 693-94, 701-03, 728, 755, 802-03, 806.)

The Court declines to apply either of these interpretations of the standard. " 'When
determining the meaning of a standard, the Commission first looks to its text and structure,' "and
" ' [i]f the wording is unambiguous, the plain language of the standard will govern, even if the
Secretary posits a different interpretation.' " *Roy Rock, LLC*, No. 18-0068, 2021 WL 3624785, at
*2 (OSHRC, July 20, 2021) (quoting *JESCO, Inc.*, 24 BNA OSHC 1076, 1078 (No. 10-0265,
2013)). As the Secretary notes, Subpart G of Part 1904 defines a "physician or other licensed health
care professional" as "an individual whose legally permitted scope of practice (i.e., license,
registration, or certification) allows him or her to independently perform, or be delegated the
responsibility to perform, the activities described by this regulation." 29 C.F.R. § 1904.46. But §
1904.5(b)(2)(ix) puts more rigorous requirements on physicians and licensed health care
professionals than the Part 1904 definition. If there is a conflict between a general provision—
here, the definition—and a specific provision—the mental illness provision—the specific
provision prevails. *See Nitro-Lift Techs., LLC v. Howard*, 568 U.S. 17, 21 (2012) ("[T]he ancient
interpretive principle that the specific governs the general (*generalia specialibus non derogant*)
applies only to conflict between laws of equivalent dignity."). Under the plain language of §
1904.5(b)(2)(ix), licensure alone is not enough; in addition to being legally permitted to diagnose
mental illnesses, a physician or licensed health care professional must also have *appropriate
training and experience* doing so.

Although scant, the preamble to the final rule provides the rationale: due to "the difficulty
of detecting, diagnosing and verifying mental illnesses," the standard "requires employers to
record only those mental illnesses verified by a health care professional with appropriate training

and experience in the treatment of mental illness, such as a psychiatrist, psychologist, or psychiatric nurse practitioner." Preamble, 66 Fed. Reg. 5916, 5953 (Jan. 19, 2001). Moreover, had OSHA intended licensure to be the controlling requirement, it could have written the standard that way, without the "appropriate training and experience" language. *See Lumex Med. Prods., Inc.*, 18 BNA OSHC 2002, at *3 (No. 97-1522, 1999) (finding "[w]here the drafter of language uses a particular term in one place but omits that term in another place, it is assumed that the drafter acted intentionally" and this "principle applies to . . . regulatory language"). Therefore, the Court focuses on the appropriateness of a diagnosing provider's training and experience rather than whether their medical license allows them to diagnose mental illness.[11]

ExxonMobil's argument a provider must have "equivalent" training and experience to the enumerated providers is similarly misplaced. To interpret the standard this way would effectively write the "etc." providers out of the standard, which the Court declines to do. *See Unarco Com. Prods.*, 16 BNA OSHC 1499, at *4 (No. 89-1555, 1993) ("It is well established that . . . a standard must be construed so as to avoid an absurd result."). ExxonMobil also suggests the non-enumerated providers must have a specialization or certification in mental illness diagnosis and/or treatment. But the relevant texts do not support this argument; neither the standard nor the preamble states a provider must have a certification or specialization, although the Court finds a certification or specialization from a certifying organization, along with appropriate training, would satisfy the standard's requirements.

Due to the inclusion of "appropriate" and "etc." in the standard, the Court cannot adopt a bright-line test. Rather, it must assess the appropriateness of the providers' training and experience with reference to the enumerated providers. Appropriate is an adjective defined as "especially suitable or compatible." Merriam-Webster Dictionary, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/appropriate (last visited Oct. 3, 2024); *see Roy Rock*, 2021 WL 3624785, at *2 ("undefined term's meaning can be determined by consulting a contemporaneous dictionary"). To determine whether their training and experience is appropriate, the Court examines whether the non-enumerated providers have "especially suitable" training and

---

[11] ExxonMobil raises two fair notice arguments. In its first argument, ExxonMobil contends the Court should vacate the Citation "because OSHA failed to provide fair notice to employers of its interpretation that licensure alone is sufficient for a health care practitioner to be qualified to render the opinion on work-related mental illness required by the standard." (Resp't Br. at 30.) As discussed above, the Court has rejected the Secretary's interpretation because it is contrary to the plain language of the standard. Therefore, the Court need not address fair notice in this context to issue its decision.

experience, as well as whether their training and experience is "compatible" with the enumerated providers. Again, their training and experience need not be the same as the enumerated providers. Because the enumerated providers' practices focus on treating and diagnosis mental illness, the Court looks for a similar immersion in the non-enumerated providers' training and experience with mental illness to determine whether they are appropriate under the standard.

*Employee 1 and Jason Wang, M.D.*

The Secretary argues Dr. Wang is qualified to diagnose PTSD and has adequate training and experience under the standard. (Sec'y Br. at 8.) Not only does under his Texas medical license permit him to diagnose the condition, according to the Secretary, but he also "has clinical experience diagnosing PTSD in other patients" and "extensive training in the psychiatry department during his family medicine residency." (Sec'y Br. at 8 (citing Tr. 374-75).) ExxonMobil contends Dr. Wang is not an enumerated provider, and he does not have special training, qualifications, and experience diagnosing mental health illnesses. (Resp't Br. at 5, 21.)

Although Dr. Wang's Texas medical license permits him to diagnose PTSD, the Court finds his training and experience are not appropriate under the standard. (Tr. 374.) During his three-year family medicine residency, Dr. Wang completed a single month rotation in psychiatry. (Tr. 378-79.) In his family medicine practice, he diagnoses at least a dozen patients with PTSD each year, so long as they have suffered a traumatic event and meet the diagnostic criteria. (Tr. 380-81.) This experience is not compatible with the enumerated providers' training and experience. Further, Dr. Wang's single month rotation in psychiatry during his residency was but a small part of his overall training. Similarly, the twelve PTSD cases he diagnoses represent less than 1 percent of the approximately 2,000 patients he sees each year. (Tr. 380.) That is not to say he does not see more patients presenting PTSD symptoms and does not apply the diagnostic criteria several more times each year during his practice of family medicine. However, these patients represent a small fraction of his practice. Just as the training in his residency was limited, his mental health practice is similarly limited to few patients.

This finding is reinforced by an error in Dr. Wang's original PTSD diagnoses for Employee 1, which he made on January 12, approximately three weeks after the incident. (Ex. C-8 at 1.) The DSM-5-TR manual requires, however, a finding the "[d]uration of the disturbance (Criteria B, C, D, and E) is more than 1 month." (Ex. R-6 at 2, criterion F.) Several providers, including Dr. McCann, Ms. Ordonio, and ExxonMobil's expert, Dr. Joel Etherton, testified to the requirement

the symptoms or disturbance be present for more than a month before a PTSD diagnosis. (Tr. 349, 474, 1132.) Dr. Wang plainly made the PTSD diagnosis too early in his treatment of Employee 1. For these reasons, the Court finds Dr. Wang was not a physician "with appropriate training and experience" under § 1904.5(b)(2)(ix).[12]

*Employee 2 Providers and Analyses*

*Dr. Chelsea McCann's Opinion*

ExxonMobil disputes Employee 2's PTSD diagnosis on two grounds, which appear to overlap. First, the company contends he did not suffer a work-related illness or traumatic event. (Resp't Br. at 28-29.) And second, it contends his PTSD diagnosis did not meet the DSM-5-TR criteria. (Resp't Br. at 29.) According to ExxonMobil, it treated Employee 2's case differently from the others because Dr. McCann, a psychologist, was an enumerated provider. (Resp't Br. at 21-22.) As set forth above, ExxonMobil, through an intermediary, engaged Dr. Joppich to review certain materials and provide a written opinion. In her first opinion, Dr. Joppich concluded "there was insufficient evidence based on those records that were given to me to establish a diagnosis of PTSD per the DSM-5." (Tr. 568; Ex. C-24 at 1). In her second opinion, she again found Employee 2 did not meet the criteria for a PTSD diagnoses. (Ex. R-1; Tr. 594). Following Dr. Joppich's first opinion, Dr. Susan Craig from ExxonMobil agreed it was more likely than not Employee 2's mental illness was not work-related, and ExxonMobil declined to record the diagnosis. (Tr. 906, 915.)

The Secretary contends the "Employees' mental illness diagnoses became recordable the moment Exxon received the voluntarily provided IDRs." (Sec'y Br. at 26.) To support her position, the Secretary relies upon an OSHA Letter of Interpretation from April 3, 2007. (Sec'y Br. at 22 (citing OSHA Letter of Interpretation, April 3, 2007, *Recording an injury when employer is provided with different medical opinions*, https://www.osha.gov/laws-regs/standardinterpretations/2007-04-03-0).) It states "an employer may use the opinion of a contemporaneous second provider if the employer believes the second opinion is more authoritative. However, once the employee was given 'Days away from work' by the treating physician, this becomes a recordable injury." Letter of Interpretation, April 3, 2007. Here, the IDRs

---

[12] Whether Employee 1 missed workdays or Dr. Wang prescribed medication to him is irrelevant here. The Secretary failed to prove Dr. Wang had appropriate training and experience under § 1904.5(b)(2)(ix). Therefore, the Court cannot find Employee 1 suffered a recordable injury or illness under § 1904.29(b)(3).

showed the Employees were diagnosed with mental illnesses resulting from a work-related event, took days off from work, and were being treated for mental illness, according to the Secretary. (Sec'y Br. at 26.) Yet, the Secretary contends, "Exxon provided no contemporaneous medical opinions that overruled the medical diagnoses of the treating physicians." (Sec'y Br. at 26.) Instead of reporting the mental illnesses when they received the IDRs, "Exxon began its process of second-guessing the medical professionals' diagnoses," the Secretary asserts. (Sec'y Br. at 26.)

ExxonMobil contends the Secretary failed to provide fair notice of any restrictions or requirements for a second opinion sought under § 1904.5(b)(2)(ix). (Resp't Br. at 32.) According to ExxonMobil, the preamble establishes an "employer's right" to a second opinion: " 'In the event that the employer does not believe the reported mental illness is work-related, the employer may refer the case to a physician or other licensed health care professional for a second opinion.' " (Resp't Br. at 32 (quoting 66 Fed. Reg. at 5953).) ExxonMobil asserts neither the preamble nor any other publicly available guidance mandates a process, specific timing, or form required for a second opinion sought under § 1904.5(b)(2)(ix). (Resp't Br. at 33.) In the absence of this information, ExxonMobil claims it acted reasonably in seeking a second opinion of Employee 2's PTSD diagnosis. (Resp't Br. 32-34.)

The Court finds ExxonMobil did not lack fair notice of the standard's requirements. Although neither § 1904.5(b)(2)(ix) nor the preamble explicitly limit an employer's right to obtain a second opinion, the recordkeeping standard is not so broad or open-ended as to allow unlimited second-opinions or those well after the initial diagnosis. Under the general recording criteria in Subpart C, an employer must record a work-related injury or illness if it results in days away from work. 29 C.F.R. § 1904.7(a); 29 C.F.R. § 1904.7(b)(1)(ii). OSHA has communicated in letters of interpretation and other guidance documents to employers they must record work-related injuries unless a contemporaneous second opinion determines otherwise. Although these letters and guidance do not have the force and effect of law, they show the Secretary's positions regarding recording illnesses and second opinions have been clear and consistent. *Cf. Latite Roofing & Sheet Metal Co.*, 21 BNA OSHC 1282, at *3 (No. 02-0656, 2005) (holding interpretation memo, along with other representations by Secretary during inspections, citations, and settlement discussions, led to confusion and deprived employer of fair notice).

The April 3, 2007, letter specifically references § 1904.5 in its response and states "an employer must consider an injury or illness to be work-related if an event or exposure in the work

environment either caused or contributed to the resulting condition . . . ." Letter of Interpretation, April 3, 2007. It also mentions the presumption of work-relatedness does not necessarily apply to the illnesses in the § 1904.5(b)(2) exceptions but does not carve out an exception or separate timeline for them. *Id.* Instead, it states that "[w]hen making an injury or illness recordkeeping decision, an employer may use the opinion of a contemporaneous second provider if the employer believes the second opinion is more authoritative."[13] *Id.*

The Secretary does not cite two other OSHA interpretation letters which provide a nuanced view of "contemporaneous," but they are easily available and helpful. A May 15, 2007, letter acknowledges "[n]either the Part 1904 regulation, nor the preamble to the 2001 Part 1904 final rule, provides an exact definition of 'contemporaneous.' " OSHA Letter of Interpretation, May 15, 2007, *Clarification of the term "contemporaneous" as used in recordkeeping FAQ 7-10a*, https://www.osha.gov/laws-regs/standardinterpretations/2007-05-15. "[F]or two or more conflicting recommendations to be considered contemporaneous," according to this OSHA letter, "they must be conducted within a time frame so that an injury or illness can be evaluated when the signs or symptoms are in the same stage of development, same degree of severity, and this can be viewed in a similar context for analysis." *Id.* The specific circumstances of an individual case, such as the type and severity of the illness, determine whether medical opinions are contemporaneous. *Id.* To determine whether providers are examining an illness in the same condition, the employer "might consider" several factors, including whether the examination of the employee is in person; when the examinations occur; whether there were additional events or exposures between the examinations; and whether medical treatment or days away from work occurred between the examinations. OSHA Letter of Interpretation, February 25, 2011, *Clarification of the terms most*

---

[13] The letter references two other sources. First, it cites to Question 7-10a, which provides guidance to employers considering whether the second opinion is more authoritative. It states an "employer can decline to record the case based on a contemporaneous second provider's opinion that the recommended medical treatment, days away from work or work restriction are unnecessary, if the employer believes the second opinion is more authoritative," but only if "medical treatment is not actually provided and no days away from work or days of work restriction have occurred." OSHA, *Detailed Guidance for OSHA's Injury and Illness Recordkeeping Rule*, Question 7-10a, https://www.osha.gov/recordkeeping/entry-faq#q7-10a (last visited Oct. 7, 2024). Similarly, the March 19, 2003, interpretation letter cited by the Secretary informs employers the keys to recordability are a work-related injury and missed days of work, not the ultimate diagnosis. OSHA Letter of Interpretation, March 19, 2003, *Results of an MRI do not negate the recordability of a physician's recommendation*, https://www.osha.gov/laws-regs/standardinterpretations/2003-03-19. In that letter, an employer stated an employee injured his knee, and his physician told him not to return to work until he underwent an MRI. *Id.* Although the MRI showed he did not have an injury, OSHA told the employer "the case met the criteria in section 1904.7 at the time of recording because the employee had sustained a work-related injury—a bruised knee involving one or more days away from work." *Id.* Despite the subsequent MRI results, the employer could not delete the entry. *Id.*

*authoritative and pre-existing conditions as used for recordkeeping purposes*, https://www.osha.gov/laws-regs/standardinterpretations/2011-02-25. However, "once medical treatment is provided to an employee, the case must be recorded, and regardless of when it is made the employer may not consider a subsequent conflicting recommendation." Letter of Interpretation, May 15, 2007. Therefore, OSHA's interpretation is limited to its own guidance; once an employee with a diagnosis under the standard misses workdays and has begun treatment, the employer has a duty to record the illness unless it has an authoritative second opinion to the contrary.

Here, ExxonMobil did not seek or receive an authoritative, contemporaneous second opinion for Employee 2's PTSD diagnosis. First, as Dr. Joppich testified, she conducted a document review instead of a clinical review of Employee 2's diagnosis. (Tr. 575.) She "would consider a second opinion to be someone who has actually met with the patient" and "would not consider a record review to be a sufficient second opinion." (Tr. 577.) Further, Dr. Zaman recognized this did not constitute a second opinion but rather "a review of our records with respect to the case of" Employee 2. (Ex. C-22 at 1.) These descriptions of Dr. Joppich's role fall short of the considerations for a second opinion set forth in OSHA's February 25 interpretation letter. An employer may consider, among other things, when determining whether the provider is examining the same condition, "whether the examination of the injured or ill employee is in person (i.e., review of documents only is generally not a substitute for a physical examination) . . . ." Letter of Interpretation, February 25, 2011. Therefore, the Court finds Dr. Joppich conducted a record review for Employee 2 and did not offer an authoritative second opinion.[14]

Second, Dr. Joppich's review or so-called opinion was not contemporaneous, because Employee 2's care had transitioned from the diagnosing phase to the treatment phase. Dr. Joppich conducted a clinical review between March 22, 2022, the date on the ExxonMobil packet she

---

[14] ExxonMobil states Employee 2 "refused" to "see another health qualified licensed health care provider" after it received Dr. McCann's IDR. (Resp't Br. at 6 (citing Tr. 833-35).) Therefore, it "sought a second opinion based upon a review of Employee 2's medical records." (Resp't Br. at 6 (citing Tr. 714).) ExxonMobil contends the Court should evaluate Dr. McCann's opinion and its decision not to record Employee 2's diagnosis through its lens—with the information available to the company at that time and in the context of Employee 2's decision not to see another psychologist of its choosing. (Resp't Br. at 10, 17-18.) Employee 2 testified ExxonMobil "told [him] after getting several of these IDR reports from the licensed clinical social worker, [he] was advised that her credentials either aren't suffic[ient] or weren't the right credentials." (Tr. 178.) Because ExxonMobil wanted him to see a psychiatrist, psychologist, or psychiatric nurse practitioner, he found Dr. McCann. (Tr. 178-79.) After he submitted an IDR from Dr. McCann, ExxonMobil then asked him to see another "doctor of their choice." (Tr. 194.) In his view, Dr. McCann's opinion was the second opinion. (Tr. 194.) The Court notes both positions, but neither one bears on its analysis.

received from Dr. Lee, and March 24, the date she issued her first written opinion.[15] (Exs. C-22, C-24.) However, the record establishes she would not have examined Employee 2 in the same condition as he was examined by Ms. Ordonio or Dr. McCann, because Ms. Brown had begun treating him for his PTSD symptoms. In other words, even if she had conducted a clinical interview during this time, she could not have issued a contemporaneous opinion. Around February 22, Ms. Ordonio told Employee 2 she would be referring him to Ms. Brown for EMDR treatment of his PTSD symptoms. (Tr. 474-75.) Two days later, Ms. Ordonio wrote in a letter that Employee 2 was suffering from PTSD, and she confirmed this diagnosis in an ExxonMobil IDR dated March 8. (Tr. 475-76; Exs. C-14 at 2, C-15.) Dr. McCann met with Employee 2 twice in February 2022, and she diagnosed his PTSD during the second visit. (Tr. 323-25.) Dr. McCann noted the diagnosis on an IDR signed March 8 and a letter. (Exs. C-14, C-21.) Ms. Brown began treating Employee 2 on March 15. (Ex. C-16.) Ms. Brown testified Employee 2 told her at their initial meeting "why he was seeking treatment, what he was struggling with" and she explained "how we might use EMDR to try to help him." (Tr. 496.) According to a March 16 entry in ExxonMobil's clinic visit history for Employee 2, he "report[ed] he is receiving a new treatment (EMDR, eye movement desensitization and reprocessing) from another therapist that was recommended by his counselor." (Ex. C-17 at 5.) Therefore, the Court finds Employee 2 was already receiving treatment for his PTSD at the time of Dr. Joppich's review. Because Dr. Joppich neither examined Employee 2 and provided an authoritative contemporaneous second opinion nor has first-hand knowledge of the incident and Employee 2's involvement in the response, the Court rejects her so-called second opinion regarding Employee 2's PTSD diagnosis. Even if the Court were to entertain ExxonMobil's argument Employee 2's mental illness diagnosis was incorrect, it still finds, for the following reasons, Employee 2's PTSD was work-related and therefore recordable.

ExxonMobil contends mental illnesses are presumed not to be work-related. (Resp't Br. at 9-10 (citing §§ 1904.5(b)(2), 1904.5(b)(2)(ix)).) Based upon the language of § 1904.5(b)(2)(ix), ExxonMobil asserts "when an employee reports that they have experienced mental illness, this exception directs the employer to begin with the presumption that it is not work-related." (Resp't

---

[15] Dr. Joppich's second opinion, called a "Psychological Evaluation Summary" and dated June 20, 2022, suffers from the same flaws—she did not evaluate Employee 2 in person, and, in any event, she provided it after Employee 2 had received months of treatment. (Ex. R-1.) Rather than a psychological evaluation, it amounts to another summary of Employee 2's involvement in the incident and an attempt to discredit on Employee 2's providers' work-relatedness findings and traumatic event findings discussed below.

Br. at 10.) This presumption, according to ExxonMobil, is reinforced by the preamble to the rule, which states "the 'employer is under no obligation to seek out information on mental illnesses from its employees.' " (Resp't Br. at 10 (quoting 66 Fed. Reg. at 5953).)

Although the Secretary bears the initial burden of proving the physician or other licensed health care professional has appropriate training and experience, the standard's use of "unless" in § 1904.5(b)(2)(ix) is instructive. The standard starts from the premise "[y]ou are not required to record injuries and illnesses if [t]he illness is a mental illness," and the "[m]ental illness will not be considered work-related." But this presumption does not necessarily hold. Once "the employee voluntarily provides the employer with an opinion from a physician or other licensed health care professional with appropriate training and experience (psychiatrist, psychologist, psychiatric nurse practitioner, etc.) stating that the employee has a mental illness that is work-related," the mental illness is considered work-related and recordable under the standard.[16] Therefore, once the Secretary meets the "unless" requirements, the burden shifts to the employer to show its decision not to record the illness complied with the standard. *See Cent. Fla. Equip. Rentals*, 25 BNA OSHC 2147, at *3 (No. 08-1656, 2016) (the "unless" clause in § 1926.602(a)(3)(i) shifted the burden to the employer to establish that it qualified for the exception). Because Employee 2 produced an opinion from a provider under the standard, ExxonMobil must show either Employee 2 did not have a mental illness or that his mental illness was not work-related. ExxonMobil makes both arguments.

ExxonMobil contends the record does not support PTSD criteria findings for Employee 2. First, he did not suffer a traumatic event in the workplace and therefore his mental illness was not work-related, according to ExxonMobil. (Resp't Br. at 29.) Second, the record lacks sufficient descriptions or fails to establish nightmares or intrusive thoughts; persistent or negative beliefs; and a marked alteration in arousal associated with the traumatic event. (Resp't Br. at 29.) Lastly, and apart from the criteria, ExxonMobil contends Employee 2's tearful and emotional testimony is indicative of personal characteristics rather than PTSD. (Resp't Br. at 29.) The Court rejects each of these arguments.

The Court begins its analysis of Employee 2's PTSD diagnosis by considering Dr. McCann's finding Employee 2 suffered a traumatic event. Employee 2 shared with Dr. McCann

---

[16] As discussed above, an employer can overcome this with a contemporaneous, authoritative second opinion that the employee does not have a mental illness. The employer may also determine the mental illness is not work-related.

"he was put in protective gear to go inside the explosion." (Tr. 327.) He also "discussed valves that were involved in the explosion" and "described the heat and the noise that he experienced as far as the explosion." (Tr. 327.) Employee 2 testified, I had "never been on that verge of not knowing if I was going to—if I was going to walk out of that situation before. Like that life or death." (Tr. 203.) Dr. McCann considered this a traumatic incident. (Tr. 327.) As discussed above, Dr. Joppich testified she did not understand the incident to be a traumatic event based on materials provided by ExxonMobil and her conversation with Dr. Lee. (Tr. 574-75, 580.) Instead, she understood the event was routine and Employee 2's response was within his training and duties to respond. (Tr. 573-74, 597-98.) Because Employee 2 did not suffer a traumatic event, he therefore did not have PTSD, Dr. Joppich concluded, and Dr. Craig concurred. (Tr. 575, 906-07.)

At trial, ExxonMobil continued to challenge Dr. McCann's PTSD diagnosis with testimony from its expert, Dr. Joel Etherton, and ExxonMobil's Michael Shannon. Based upon Shannon's testimony and purported absence of information from Dr. McCann, ExxonMobil contends it understood Employee 2 "had a relatively limited level of involvement in the incident." (Resp't Br. at 22, 28 (citing Tr. 645-46).) Specifically, ExxonMobil asserts Employee 2 was driving away from the HDU when the explosion occurred and, when he returned to the HDU, he "calm[ly]" entered it to identify valves for the fire team to close, which was he was trained to do. (Resp't Br. at 22-23 (citing Tr. 644-47, 1020).) Further, the fire team had "controlled" the fire at this point, which Dr. Etherton opined was not sufficiently traumatic to cause PTSD. (Resp't Br. at 29 (citing Tr. 1164-65).) Relying on Dr. Etherton's testimony, ExxonMobil contends the fire " 'seemed much more contained, and controlled, and predictable' " such that " 'the likelihood of an explosion occurring' " or " 'injury was very low.' " (Resp't Br. at 29 (quoting Tr. 1164-65).)

The Court rejects this argument and finds ExxonMobil's focus on the initial explosion is misplaced. Nothing in the DSM-5-TR diagnostic nor any testimony establishes the traumatic event in this case must be the initial explosion rather than Employee 2's response to control the explosion's fire. Although Jared Sanders testified the fire was under control, and Shannon testified Employee 2 had been trained to isolate the HDU, purportedly in these conditions, the three process technicians working that night testified to the contrary. Employee 2 testified the night of the explosion was the first time he donned full bunker gear. (Tr. 244.) He agreed the HDU shutdown was "catastrophic" and testified it amounted to "a loss of control." (Tr. 244-45.) Employee 2 had been trained to know the equipment, including the location of certain valves, but he had not been

trained to respond like Jared Sanders, an assistant fire team captain. (Tr. 223, 243.) Similarly, Employee 1 and Employee 3 testified they were not trained on how to respond to emergencies or uncontrolled shutdowns of this magnitude. (Tr. 138, 261, 295.) Unlike Jared Sanders, Employee 2 actually entered the HDU to identify the valves while the flames were still 75 feet high and deafening, and he witnessed these conditions first-hand. (Tr. 165, 995, 1074.) Sanders' own testimony spoke to the magnitude of the fire. He said this was an "all call" fire because it required fire-fighting resources, apparatuses, and manpower beyond those available on that shift. (Tr. 1038-39.) According to Sanders, teams have 22 firefighters, and at least 80 ExxonMobil emergency responders were required to fight the fire early that morning and contain it the following days. (Tr. 1039-40.) Therefore, the Court finds ExxonMobil has not shown Employee 2 did not suffer a traumatic event and his diagnosed mental illness was not work-related.[17]

Next, ExxonMobil contends the record does not support a finding Employee 2 had intrusive symptoms or nightmares associated with the traumatic event. (Resp't Br. at 29 (citing Tr. 1168).) According to criterion B of the DSM-5-TR manual, a PTSD diagnosis must be supported by, among other things, one or more of: "1. Recurrent, involuntary, intrusive distressing memories of the traumatic event(s);" or "2. Recurrent distressing dreams in which the content and/or affect [sic] of the dream are related to the traumatic event(s);" or "3. Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring."[18] (Ex. R-6 at 2.) Regarding intrusion symptoms associated with the traumatic event, Dr. McCann found Employee 2 was suffering from nightmares and flashbacks. (Tr. 364; Exs. C-14 at 1, C-21 at 1.) Dr. Etherton

---

[17] According to OSHA, "the determination of workrelatedness is best made by the employer, as it has been in the past." 66 Fed. Reg. at 5950. This is because "[e]mployers are in the best position to obtain the information, both from the employee and the workplace, that is necessary to make this determination." 66 Fed. Reg. at 5950. Here, however, ExxonMobil was unable to obtain information about Employee 2's involvement in the incident. Employee 2 met with Ms. Timbs on January 10, 2022, to tell her "what he was dealing with." (Tr. 178.) Ms. Timbs testified she assessed him and talked to him and worked with his case manager "as far as the communications she was having with him and the documentation." (Tr. 794-95.) She also testified that at the January 10 meeting Employee 2 did not mention a potential PTSD diagnosis and did not share his involvement in the fire and explosion. (Tr. 863.) According to Ms. Timbs, Employee 2 said he was not ready to return to work and was speaking to a counselor. (Tr. 863-64.) Based upon these conversations, ExxonMobil did not know "his involvement around the fire, what he did, where he was at; didn't know any of that." (Tr. 835.) Although the preamble envisions an employer will be in the best position to obtain information from the employee, Ms. Timbs's testimony shows ExxonMobil was not best placed to obtain information about Employee 2's involvement in this case. Despite lacking this information, ExxonMobil contends its decision not to record mental illnesses in early 2022 was correct. (Resp't Br. at 18.)

[18] The two other intrusive symptoms are: "4. Intense or prolonger psychological distress at exposure or internal or external cues that symbolize or resemble an aspect of the traumatic event(s);" and "5. Marked psychological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event(s)." (Ex. C-6 at 2-3.)

challenged Dr. McCann's flashbacks finding on the ground Employee 2's recollections or memories of the traumatic event did not have a dissociative quality. (Tr. 1168-69.) According to Dr. McCann, Employee 2 did "not necessarily" describe feeling the heat from the incident; instead, "[h]e was describing the flashback regarding the explosion. He was describing the nature of the explosion not necessarily that he was feeling the heat in that moment at the time he was experiencing the flashback." (Tr. 363-64.) Moreover, Employee 2 did not testify he suffered from dissociative reactions. Therefore, the Court finds Employee 2 did not have flashbacks.[19]

However, the record supports Employee 2's B.1 symptom, which is recurrent distressing dreams. Dr. McCann testified Employee 2 described nightmares regarding the explosion to her. She could not recall the contents of these dreams, other than Employee 2 saying he was back in "the building." (Tr. 364-65.) Moreover, Employee 2 testified, in the context of his appointments with Ms. Ordonio, he was experiencing "dreams that were not sitting well with me" and they "were constantly coming." (Tr. 175, 471.) Although this testimony lacks some detail, the context and content support a finding he was experiencing recurrent distressing dreams related to the incident and his involvement. Therefore, ExxonMobil has not shown Employee 2 did not have an intrusion symptom.

ExxonMobil also argues the record does not support a finding Employee 2 had persistent and exaggerated beliefs. (Resp't Br. at 29 (citing Ex. C-14; Tr. 1174-75).) "Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world" is subcriterion D.2 under negative alterations in cognitions and mood associated with the traumatic event. (Ex. C-6 at 3.) Dr. Etherton testified Employee 2's loss of trust in his coworkers was not enough to reach a level of persistent negative belief. (Tr. 1174-75.) But Employee 2's loss of trust was more widespread than this. In fact, Employee 2 testified he also lost trust and confidence "in the systems, the process," even after he went back to work. (Tr. 195.) This shows his negative beliefs and expectations were persistent. Employee 2 described a clinically significant "global change in his trust level," according to Dr. McCann, based upon her clinical level interview and testing. (Tr. 362.) Similarly, Ms. Ordonio testified Employee 2 expressed "a lot of distrust in some of his

---

[19] Dr. McCann testified Employee 2 "described being back in the explosion in regards to the fire and the heat and things of that nature" and that these memories "were occurring at least a couple times a week." (Tr. 364.) Moreover, Employee 2 testified he continued to have memories of the fires in the HDU. (Tr. 203.) Although these descriptions do not amount to flashbacks, according to Dr. Etherton, due to their lack of dissociative quality, both Dr. McCann's and Employee 2's testimony support a finding of sufficient evidence of "recurrent, involuntary, and intrusive distressing memories of the traumatic event." They potentially satisfy criterion B.1 of DSM-5-TR.

coworkers" and "felt like everything was on his shoulders." (Tr. 471, 482.) The Court finds ExxonMobil has not shown Employee 2 did not meet subcriterion D.2.[20]

Regarding alterations in arousal and activity associated with the traumatic event, Dr. McCann testified Employee 2 "described feelings or hypervigilance and exaggerated startle response." (Tr. 349.) According to Dr. Etherton, the nature of Employee 2's exposure did not position him to have hypervigilance. (Tr. 1179.) The Court has already found Employee 2 suffered a traumatic event, so it rejects this argument. Dr. Etherton also testified his "sense was that Dr. McCann did not adequately elaborate on that or justify his experience of hypervigilance in a way that would demonstrate that he experienced those symptoms." (Tr. 1178.) Dr. McCann could not recall specific instances or discussions with Employee 2, but she said both the DAPS and TSI assessments identified his startle response. (Tr. 350-51.) Similarly, the clinical interview, as well as assessments, revealed to Dr. McCann that Employee 2 was hypervigilant about his surroundings.[21] (Tr. 352-53.) Although the record does not provide specific details about these assessments and conversations between Employee 2 and Dr. McCann, there is some support in Employee 2's testimony for this finding. Employee 2 testified he has, over time, "adjust[ed] to not thinking that I'm surrounded and the boom . . . is going to happen again. It's going to happen again and it's just a matter of time." (Tr. 195-96.) The Court cannot conclude the record does not support these findings are incorrect or unsupported based merely upon Dr. Etherton's "sense" Dr. McCann "did not adequately elaborate" upon her findings.

Relying upon Dr. Etherton's testimony, ExxonMobil also asserts Employee 2's emotional retelling of the events does not support a PTSD finding. (Resp't Br. at 29 (citing Tr. 1162-63).) Dr. Etherton said he "noticed . . . a significant kind of emotionality, a tearfulness" from Employee 2 while he was "talking about the incident." (Tr. 1162.) Dr. Etherton's "take" was that Employee 2 felt he stepped up in the face of danger, while others let him down. (Tr. 1162.) However, Dr. Etherton also testified emotionality is a characteristic, "not a specific psychological symptom" and

---

[20] Two subcriteria are required to meet criterion D, according to the DSM-5-TR manual. Ex. C-6 at 3. ExxonMobil does not contend Employee 2 does not meet other negative alterations factors. Both Dr. McCann and Ms. Ordonio testified Employee 2 met subcriterion D.5, "diminished interest or participation in significant activities." (Tr. 362-63, 480, 483.) Ms. Ordonio also testified he met subcriteria D.3 ("[p]ersistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others"), D.4 ("[p]ersistent negative emotional state"), and D.6 ("[f]eelings of detachment or estrangement from others."). (Tr. 480, 481-84.)

[21] Ms. Ordonio and Ms. Brown also identified an exaggerated startle response and hypervigilance in Employee 2. (Tr. 480-81, 496-97.)

"not a symptom related to" or "connect[ed]" to PTSD. (Tr. 1162-63.) Therefore, the Court finds this observation, by Dr. Etherton's own admission, is irrelevant to Employee 2's PTSD diagnosis.

The Court finds Dr. McCann was qualified to diagnose mental illness under the standard, the record supports her PTSD diagnosis for Employee 2, and ExxonMobil did not provide an authoritative, contrary second opinion, or otherwise show the illness was not work-related. Furthermore, Employee 2 missed workdays and ExxonMobil did not record his mental illness as required by § 1904.29(b)(3). Therefore, the Court finds ExxonMobil violated the standard and need not turn to the other providers' credentials and diagnoses for Employee 2. However, the parties have briefed these providers' credentials and further discussion would aid the parties, as well as other employers as they make future recordability determinations under the standard. Therefore, the Court makes the following findings.

*Sydney Adams-Ordonio, LCSW*

The Secretary argues Ms. Ordonio is qualified to diagnose PTSD under the standard because she has 22 years of mental health counseling experience and a master's degree in social work with a concentration in mental health. (Sec'y Br. at 9.) She is also qualified to diagnose and treat mental health conditions by the Texas Behavioral Health Executive Council, according to the Secretary. (Sec'y Br. at 9.) ExxonMobil contends Ms. Ordonio is not an enumerated provider and does not satisfy the standard's requirements. (Resp't Br. at 5, 21 n.4.)

The Court finds Ms. Ordonio has "appropriate training and experience" under § 1904.5(b)(2)(ix). As discussed above, her training centered on mental health and illnesses. She studied psychology at both the undergraduate and graduate levels and earned her graduate degree with a concentration in mental health. (Tr. 468.) She completed her required and advanced internships at an inpatient psychiatric hospital. (Tr. 468.) Her training was therefore "especially suitable" for diagnosing and treating mental illness.

Unlike a doctor practicing family medicine, she solely practices in the areas of diagnosing and treating of mental illnesses and had done so for nearly 20 years at the time of this trial. (Tr. 485.) After her internships, a neuropsychologist hired Ms. Ordonio in 2003 "to do clinical testing including neuropsychological evaluations, psyche eval[uation]s, ADHD testing, personality assessments for her and I was also a psychotherapist while also working in an inpatient setting." (Tr. 469.) She also continued to work at the psychiatric hospital where she completed her internship and worked as an inpatient psychotherapist at another hospital. (Tr. 469.) As the owner of

Kingwood Counseling Center, she sees patients, consults on cases, and reviews reports. (Tr. 469-70.) Lastly, she is a clinical supervisor designated by the State of Texas. (Tr. 470.) At the time of trial, she was supervising three clinical trainees. (Tr. 470.) Ms. Ordonio testified the Texas Behavioral Health Executive Council has qualified her to diagnose and treat mental health diagnoses, and she is also qualified and allowed to use the diagnostic and statistical manual of mental disorders. (Tr. 485.) Like the enumerated providers, Ms. Ordonio is immersed in the practice of diagnosing and treating mental illnesses. It was the sole focus of her graduate work and is the sole subject of her practice, beyond the administrative functions she carries out as a business owner. [22] (Tr. 470.) Therefore, the Court finds her training and experience is appropriate under the standard.

*Rachel Brown, LCSW*

The Secretary argues Ms. Brown is qualified to diagnose PTSD under the standard because she has a master's degree in social work and has worked in the field since 2013. (Sec'y Br. at 11.) She specializes in trauma and trauma-related disorders, according to the Secretary, and, as a LCSW, she is permitted to diagnose PTSD in Texas. (Sec'y Br. at 11.) Again, ExxonMobil contends Ms. Brown is not an enumerated provider and does not satisfy the standard's requirements. (Resp't Br. at 21 n.4.) For the following reasons, the Court finds Ms. Brown has appropriate training and experience under § 1904.5(b)(2)(ix).

Ms. Brown earned a master's degree in social work and has been diagnosing mental illnesses across two states since 2013. (Tr. 494, 502-03.) She began her career as a licensed therapist working with children and adolescents in Arkansas before moving to Texas two years later. (Tr. 495.) She worked at "Kingwood Hines Hospital"[23] and then "for a partial hospitalization program called ER American Healthcare," which is a psychiatric treatment facility.[24] (Tr. 495.) In

---

[22] Dr. Joppich testified she had no reservations about LCSWs diagnosing PTSD because "they are mental health professionals. They should be fully competent to diagnose PTSD." (Tr. 598.)

[23] Ms. Brown testified to the names of the hospitals but not to their specialties. The Court cannot find a Kingwood Hines Hospital in the Houston area but takes judicial notice of a Kingwood Pines Hospital in Kingwood, Texas, approximately 25 miles north of Houston. *See* Fed. R. Evid. 201; Commission Rule 71, 29 C.F.R. § 2200.71 (Federal Rules of Evidence are applicable in Commission proceedings). Kingwood Pines Hospital "offers inpatient treatment, outpatient services and partial hospitalization programs for individuals who suffer from psychiatric, behavioral or chemical dependency issues." *Kingwood Pines Hospital*, https://kingwoodpines.com/about-us/ (last visited Sept. 25, 2024).

[24] The Court also takes judicial notice of the following fact: ER American Healthcare is a psychiatric facility in

2019, Ms. Brown began working as a mental health therapist for Ms. Ordonio's Kingwood Counseling Center. (Tr. 494.) Since 2019, she diagnoses PTSD once or twice a month but sometimes sees patients whose trauma does not result in PTSD diagnosis under DSM-5. (Tr. 503-04.) Again, this is immersive experience in treating and diagnosing mental illnesses. She does not practice in this area from time to time; she does so on a consistent basis. Therefore, the Court finds she has appropriate training and experience under the standard.

*Cesare Castillo, M.D.*

The Secretary also asserts Dr. Castillo is qualified to diagnose PTSD under his Texas family medical license. (Sec'y Br. at 10.) According to the Secretary, Dr. Castillo has more than 20 years of experience treating military personnel and veterans, including diagnosing them for PTSD. (Sec'y Br. at 10-11.) Again, ExxonMobil contends Dr. Castillo is not an enumerated provider and does not satisfy the standard's requirements. (Resp't Br. at 21 n.4.)

Although Dr. Castillo has some experience and training diagnosing and treating mental illnesses, the Court finds it is not appropriate within the meaning of the standard. During his three-year residency, Dr. Castillo trained under a psychiatrist for one month and under a family medical doctor at a drug rehabilitation facility for two months. (Tr. 454-55.) Psychiatry was also generally incorporated into his family medicine rotation and practice. (Tr. 453) Similar to Dr. Wang, this was a small portion of Dr. Castillo's residency. Dr. Castillo testified he also completed rotations of various lengths in OB/gynecology, orthopedics, cardiology, pulmonology, ear, nose and throat, and pediatrics. (Tr. 450.) Dr. Castillo trained in these areas, but he also noted he does not have medical expertise in them such that he could be considered, for example, a surgeon or an OB/GYN. (Tr. 441.) As discussed above, the standard requires "appropriate training and experience," and the Court considers "appropriateness" with reference to the enumerated providers. Although their credentials need not be the same, the training received by non-enumerated physicians and licensed health care professionals must be compatible and a mere rotation or two does not clear this bar. Therefore, the Court finds Dr. Castillo did not have the appropriate training required by the standard.

Following his residency and a year of practice, Dr. Castillo worked at Lackland Air Force

Houston. *Care.com listings for Psych Residences and Mental Health Centers*, https://carelistings.com/psych-residences-and-mental-health-centers/houston-tx/e-r-american-healthcare-services-llc/5ace88fe93efd2372f98ff4b (last visited Sept. 25, 2024); Fed. R. Evid. 201(b).

Base clinic for two years, "taking care of family members of the ones that had been deployed, and also vets, veterans that had been in previous wars." (Tr. 433, 439.) He saw patients with previous trauma and continued to accept military insurance when he left that clinic. (Tr. 439.) According to Dr. Castillo, PTSD "has been a pretty common thing that I see in my office." (Tr. 440.) He testified he sees patients with psychiatric conditions on a regular basis. (Tr. 441.) However, when asked to elaborate on the number of PTSD cases a year, he said he "probably see[s] maybe two or three a year." (Tr. 442.) Although, Dr. Castillo has seen and continues to see patients who may suffer from mental illness, he is not diagnosing and treating mental illness on a consistent basis, as a LCSW or enumerated provider does. Therefore, his sporadic diagnosis and treatment of mental illness does not fulfill the standard's appropriate experience requirement.

*Employee 3 and Nikita Engineer, PA*

The Secretary argues Ms. Engineer's licensure with the Texas Physician Assistant Board and the National Commission on Certifying Physician Assistants permits her to diagnose mental health conditions. (Sec'y Br. at 12.) She graduated from PA school with a concentration in psychiatry and had worked solely in this specialty for four years at the time of trial, according to the Secretary. (Sec'y Br. at 12.) ExxonMobil argues Ms. Engineer is not an enumerated provider and did not make Employee 3's initial PTSD diagnosis. (Resp't Br. at 7.) Rather, she provided continuing care and diagnosed Employee 3 with GAD on February 1, 2022, according to ExxonMobil. (Resp't Br. at 7, 28.) For the following reasons, the Court finds Ms. Engineer has appropriate experience under § 1904.5(b)(2)(ix).

Ms. Engineer has especially suitable training under the standard. She earned a master's degree in PA studies with a concentration in psychiatry. (Tr. 397.) During her graduate studies, she took a behavioral health course, which involved diagnosing and treating mental health conditions, and a pharmacology course, in which she learned about psychiatric medications. (Tr. 424.) She also completed a one-month psychiatric clinical rotation at the VA. (Tr. 424.) Before she started working independently, Ms. Engineer trained under PAs and medical doctors in inpatient and outpatient psychiatry. (Tr. 403-04.)

Following graduation in 2019 from PA school, Ms. Engineer passed her certifying exam and obtained licenses allowing her to diagnose mental illnesses from the Texas Physician Assistant Board and National Commission on Certifying Physician Assistants. (Tr. 402-03.) At the time of trial, she was waiting on the exam results for her psychiatry certification in mental health that is

available to PAs. (Tr. 408-09.) "On a daily basis," she "diagnose[s] and treat[s] mental and physical health conditions, to order and interpret labs, to formulate treatment plans for patients in collaboration with healthcare teams." (Tr. 403.) She sees roughly 100 patients per week. (Tr. 404.) Ms. Engineer devotes her practice to diagnosing and treating mental illness. This evidence supports finding Ms. Engineer has appropriate experience under § 1904.5(b)(2)(ix).

Turning to Employee 3, ExxonMobil argues his PTSD and GAD diagnoses were unreliable. (Resp't Br. at 27-28.) Among other things, the company contends Employee 3's involvement in the incident "such as driving toward the HDU or positioning fire monitors," did not rise to "the level of danger that could qualify as the 'traumatic event' needed to give rise to a PTSD diagnosis." (Resp't Br. at 27 (citing Tr. 1152, 1155).) Because Ms. Engineer has appropriate training and experience under § 1904.5(b)(2)(ix), the Court begins its analysis from the premise her diagnosis of work-related mental illness was recordable. For the following reasons, however, the record supports a finding Employee 3's mental illness was not work-related.

First, Employee 3's involvement in the incident is distinguishable from Employees 1 and 2. This finding is not intended to minimize it, but instead helpful to determine whether Employee 3 was "[e]xposed to actual or threatened death, [or] serious injury" during the incident such that his mental illness can be considered work-related. Ex. R-6 at 2, criterion A. According to Ms. Engineer, Employee 3 "attributed the symptoms to the explosion at the refinery so we went with that. He said his symptoms had either started or worsened after the explosion." (Tr. 402.) Mr. Kim, a PA in Ms. Engineer's practice, had previously diagnosed Employee 3 with PTSD and Ms. Engineer did not believe, based upon her initial meeting this diagnosis was incorrect.[25] (Tr. 402.) The record shows they discussed his symptoms and medication. (Tr. 413-14.) But, as Ms. Engineer testified, she "did not go into details of the explosion," or "specifics of the traumatic event" because she did not want to have the patient "relive" it. (Tr. 419.)

Ms. Engineer's statement on its own is conclusory, and Mr. Kim did not testify to offer context or what Employee 3 shared with him. The evidence does not support criterion A.

---

[25] It is unclear when Mr. Kim diagnosed Employee 3 with PTSD. Ms. Engineer testified Employee 3's appointment with Mr. Kim "was a week before he saw me or two weeks." (Tr. 409.) She also testified the appointment with Dr. Kim was "at the end of January because after that was when he was transferred to my care." (Tr. 415.) Ms. Engineer's first appointment with Employee 3 was on February 1. (Tr. 399.) If her appointment with Employee 3 was two weeks after Dr. Kim's appointment, then Dr. Kim's PTSD diagnosis would be too early based upon the one month of symptoms requirement in DSM-5-TR. *See* Ex. R-6 at 3, criterion F. The Court cannot determine the date of Dr. Kim's appointment based upon the record before it.

Employees 2 and 3 were driving away from the HDU when the explosion occurred. (Tr. 255.) Among other things, Employee 3 used fire monitors to put water on the cooling tower and flare drum and started the spare cooling tower fan. (Tr. 256-57, 289-90.) He testified prior issues and anxiety triggered a response of helplessness, but he tried to do what he could with the cooling tower. (Tr. 258.) Over the radio, he learned colleagues were at the south pipe rack trying to isolate valves, but Employee 3 stayed by the cooling tower and later returned to the console. (Tr. 262.) Jared Sanders did not see Employee 3 during his response. (Tr. 1030.) Employee 3 did not witness or experience the explosion first-hand, as Employee 1 did. And he did not experience the conditions at the HDU as Employee 2 did by heading back into the HDU to isolate valves or by donning protective gear to enter the HDU and identify valves for the emergency response team. Therefore, the record does not establish Employee 2 suffered a traumatic event such that his mental illness was work-related.[26]

Lastly, ExxonMobil asserts Employee 3's GAD diagnosis on his IDR was incorrect due to its timing. (Resp't Br. at 28 (citing Ex. C-18).) Although Ms. Engineer testified she did not know when Mr. Kim made the diagnosis, Employee 3 testified Ms. Engineer first assigned the diagnosis during his February 1 telehealth visit. (Resp't Br. at 28 (citing Tr. 305, 412).) Dr. Etherton testified Employee 3's GAD was not caused by the incident because it was made a month following the incident, and GAD symptoms must be present for six months before a provider can diagnose it. (Resp't Br. at 28 (citing Tr. 1160-61).)

Setting aside whether Ms. Engineer or Mr. Kim diagnosed Employee 3 with GAD, the timing of the diagnosis cannot support a finding it was caused by the incident and therefore work-related. Dr. Etherton credibly testified patients must exhibit three of six GAD symptoms, and the disorder must "last[] for at least six months, most days for most of the day" to be diagnosed.[27] (Tr.

---

[26] ExxonMobil makes two other related arguments related to Employee 3's PTSD diagnoses. First, it contends Ms. Engineer's diagnosis was unreliable because she did not use any diagnostic tests or evaluations to diagnose Employee 3 and only met with him virtually for 20-25 minutes at each appointment. (Resp't Br. at 27 (citing Tr. 402).) Further, his symptoms were more closely related to and caused by his preexisting medical conditions rather than indicative of PTSD, according to the company. (Resp't Br. at 27 (citing Tr. 1150-51).) Although the Court does not need to reach these arguments, it briefly addresses them. Nothing required Ms. Engineer to use diagnostic tests or evaluations to make her diagnosis. In this case, though, and given Employee 3's preexisting conditions, diagnostics certainly would have been helpful to establish a baseline for his conditions; show that she, not Employee 3, attributed his symptoms to the explosion; and support her traumatic event and work-relatedness findings.

[27] The Court briefly distinguishes Dr. Etherton's testimony on this point from his testimony regarding Dr. McCann's diagnosis of Employee 2's PTSD. Here, Dr. Etherton was testifying to a requirement for diagnosing the condition,

1160.) Based upon Employee 3's diagnosis in either late January or early February 2022, he either had GAD well-before the incident or he developed symptoms following the incident but had not suffered from them long enough to support a valid diagnosis. The Court finds Employee 3's GAD diagnosis was not attributable to the incident and therefore not work-related.

## Exposure and Knowledge

While ExxonMobil's decision not to record Employee 2's illness did not expose him to a hazard, his involvement in the incident did. The record establishes Employee 2 experienced a traumatic event. He manually closed valves at the south rack and entered the HDU to identify valves for the emergency response team to close. (Tr. 215, 219-22.) The flames were at least 75 feet high, and the noise was so deafening he could not verbally direct the fire team which valves to close. (Tr. 163-65.) This environment could have exposed him to heat, noise, and explosion hazards, and his PTSD diagnosis suggested these exposures. *See Shaw Glob. Energy Servs., Inc.*, 23 BNA OSHC 2105, at *5 (No. 09-0555, 2012) (employee worked in an environment that could have exposed him to mercury and test result suggested such exposure), *aff'd*, 547 F. App'x 447 (5th Cir. 2013) (unpublished).

ExxonMobil argues it did not have knowledge of the violative condition. To establish knowledge, the Secretary must prove that the employer knew or, with the exercise of reasonable diligence, should have known of the conditions constituting the violation. *Jacobs Field Servs. N.A.*, 25 BNA OSHC 1216, at *3 (No. 10-2659, 2015). Here, the alleged violative condition is ExxonMobil's failure to record the mental illnesses on the OSHA 300 Log and/or on an incident report such as OSHA Form 301 within seven calendar days of receiving information that a recordable illness had occurred. (Citation at 6.) ExxonMobil decided not to record Employee 2's mental illness despite receiving a diagnosis from an enumerated provider and two LCSWs and having no authoritative, contemporaneous second opinion in hand. Therefore, it had knowledge of the violative condition.

ExxonMobil contends its decision not to record Employee 2's diagnosis was "reasonable and appropriate" based upon "the information available in March or April 2022." (Resp't Br. at 25, 29-30.) "An employer may rebut the Secretary's *prima facie* showing of knowledge with evidence that it took reasonable measures to prevent the occurrence of the violation." *Aquatek Sys.,*

---

rather than opining on whether the diagnosis was correct. Therefore, it does not amount to second-guessing, and the Court credits his testimony.

*Inc.*, 21 BNA OSHC 1400, at *2 (No. 03-1351, 2006). The Commission has found the asbestosis recording "standard cannot be read to require an employer to do more than make a reasonable judgment based on the information and expertise available to it." *Amoco Chems. Corp.*, 12 BNA OSHC 1849, at *7 (No. 78-0250, 1986). In *Amoco*, the Commission found doctors disagreed over diagnoses, and two other employees had "confounding medical histories that made it unclear whether" they suffered from asbestosis. *Id.* at *6. Due to the "equivocal" evidence, the opinion of Amoco's retained physician that the employees did not suffer from work-related asbestosis was not unreasonable. *Id.* at *6-7. However, the Commission has ruled otherwise when an employer knew of or became aware of the illness and decided not to record it. In *Shaw Global*, the employer's safety manager visited the ill employee in the hospital, and therefore knew the employee was being treated for mercury toxicity. 23 BNA OSHC 2105, at *5. Further, nothing "occurred during or after the safety manager's hospital visit to dispel this understanding." *Id.* The Commission concluded the "employer had sufficient information to determine that a recordable illness had occurred" and that its "decision not to record was plainly unreasonable." *Id.* at *5, n.7.

The facts of this case are more like *Shaw Global* than *Amoco*. Here, ExxonMobil did not have a competing contemporaneous, authoritative opinion in hand when it decided not to record Employee 2's mental illness. And Employee 2, unlike Employee 3, did not have a confounding medical history, which would make it difficult to disentangle his diagnosed mental illness from the traumatic event and personal medical history. Instead, ExxonMobil had several IDRs, including from an enumerated provider and two LCSWs, stating Employee 2 had PTSD, a recordable mental illness. This information was sufficient for ExxonMobil to determine a recordable illness had occurred. Further, the Court cannot see how so-called second opinions from mental health professionals with no first-hand knowledge of the incident and Employee 2's training and his role in the incident would uncover new facts relevant to work-relatedness. For these reasons, the Court finds ExxonMobil had knowledge of the violative condition and violated § 1904.29(b)(3) by failing to record the Employee 2's illness "within seven (7) calendar days of receiving information that a recordable . . . illness [had] occurred."

For the reasons set forth *supra*, the Court affirms Citation 1, Item 1, instance b (Employee 2), and vacates Citation 1, Item 1, instances a and c (Employees 1 and 3).

## CLASSIFICATION AND PENALTY DETERMINATION

The Secretary correctly characterizes the violation as other-than-serious. (Citation at 6.) An

other-than-serious violation "is one in which there is a direct and immediate relationship between the violative condition and occupational safety and health but not of such relationship that a resultant injury or illness is death or serious physical harm." *Crescent Wharf & Warehouse Co.*, 1 BNA OSHC 1219, at *3 (No. 1, 1973). Although there is a direct and immediate relationship between the ExxonMobil's failure to record Employee 2's mental illness and occupational safety and health, there is no threat of injury or illness resulting in death or serious physical harm due to this failure. *See Kaspar Wire Works, Inc.*, 18 BNA OSHC 2178, at *13 (No. 90-2775, 2000), (affirming violations as other than serious where evidence did "not show that the failure to file the required injury reports could result in a substantial probability of death or serious physical harm") *aff'd*, 268 F.3d 1123 (D.C. Cir. 2001). Therefore, the violation is properly classified as other-than-serious.

The Commission considers penalties *de novo*. *See Valdak Corp.*, 17 BNA OSHC 1135, at *3 (No. 93-0239, 1995), *aff'd*, 73 F.3d 1466 (8th Cir. 1996). Under section 17(j) of the Act, 29 U.S.C. § 666(j), "the Commission must give 'due consideration' to four criteria: the size of the employer's business, gravity of the violation, good faith, and prior history of violations." *J.A. Jones Constr. Co.*, 15 BNA OSHC 2201, at *15 (No. 87-2059, 1993). The Secretary proposed a $2,072 penalty for the violation. (Citation at 6.) According to the Secretary, CSHO Rusin determined the penalty amount would be appropriate for the violation's three separate instances. (Sec'y Br. at 16 (citing Tr. 544-45).) Further, CSHO Rusin did not adjust the penalty amount for size or good faith, because ExxonMobil had between 900-1000 employees and a history of other violations. (Sec'y Br. at 16 (citing Tr. 545-47).) ExxonMobil does not dispute the penalty amount; instead, it asks the Court to vacate the Citation and assess no penalty. (Resp't Br. at 3, 35.)

Because the Court has affirmed one instance of the alleged violation, it assesses a $691 penalty, which is approximately one-third of the proposed penalty. In doing so, the Court credits CSHO Rusin's testimony that a reduction was not appropriate due to ExxonMobil's size, prior history, and good faith. Further, the Court finds gravity was low. *See Kaspar Wire*, 18 BNA OSHC 2178, at *7 ("the gravity of recordkeeping violations is generally considered low"); *Caterpillar Inc.*, 15 BNA OSHC 2153, at *30 (No. 87-0922, 1993) ("Since recordkeeping violations, in general, only bear on [gravity] factors in the most tangential way, we are constrained to characterize the gravity of these recordkeeping violations as low."). In addition to these factors, ExxonMobil does not dispute the Secretary's penalty calculation. Therefore, one-third of the

proposed penalty is appropriate under the circumstances. *See KS Energy Servs.*, 22 BNA OSHC 1261, at *7 n.11 (No. 06-1416, 2008) (assessing proposed penalty where not in dispute).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The foregoing decision constitutes the findings of fact and conclusions of law in accordance with Commission Rule 90(a)(1), 29 C.F.R. § 2200.90(a)(1), and Rule 52(a) of the Federal Rules of Civil Procedure.

## ORDER

Based upon the foregoing decision, it is **ORDERED** that:

1. Citation 1, Item 1, instance a, alleging a violation of 29 C.F.R. § 1904.29(b)(3), is **VACATED** and no penalty is assessed;

2. Citation 1, Item 1, instance b, alleging a violation of 29 C.F.R. § 1904.29(b)(3), is **AFFIRMED** and a penalty in the amount of $691 is assessed; and

3. Citation 1, Item 1, instance c, alleging a violation of 29 C.F.R. § 1904.29(b)(3), is **VACATED** and no penalty is assessed.

**SO ORDERED.**

                    */s/*_____
                    Sharon D. Calhoun
                    Administrative Law Judge, OSHRC

Dated: _____
      Atlanta, GA