No. 25-60108

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Exxon Mobil Corp.,

*Petitioner*,

v.

Occupational Safety and Health Review Commission,

*Respondent,*

Lori Chavez-DeRemer, Secretary, U.S. Department of Labor,

*Respondent.*

On Petition for Review of an Order of the
Occupational Safety and Health Review Commission

**Opening Brief for Petitioner**

MICAH R. SMITH
RICHARD B. RAILE
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 861-1638
msmith@bakerlaw.com

*Attorneys for Petitioner*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judge of this court may evaluate possible disqualification or recusal.

## A. Petitioner

Exxon Mobil Corporation. Exxon Mobil Corporation has no parent corporation, and no publicly held company owns 10% or more of its stock.

## B. Attorneys for Petitioner

Micah R. Smith
Richard B. Raile
Baker & Hostetler LLP
1050 Connecticut Avenue N.W., Suite 1100
Washington, D.C. 20036

## C. Respondents

Occupational Safety and Health Review Commission
Lori Chavez-DeRemer, Secretary of Labor

## D. Interested Government Agency

Occupational Safety and Health Administration

## E. Attorneys for Respondent

Sheila Eileen Naughton
Louise McGauley Betts
Seema Nanda
William W. Thompson
United States Department of Labor
200 Constitution Ave., N.W.
Washington, D.C. 20210

*/s/ Micah R. Smith*
Micah R. Smith
*Counsel for Petitioner*

## STATEMENT REGARDING ORAL ARGUMENT

At issue in this case is arbitrary agency action that violates the Due Process Clause, Administrative Procedure Act, and the statute the agency is charged with faithfully administering. The Occupational Safety and Health Administration cited novel requirements that could not have been reasonably ascertained in advance as a basis to cite Exxon Mobil Corporation for a violation of a recordkeeping regulation that exceeds the agency's statutory authority. Petitioner respectfully submits that oral argument would be useful to the Court's consideration of this important case.

# TABLE OF CONTENTS

Certificate of Interested Persons........................................................i

Statement Regarding Oral Argument ..........................................ii

Table of Authorities ...........................................................v–ix

Introduction .......................................................................... 1

Statement of Jurisdiction ...................................................... 3

Statement of the Issues ........................................................ 3

Statement of the Case............................................................ 4

    A. Legal Background.............................................................. 4

    B. The Present Controversy ................................................. 9

Summary of the Argument ...................................................... 14

Standard of Review................................................................. 16

Argument ............................................................................... 16

I.    The Decision Contravenes Due Process by Imposing a Fine
    Without Fair Notice.............................................................. 16

    A. ExxonMobil Lacked Notice of the Limits OSHA Would
    Impose on the Second-Opinion Opportunity *Post Hoc*..................... 17

    B. The Materials from Which the Decision Drew
    Its Restrictions Could Not Have Been Anticipated to
    Apply in This Case in Advance ..................................... 21

II.    The Decision Fails the APA's Standard of
    Reasoned Decision-Making................................................. 26

    A. The Decision Is Illogical and Incompatible with the
    Agency's Own Stated Position on Second Opinions....................... 27

B. The Agency Failed to Consider Important Aspects of the Problem Before It .................................................................. 30

C. The Agency Failed to Acknowledge or Explain Its Departure from Its Prior Position .................................................. 34

III.   The Decision's Alternative Framework Suffers All Defects of Its Principal Framework ........................................................ 34

IV.   The OSH Act Does Not Authorize OSHA to Require Recording of Mental Disorders ........................................................... 37

Conclusion .......................................................................... 43

Addendum ............................................................................ 47

# TABLE OF AUTHORITIES

**Cases**

*Airlines for Am. v. DOT,*
 127 F.4th 563 (5th Cir. 2025) ................................................................ 16

*Am. Clinical Lab'y Ass'n v. Becerra,*
 40 F.4th 616 (D.C. Cir. 2022) ............................................................... 30

*Babb v. Wilkie,*
 589 U.S. 399 (2020) ............................................................................... 39

*Bostock v. Clayton Cnty.,*
 590 U.S. 644 (2020) ............................................................................... 39

*Chamber of Com. of United States v. SEC,*
 85 F.4th 760 (5th Cir. 2023) .................................................................. 30

*Christopher v. SmithKline Beecham Corp.,*
 567 U.S. 142 (2012) ............................................................................... 19

*Circus Circus Casinos, Inc. v. NLRB,*
 961 F.3d 469 (D.C. Cir. 2020) ............................................................... 20

*Clarke v. CFTC,*
 74 F.4th 627 (5th Cir. 2023) .................................................................. 32

*Comcast Corp. v. FCC,*
 526 F.3d 763 (D.C. Cir. 2008) ............................................................... 34

*Dep't of Com. v. New York,*
 588 U.S. 752 (2019) ............................................................................... 27

*DHS v. Regents of the Univ. of Cal.,*
 591 U.S. 1 (2020) ................................................................................... 33

*Diamond Roofing Co. v. OSHRC,*
 528 F.2d 645 (5th Cir. 1976) ................................................................. 17

*Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin. Hearing Officer,*
 833 F.3d 480 (5th Cir. 2016) ..................................................... 16, 19, 22

v

*Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*,
106 F.4th 1113 (D.C. Cir. 2024) ........................................................29, 31

*ExxonMobil Pipeline Co. v. DOT*,
867 F.3d 564 (5th Cir. 2017) ............................................................20, 22

*Fabrizius v. Dep't of Agric.*,
129 F.4th 1226 (10th Cir. 2025) ............................................................ 16

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................................ 34

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) .................................................................... 17, 21, 25

*Gates & Fox Co. v. OSHRC*,
790 F.2d 154 (D.C. Cir. 1986) ..........................................................17, 20

*Gen. Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995) ............................................................... 18

*Houston Aquarium, Inc. v. OSHRC*,
965 F.3d 433 (5th Cir. 2020) ...............................................................3, 40

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
448 U.S. 607 (1980) .................................................................................. 4

*Johnson Controls, Inc.*,
1990 CCH OSHD ¶ 29097 (No. 89-2614, 1990) ...................................... 41

*Jupiter Energy Corp. v. FERC*,
407 F.3d 346 (5th Cir. 2005) .................................................................. 34

*Kennecott Utah Copper Corp. v. Dep't of Interior*,
88 F.3d 1191 (D.C. Cir. 1996) ............................................................... 22

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................... 16, 38, 42

*Louisiana v. Dep't of Energy*,
90 F.4th 461 (5th Cir. 2024) ............................................. 17, 20, 21, 31, 32

*Martin v. OSHRC*,
499 U.S. 144 (1991) .................................................................. 12

*MCR Oil Tools, L.L.C. v. DOT*,
110 F.4th 677 (5th Cir. 2024) ................................................. 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................ 27, 30, 32

*Nat. Res. Def. Council v. EPA*,
571 F.3d 1245 (D.C. Cir. 2009) .............................................. 22

*NFIB v. OSHA*,
595 U.S. 109 (2022) ......................................................... 4, 40, 42

*Nissan Chem. Corp. v. FDA*,
744 F. Supp. 3d 1 (D.D.C. 2024) ......................................... 20, 22

*Off. of Commc'n of United Church of Christ v. FCC*,
707 F.2d 1413 (D.C. Cir. 1983) .............................................. 32

*Phoenix Roofing, Inc. v. Dole*,
874 F.2d 1027 (5th Cir. 1989) ................................................. 12

*S&H Riggers & Erectors, Inc. v. OSHRC*,
659 F.2d 1273 (5th Cir. 1981) ................................................. 17

*Safer Chems., Healthy Families v. EPA*,
943 F.3d 397 (9th Cir. 2019) .................................................. 22

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ................................................................ 21

*State v. Biden*,
10 F.4th 538 (5th Cir. 2021) .................................................. 30

*Sun Ship, Inc. Respondent & Loc. 802, I.B.B.I.B.F.H. Affected Emp. Representative*,
No. 80-3192, 1981 WL 95816 (CMPAU Aug. 19, 1981) ............................ 5

*Sw. Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019) ............................................. 27, 30

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023) ................................................................. 40

*Univ. of Texas M.D. Anderson Cancer Ctr. v. DHS*,
    985 F.3d 472 (5th Cir. 2021) ........................................... 16, 26

*United States v. Koutsostamatis*,
    956 F.3d 301 (5th Cir. 2020) .................................................. 39

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) .............................................. 29

*United States v. Rainey*,
    757 F.3d 234 (5th Cir. 2014) .................................................. 38

*U.S. Chamber of Com. v. DOL*,
    885 F.3d 360 (5th Cir. 2018) ............................................. 27, 30

*Wal-Mart Distrib. Ctr. #6016 v. OSHRC*,
    819 F.3d 200 (5th Cir. 2016) .................................................. 22

*10 Ring Precision, Inc. v. Jones*,
    722 F.3d 711 (5th Cir. 2013) .................................................. 32

## Statutory and Regulatory Authorities

5 U.S.C. § 706 .................................................... 26, 37, 38

18 U.S.C. § 1464 ...................................................... 19

29 C.F.R. part 1910 ................................................. 5, 40

29 C.F.R. § 1904.4 ................................................... 7, 26

29 C.F.R. § 1904.5 .................................................. *passim*

29 C.F.R. § 1904.6 ..................................................... 8

29 C.F.R. § 1904.7 .................................................. *passim*

29 C.F.R. § 2200.90 .................................................... 3

29 C.F.R. § 2200.91 ................................................... 14

29 U.S.C. § 651 ........................................................4, 42

29 U.S.C. § 652 ........................................................... 4

29 U.S.C. § 655 ........................................................4, 40

29 U.S.C. § 657 ........................................ 5, 16, 38, 40–42

29 U.S.C. § 660 ........................................................3, 14

29 U.S.C. § 661 ........................................................3, 12

29 U.S.C. § 669 ........................................................... 42

29 U.S.C. § 670 ........................................................... 40

36 Fed Reg. 12612 (July 2, 1971) ...........................5, 41

66 Fed. Reg. 5916 (Jan. 19, 2001) .......................*passim*

**Other Authorities**

OSHA Apr. 3, 2007 Interpretive Letter .................23, 25

OSHA Feb. 22, 2011 Interpretive Letter................... 23

OSHA Mar. 19, 2003 Interpretive Letter ...............23, 25

OSHA May 15, 2007 Interpretive Letter .......8, 23–25, 32

OSHA, OSHA Injury and Illness Recordkeeping Rule Regulatory Text
     and Resources by Provision .................................... 25

OSHA Question 7-10a ................................ 23, 25, 31

Webster's Second New International Dictionary (1957)............................. 38

Webster's Third New International Dictionary (1990) ...........22, 38

7 Oxford English Dictionary (2d ed. 1989) .................. 38

## INTRODUCTION

Petitioner Exxon Mobil Corporation (ExxonMobil) challenges arbitrary agency action that contravenes due process, the Administrative Procedure Act (APA), and the statute the Occupational Safety and Health Administration (OSHA) is tasked with implementing. At issue in this case is the framework OSHA created governing recordkeeping obligations. Exceeding the limits of its statutory authority, OSHA required that employers record work-related mental illnesses on the OSHA 300 log and 301 Incident Report, even though OSHA does not regulate work-related mental illnesses in any other manner.

In promulgating this framework in 2001, OSHA recognized "that recording work-related mental illnesses involves several unique issues," and it devised a complex framework by which employers must ascertain whether mental illnesses are recordable. Occupational Injury and Illness Recording and Reporting Requirements, 66 Fed. Reg. 5916, 5953 (Jan. 19, 2001). OSHA acknowledged that mental illnesses are unlike physical injuries and therefore must be evaluated under a different set of rules. As a threshold matter, whereas physical injuries are presumptively recordable if they arise at work, mental illnesses are presumptively not recordable. Mental illnesses are only recordable if the employee provides a qualified medical professional's written opinion that a mental illness exists and is work-related. At that point, "the employer may refer the case to a physician or other licensed health care professional for a second opinion." *Id.* No agency rule or guidance curtails that right to a second opinion.

In this case, however, the agency abandoned this framework in favor of a novel set of rules that make it impossible for employers to obtain a second opinion in mental-illness cases. Reasoning that *some* parameters must limit the second-opinion opportunity, the agency erred in relying on guidance addressing the diagnosis and treatment of *physical* conditions and applying them to alleged *mental* illnesses. From there, the agency arrived at two holdings that render the right to a second opinion useless: (1) the second-opinion opportunity ends as soon as an employee misses work or receives treatment for the mental illness, and (2) a second opinion can be relied on only if the employee voluntarily speaks directly with the employer's chosen mental-health professional for a diagnosis. These holdings are incompatible with reality: mental illnesses can take months to diagnose, so a contemporaneity requirement leaves employers no time after an initial diagnosis—if that triggers the recording obligation—to seek a second opinion. And, as in this case, the employee may refuse to speak to the employer's chosen professional, leaving the company no means to satisfy the new direct-interaction requirement. The new rationale effectively eliminates the right to a second opinion, leaving little credible prospect that the second-opinion opportunity may be exercised in any future case or that employers will ever be able to contest an employee's assertion of a work-related mental illness.

This case merits this Court's intervention. First, ExxonMobil lacked notice of the new second-opinion requirements when it made its recording decision. Second, the new rules are arbitrary and capricious because they are not the product of reasoned decision-making. And third, the governing statute does

not authorize OSHA to mandate that mental illnesses be recorded. For reasons set forth below, the Court should grant the petition for review and reverse.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal under 29 U.S.C. § 660(a), which provides for judicial review of orders of the Occupational Safety and Health Review Commission (OSHRC), the adjudicative agency that reviews OSHA citations. *Houston Aquarium, Inc. v. OSHRC*, 965 F.3d 433, 438 (5th Cir. 2020). The underlying ruling in this case (Notice of Decision, Excerpts of Record (ER) 0004–6; Decision and Order, ER 0007–53) was issued by an administrative law judge (ALJ) within OSHRC under 29 U.S.C. § 661(j) on November 22, 2024, and it was formally docketed on December 3, 2024, *see* 29 C.F.R. § 2200.90(b)(2). On December 19, 2024, ExxonMobil filed a timely petition for discretionary review of the ruling (the Decision) with OSHRC. OSHRC did not direct the case for review on or before January 2, 2025, and the Decision accordingly became the final order of OSHRC on that date. *See* ECF No. 1-1 (Notice of Final Order, ER 0001–3); 29 U.S.C. § 661(j). ExxonMobil timely filed a petition for review in this Court on March 3, 2025. 29 U.S.C. § 660(a); Fed. R. App. P. 15.

## STATEMENT OF THE ISSUES

1. Whether ExxonMobil had sufficient notice as required by the Due Process Clause that OSHA and OSHRC would reject ExxonMobil's reliance on a second opinion from a qualified professional finding no work-related mental illness in declining to record that alleged illness.

2.     Whether the Decision's reasons for rejecting ExxonMobil's reliance on a second opinion are arbitrary, capricious, or contrary to law.

3.     Whether the statute OSHA is tasked with administering authorizes OSHA to require that employers make records of their employees' mental illnesses.

## STATEMENT OF THE CASE

### A.     Legal Background

**1.**     In 1970, Congress enacted the Occupational Safety and Health Act (the OSH Act), 84 Stat. 1590, 29 U.S.C. § 651 *et seq.*, to address the problem of "personal injuries and illnesses arising out of work situations." 29 U.S.C. § 651(a). "The [OSH] Act created the Occupational Safety and Health Administration (OSHA), which is part of the Department of Labor and under the supervision of its Secretary." *NFIB v. OSHA*, 595 U.S. 109, 114 (2022). The OSH Act tasks OSHA with creating "occupational safety or health standard[s]," 29 U.S.C. § 655(b), that are "reasonably necessary and appropriate to remedy a significant risk of material health impairment" in work-places, *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 639 (1980) (plurality opinion); *see* 29 U.S.C. § 652(8). In exercising this power, OSHA has created a comprehensive code of safety regulations governing the physical premises of work sites, such as by regulating "Walking-Working Surfaces," "Exit Routes and Emergency Planning," "Powered Platforms," "Hazardous Materials," "Personal Protective Equipment," "Fire Protection," and so forth. *See* 29 C.F.R.

part 1910, subparts D, E, H, I, and L. OSHA has not attempted to set standards safeguarding employees' mental health. *See id.* part 1910.

Additionally, to "carry out the purposes" of the OSH Act, OSHA maintains authority to inspect work sites and review "such records regarding" employers' "activities" that OSHA "may prescribe by regulation as necessary or appropriate for the enforcement of" the OSH Act "or for developing information regarding the causes and prevention of occupational accidents and illnesses." 29 U.S.C. § 657(a) and (c)(1). Accordingly, in the same statutory section (§ 8 of the OSH Act), OSHA is delegated power:

> to prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job.

*Id.* § 657(c)(2). For three decades, OSHA administered this statute to mandate recording of work-related bodily harms. *See* Recording and Reporting Occupational Injuries and Illnesses, 36 Fed. Reg. 12612, 12615 (July 2, 1971) (initial rule requiring recording of "the injury or illness" and "the part of the body affected"); *Sun Ship, Inc. Respondent & Loc. 802, I.B.B.I.B.F.H. Affected Emp. Representative*, No. 80-3192, 1981 WL 95816, at *8 (CMPAU Aug. 19, 1981) (quoting form requiring description of "part or parts of the body affected, i.e., amputation of 1st joint right forefinger, strain of lower back; contact dermatitis on both hands, electrocution—body").

**2.** In 2001, as part of "a larger overall effort to revise" its regulations, OSHA revised "its rule addressing the recording and reporting of occupational injuries and illnesses," which appears at 29 C.F.R. parts 1904 and 1952. 66 Fed. Reg. at 5916. Among the more prominent and controversial developments was OSHA's requirement of "recording mental illnesses" on OSHA 300 log and OSHA form 301, where employers must record work-related injuries and illnesses. *Id.* at 5953. Commenters objected that "[t]he diagnosis of mental illnesses is subjective and unreliable," that "[m]ental illnesses are beyond the scope of the OSHA Act," and that "[r]ecording mental disorders opens the door to abuse." *Id.* at 5952. Unpersuaded, OSHA elected to require recording of mental illnesses and not to "limit recordable mental disorders to post traumatic stress syndrome or any other specific list of mental disorders." *Id.* at 5953. Proposing without textual analysis that "[t]he OSH Act is concerned with both physical and mental injuries and illnesses," the agency credited evidence that "[j]ob stress is perhaps the most pervasive occupational health problem in the workplace today," resulting in "depression and anxiety."[1] *Id.* at 5952–93.

At the same time, the agency "agree[d] that recording work-related mental illnesses involves several unique issues, including the difficulty of detecting, diagnosing and verifying mental illnesses; and the sensitivity and privacy

---

[1] OSHA represented that it "has required the recording of these illnesses since the inception of the OSH Act" but cited no such requirements and did not explain how it believed the prior system worked. 66 Fed. Reg. at 5953. As indicated, OSHA regulations and forms beginning in 1971 do not appear to reference mental illnesses.

concerns raised by mental illnesses." *Id.* Accordingly, the final rule in relevant part provides:

> Mental illness will not be considered work-related unless the employee voluntarily provides the employer with an opinion from a physician or other licensed health care professional with appropriate training and experience (psychiatrist, psychologist, psychiatric nurse practitioner, etc.) stating that the employee has a mental illness that is work-related.

29 C.F.R. § 1904.5(b)(ix). OSHA explained that this approach relieved employers of any "obligation to seek out information on mental illnesses from its employees" and ensured objectivity by requiring recording only of "illnesses verified by a health care professional with appropriate training and experience in the treatment of mental illness, such as a psychiatrist, psychologist, or psychiatric nurse practitioner." 66 Fed. Reg. at 5953. In promulgating this regulation, OSHA further clarified in the preamble:

> In the event that the employer does not believe the reported mental illness is work-related, the employer may refer the case to a physician or other licensed health care professional for a second opinion.

*Id.*

**3.** The mental illness recording requirement was ultimately folded into a complicated structure that employers must attempt to follow in assessing their recordkeeping obligations, codified at part 1904, subpart C, of Title 29, which is summarized in Section 1904.4, 29 C.F.R. § 1904. The inquiry begins with a determination of work-relatedness under Section 1904.5. Under that framework, "[w]ork-relatedness is presumed for injuries and illnesses resulting from events

or exposures occurring in the work environment, unless an exception … applies." *Id.* § 1904.5(a). The mental-illness framework described above is folded in as exception (ix) under this rule. *See id.* § 1904.5(b)(2)(ix).

If an injury or illness is work-related, employers proceed to a determination of whether the case is new, *id.* § 1904.6, and a subsequent determination of general recording criteria, *id.* § 1904.7. The recording criteria are effectively severity criteria that ensure work-related illnesses and injuries become recordable only if the result is "death, days away from work, restricted work or transfer to another job, medical treatment beyond first aid, or loss of consciousness." *Id.* § 1904.7(a). OSHA has issued extensive guidance on its website, including interpretive letters, about employers' opportunity to contest an employee's self-selected medical professional's initial opinions concerning these criteria, such as in cases where time off work is recommended.

With regard to the general recording criteria under Section 1904.7, agency guidance provides that an employer may obtain a second opinion where a health care professional recommends medical treatment, days away from work, or restricted activity, but only if "the medical treatment is not actually provided and no days away from work or days of days of work restriction have occurred." OSHA May 15, 2007 Interpretive Letter at 1, Addendum (Add.) 031.[2] "However, once medical treatment is provided for a work-related injury or

_____

[2] *Available at* https://www.osha.gov/laws-regs/standardinterpretations/2007-05-15.

illness, or days away from work or work restriction have occurred, the case is recordable." *Id.*

## B. The Present Controversy

**1.** ExxonMobil operates a petroleum refining facility in Baytown, Texas. ER 0009. On December 23, 2021, three contractors in the refinery's hydro-desulfurization unit (HDU) were swapping flange bolts when the pipe holding the flange ruptured and caused an explosion. *Id.* at 0010. The contractors were injured, and a fire burned in the HDU for several hours. *Id.* at 0011–12.

Many ExxonMobil employees and contractors from this unit and other process units responded to the fire, including three process technicians who have been identified in this litigation as Employees 1, 2, and 3. Only Employee 2 remains at issue. Employee 2 was working in a different unit on the night of the incident and was riding in a car about a quarter mile away when the explosion occurred. ER 0016. Employee 2 assisted in the response, first in the control room and then by accompanying firefighters into the HDU to help them identify the valves to be closed to restrict fuel to the fire. *Id.* at 0016–18.

**2.** Beginning in mid-January 2022, Employee 2 met with a licensed clinical social worker (LCSW), Sydney Adams-Ordonio, who diagnosed him on January 17 with adjustment disorder with anxiety. *Id.* at 0018–19. After less than four weeks, it was not then possible to assess whether Employee 2 had post-traumatic stress syndrome (PTSD) "because symptoms must persist for a month or more to diagnose PTSD." *Id.* at 0019. On documentation from Employee 2's

9

March 8 appointment, Ms. Adams-Ordonio added a PTSD diagnosis. *Id.* Employee 2 also received PTSD diagnoses from his primary care provider, Dr. Cesare Castillo, and his mental health therapist, Rachel Brown. *Id.* at 0019–20. By early February, however, ExxonMobil had informed Employee 2 that these practitioners lacked "appropriate training and experience" to provide an authoritative opinion about work-related mental illness. *See* 29 C.F.R. § 1904.5(b)(ix); ER 0021. Employee 2 then visited Dr. Chelsea McCann, a licensed psychologist. Dr. McCann diagnosed Employee 2 with PTSD and completed documentation on March 8, 2022, reflecting this diagnosis and recommending that Employee 2—who had already missed days of work— not return to the job for six additional months. ER 0021–23.

ExxonMobil processes individual disability reports (IDRs) through a medical team, which reviews the documentation provided by employees and determines whether the documentation identifies an injury or illness that may be work-related. *Id.* at 0015; AR.Vol.3 at 52–53 (Hearing Tr. 607–08). ExxonMobil's medical team determined that Dr. McCann was qualified to render a mental illness opinion, ER 0023, but were puzzled by the "drastic measure" recommended—six months leave—that Dr. McCann had "prognosticate[d] … far out" in advance with little apparent rationale or evidence, AR.Vol.3 at 177–78 (Hearing Tr. 732–33). Accordingly, ExxonMobil personnel spoke with Employee 2 and asked that he see another licensed health care provider qualified to diagnose PTSD according to the OSHA rules so the

company could obtain a second opinion. AR.Vol.3 at 278–79 (Hearing Tr. 833–34). Employee 2 refused to do so. *Id.*

Following this refusal, ExxonMobil sought a second opinion based on Employee 2's medical records and a summary of the December 23, 2021 incident and Employee 2's involvement, as ExxonMobil understood it. AR.Vol.3 at 159 (Hearing Tr. 714); AR.Vol.5 (Hearing Ex. C-24). ExxonMobil provided all documents it had received from Employee 2 to Dr. Heather Joppich, a licensed psychologist, and Dr. Joppich reviewed all the information she received. AR.Vol.3 at 159 (Hearing Tr. 714). Based on her review and her training and experience as a licensed psychologist, Dr. Joppich concluded that there was no evidence that Employee 2 had work-related PTSD. AR.Vol.5 (Hearing Ex. C-24); ER 0023–24.

Based on Dr. Joppich's opinion, ExxonMobil's team determined that Employee 2 did not have a work-related mental illness subject to recording on the OSHA 300 log and OSHA form 301 under OSHA's recordkeeping regulation. ER 0023–24.

**3.** The union representing ExxonMobil's Baytown employees informed OSHA of recording decisions related to the December 23 incident; the agency investigated; and on June 3, 2022, it issued a citation alleging "an other-than-serious violation" of the OSH Act for failure to record mental illness

diagnoses concerning Employees 1, 2, and 3.[3] ER 0010. ExxonMobil challenged the citation with OSHRC, an adjudicative agency separate from OSHA that reviews OSHA's citation decisions. *See Martin v. OSHRC*, 499 U.S. 144, 147–48 & n.1 (1991); 29 U.S.C. § 661. The case was assigned to an ALJ who conducted a four-day hearing. *See* 29 U.S.C. § 661(j); ER 0010.

On November 22, 2024, the ALJ issued the Decision affirming in part and vacating in part OSHA's citation. ER 0053; ER 0005. The Decision vacated OSHA's citation as related to Employees 1 and 3, agreeing with ExxonMobil that the practitioner who issued a mental-illness diagnosis concerning Employee 1 lacked the requisite qualifications, ER 0033–34, and that the diagnosis of Employee 3 was unfounded, *id.* at 0047–50. OSHA has not petitioned for review of those determinations.

The Decision, however, affirmed the citation as related to Employee 2. *Id.* at 0034–44. The ALJ began with ExxonMobil's recognition that Dr. McCann was qualified to assess whether Employee 2 had a mental illness. *Id.* at 0034. The ALJ then acknowledged an employer's "right to obtain a second opinion" and that neither the regulation nor any OSHA guidance "explicitly limit" that right. *Id.* at 0035. However, reasoning that the standard cannot be "so broad or open-ended as to allow unlimited second-opinions or those well after the initial diagnosis," the ALJ looked for limitations "in letters of interpretation and other

---

[3] A violation of the OSH Act may be classified as serious or other-than-serious. *Phoenix Roofing, Inc. v. Dole*, 874 F.2d 1027, 1031–32 (5th Cir. 1989).

guidance," but considered only letters concerning the general recording criteria of Section 1904.7, in cases involving physical injuries. *Id.*

The Decision pieced together portions of agency guidance addressing Section 1904.7 for physical injuries, concluding that a second opinion must be "contemporaneous" and that a case "must be recorded" "once medical treatment is provided," notwithstanding a competing second opinion. *Id.* at 0036–37 & n.13. Applying those strictures, the ALJ determined that Dr. Joppich's opinion was not "authoritative" because: (1) she had not met personally with Employee 2, and (2) Employee 2 had already missed work and begun receiving medical treatment before she rendered her opinion. *Id.* at 0037–38. The Decision noted that Employee 2 declined to meet with Dr. Joppich but stated that the fact did not "bear[] on" the "analysis." *Id.* at 0037 n.14.

The Decision proceeded to state that it would find a recordable illness even "entertain[ing] ExxonMobil's argument that Employee 2's mental illness diagnosis was incorrect." *Id.* at 0038. At this stage, the ALJ employed a novel burden-shifting framework, requiring OSHA to initially establish that a qualified professional issued an opinion and then shifting the burden to the employer "to show its decision not to record the illness complied with the standard." *Id.* at 0039. The ALJ cited no relevant precedent or agency guidance supporting this framework. *See id.* at 0038–41. The ALJ nevertheless determined that Dr. McCann's opinion sufficed to shift the burden and that ExxonMobil did not shoulder that burden. *Id.* The ALJ also proceeded to find that Mses. Adams-

Ordonio and Brown (but not Dr. Castillo) were sufficiently qualified to diagnose Employee 2's PTSD in addition to Dr. McCann. *Id.* at 0044–47.

Accordingly, the Decision affirmed the citation as to Employee 2 and assessed a $691 monetary penalty. *Id.* at 0052.

**4.** ExxonMobil timely petitioned OSHRC for review of the Decision's ruling regarding Employee 2. *See* 29 C.F.R. § 2200.91(b). OSHRC—which was then composed of only one member—did not direct the case for review, so the Decision became a final order of OSHRC. *See* ECF No. 1-1 (Notice of Final Order); ER 0002. ExxonMobil now petitions this Court for review. *See* 29 U.S.C. § 660; Fed. R. App. P. 15.

## SUMMARY OF THE ARGUMENT

The Decision is arbitrary, capricious, and contrary to law. This Court should grant the petition and reverse the Decision.

**I.** The Decision denies due process by fining ExxonMobil without advance notice of the governing standards. Due process mandates that an employer receive notice of the requirements of any OSHA regulation before it is cited for an alleged violation. Here, ExxonMobil properly relied on the agency's established and publicized position that employers doubting a mental-illness diagnosis may obtain a second opinion. But the ALJ imposed restrictions on that prerogative that ExxonMobil could not have anticipated at the time of its recording decision. The interpretive materials the Decision cited for its holding did not provide the requisite notice because they addressed physical injuries, not mental illnesses. Moreover, most of the materials related to a rule addressing

general recording criteria (Section 1904.7), whereas the rule at issue here addresses whether a work-related mental illness exists (Section 1904.5). On both independent grounds, it was unreasonable to expect that ExxonMobil could have imagined the novel obligations the ALJ would impose.

**II.** The Decision fails bedrock standards of the APA governing all agency action because it is not the product of a reasoned analysis that was reasonably explained. First, the Decision imposes illogical dictates that are incompatible with the second-opinion right in mental-illness cases. Second, the Decision fashioned those dictates without addressing important factors that OSHA had itself identified or answering obvious questions that would be readily apparent to a reasonable observer. Third, the Decision departed from OSHA's past position that employers are entitled to a second opinion in mental-illness cases without acknowledging or justifying the change. On all these grounds, the Decision's principal holding fails.

**III.** The Decision's alternative holding, imposing a burden-shifting framework, bears all deficiencies of the principal holding and thus fails under the Due Process Clause and the APA for the same reasons. ExxonMobil was not on notice of the framework, and it came without adequate explanation or answers to important questions that should have been addressed.

**IV.** Even if the Decision could stand on its own terms (it cannot), it would fail because the regulation it applies contravenes the OSH Act, which authorizes OSHA to require records and reports on "work-related deaths, injuries and illnesses" of the type that require "medical treatment" beyond "first

aid," "loss of consciousness" or "restriction of work or motion." 29 U.S.C. § 657(c)(2). Statutory text makes clear that these are physical injuries and illnesses, not mental illnesses. Although the term "illness" used in isolation today sometimes refers to mental illnesses, that is not the best reading of the term "illnesses" in the context of adjacent terms and the broader statute as enacted in 1970.

## STANDARDS OF REVIEW

This Court reviews *de novo* whether an agency complied with due process guarantees. *Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 484 (5th Cir. 2016); *Fabrizius v. Dep't of Agric.*, 129 F.4th 1226, 1237 (10th Cir. 2025). It exercises "searching and careful" review under the APA to assess whether "an agency examine[s] the relevant data and articulate[s] a satisfactory explanation for its action." *Univ. of Texas M.D. Anderson Cancer Ctr. v. DHS*, 985 F.3d 472, 475 (5th Cir. 2021) (citation omitted). And the Court reviews an agency's interpretation of a statute "de novo, with no deference owed to the agency." *Airlines for Am. v. DOT*, 127 F.4th 563, 572–73 (5th Cir. 2025); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

## ARGUMENT

### I.   The Decision Contravenes Due Process by Imposing a Fine Without Fair Notice

When it made its recording decision, ExxonMobil lacked fair notice of the framework the agency would apply. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of

conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (*Fox II*). Accordingly, "[d]ue process mandates that an employer receive notice of the requirements of any OSHA regulation before he is cited for an alleged violation." *S&H Riggers & Erectors, Inc. v. OSHRC*, 659 F.2d 1273, 1279–80 (5th Cir. 1981); *see also Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976); *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986). This requires both that OSHA regulations be "sufficiently specific" and that "they be applied only in such a manner that an employer may readily determine [their] requirements." *S&H Riggers*, 659 F.2d at 1280. The Decision fails this test.

### A. ExxonMobil Lacked Notice of the Limits OSHA Would Impose on the Second-Opinion Opportunity *Post Hoc*

The agency's longstanding, publicized position has been that, where an employer receives a qualifying opinion that its employee has a work-related mental illness, the employer "may refer the case to a physician or other licensed health care professional for a second opinion." 66 Fed. Reg. at 5953. ExxonMobil did that promptly here. On or after March 8, 2022, ExxonMobil received the opinion of Dr. Chelsea McCann that Employee 2 suffered from PTSD caused by the December 23, 2021 incident. ER 0023, 0038. But, questioning the recommendation of a lengthy leave of absence on little apparent basis, ExxonMobil referred the case to Dr. Heather Joppich, a psychologist equally qualified with Dr. McCann, to assess the existence and cause of mental illnesses like PTSD. *Id.* at 0023–24, 0037–38. Despite Employee 2's refusal to

cooperate with obtaining the second opinion, Dr. Joppich promptly conducted a clinical review and found insufficient evidence to support a PTSD diagnosis stemming from a work-related event. *Id.* at 0024, 0034. Based on Dr. Joppich's opinion, ExxonMobil declined to record Employee 2's PTSD diagnosis. *Id.* at 0024. This is precisely the reliance on "a second opinion" from "a physician or other licensed health care professional" to whom "the employer may refer the case" that OSHA has endorsed. 66 Fed. Reg. at 5953.

In subsequent litigation, however, the ALJ faulted this reliance on grounds that Dr. Joppich had not "actually met with the patient," ER 0037 (citation omitted), and found that Dr. Joppich's opinion "was not contemporaneous," *id.* at 0037–38. Then, claiming to reach an alternative holding, the ALJ employed a new burden-shifting framework that required ExxonMobil to rebut a presumption by "show[ing] its decision not to record the illness complied with the standard," *id.* at 0039, then independently weighed the evidence and decided that Employee 2 suffered a recordable work-related illness, *see id.* at 0038–41; *see infra* § III. But the agency never informed employers of these standards. *See Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1334 (D.C. Cir. 1995) ("[W]here the agency itself struggles to provide a definitive reading of the regulatory requirements, a regulated party is not 'on notice' of the agency's ultimate interpretation of the regulations."). Even if the requirements the ALJ imposed were permissible (they are not, *see infra* §§ II, III, and IV), ExxonMobil lacked notice of them in 2022 when it made the decisions OSHA later deemed unlawful.

This case presents "precisely the kind of 'unfair surprise' against which [governing] cases have long warned." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012). For example, in *Fox II*, the Federal Communications Commission (FCC) penalized television stations for prime-time broadcasts of award ceremonies where "the F-word" was used and a prerecorded drama "show[ing] the nude buttocks of an adult female character for approximately seven seconds and for a moment the side of her breast." 567 U.S. at 247–48. Although the statute prohibited the broadcasting of "any obscene, indecent, or profane language," 18 U.S.C. § 1464, the Supreme Court unanimously found that a "person of ordinary intelligence [lacked] fair notice of what is prohibited" because the FCC had never announced that "fleeting expletives and a brief moment of indecency were actionably indecent," 567 U.S. at at 254 (citation and alteration marks omitted).

Likewise, in *Employer Solutions Staffing Group II*, Immigration and Customs Enforcement (ICE) penalized an employer for an I-9 Form attesting that employees' immigration status had been checked because the signing representative had not personally reviewed the requisite documents in new employees' presence. 833 F.3d at 484–85. This Court vacated that ruling because the agency had never provided notice that it would accept only individual (as opposed to corporate) attestations. *Id.* at 487–91. And, in *Gates & Fox Co.*, the court vacated OSHA's citation of a construction company where the agency had not made clear that "self-rescuers" should be provided to employees not working near walls of earth where excavation work was progressing. 790 F.2d at 156; *see*

*also ExxonMobil Pipeline Co. v. DOT*, 867 F.3d 564, 579–80 (5th Cir. 2017) (finding no fair notice of agency position against reliance on reputable third-party report in establishing pipeline integrity management plan).

This case is no different. OSHA had never announced restrictions on an employer's prerogative to rely on "a second opinion" where "the employer does not believe the reported mental illness is work-related," 66 Fed. Reg. at 5953, and the ALJ fashioned requirements ExxonMobil could not have anticipated. Indeed, the ALJ admitted that "neither § 1904.5(b)(2)(ix) nor the preamble explicitly limit an employer's right to obtain a second opinion." ER 0035. The Decision, however, reasoned that the standard could not be "so broad or open-ended as to allow unlimited second-opinions or those well after the initial diagnosis." *Id.* That would be a sound reason for the agency to announce standards applicable prospectively—just as the FCC would have good reason to announce standards protecting against unlimited nudity and profanity in prime-time television and ICE would have good reason to announce standards limiting the universe of individuals who may make certain attestations. The problem here, as in precedents, is that the agency fashioned such standards in a *post hoc* posture without prior notice. *Nissan Chem. Corp. v. FDA*, 744 F. Supp. 3d 1, 10 (D.D.C. 2024) (explaining that "one of the key purposes of the fair notice doctrine is to provide parties 'an opportunity to conform their behavior to legal rules'" (quoting *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 476 (D.C. Cir. 2020))).

**B.** **The Materials from Which the Decision Drew Its Restrictions Could Not Have Been Anticipated to Apply in This Case in Advance**

The Decision's effort to identify agency precedent for the new rules it fashioned identify "nothing that would have given [ExxonMobil] affirmative notice" that Dr. Joppich's second opinion would be dismissed as unauthoritative. *Fox II*, 567 U.S. at 257.

**1.** As an initial matter, it is significant that the Decision did *not* claim the governing statute or regulation placed ExxonMobil on notice of the new standards and affirmatively acknowledged the regulation's silence. ER 0035. Because "the grounds upon which an administrative order must be judged are those upon which the record discloses its action was based," *Louisiana v. Dep't of Energy*, 90 F.4th 461, 469 (5th Cir. 2024) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)) (alteration marks omitted), there is no room for the agency in litigation to rest its defense on the regulation.

And the Decision had good reason to concede this point: the regulation is indeed silent. It simply states that a mental illness "will not be considered work-related unless the employee voluntarily provides the employer with" a qualifying opinion "that the employee has a mental illness that is work-related." 29 C.F.R. § 1904.5(b)(2)(ix). The regulation's not/unless syntax identifies a necessary condition (i.e., a qualifying professional opinion) but does not specify all conditions that are sufficient to trigger the recording requirement. *See* Webster's Third New International Dictionary 2503 (1993) ("unless" means "without the accompanying circumstance or condition"). Put differently, the regulation states

that a mental illness becomes potentially recordable only if an employee presents a qualifying professional opinion but does not provide that a recording obligation necessarily arises when that occurs or what factors determine the obligation from that point. Because the regulation is ambiguous about the full range of sufficient conditions, ExxonMobil was justified in looking to the preamble to understand its obligations. *See Emp'r Sols.*, 833 F.3d at 486; *ExxonMobil*, 867 F.3d at 579; *cf. See Wal-Mart Distrib. Ctr. #6016 v. OSHRC*, 819 F.3d 200, 203 (5th Cir. 2016) ("When the regulatory language is ambiguous, we may also consult the regulation's preamble."); *see also Nissan Chem. Corp.*, 744 F. Supp. 3d at 7–8 (finding due-process violation where agency departed from its preamble without notice).[4]

**2.** The Decision sought to clear up the regulation's ambiguity by referencing OSHA interpretive letters and an agency FAQ response, ER 0036–37, but ExxonMobil had no basis to guess at this in advance for at least two independent reasons.

First, the cited agency materials addressed only physical injuries, not mental illnesses. The Decision cited interpretive letters speaking to cases where "an employee fell on the steps at work and was diagnosed by an emergency

---

[4] Because the regulation was facially incomplete, and OSHA completed it at the time of promulgation in the preamble, this is a case where the agency intended to bind itself to the preamble. *See Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1220 (D.C. Cir. 1996); *Nat. Res. Def. Council v. EPA*, 571 F.3d 1245, 1252 n.2 (D.C. Cir. 2009); *Safer Chems., Healthy Families v. EPA*, 943 F.3d 397, 417 (9th Cir. 2019).

room physician with an acute right wrist scaphoid fracture and acute left knee contusion," Add. 027[5]; "an employee who sustained a work-related bruise on his knee was told by a physician not to return to work until undergoing an MRI," Add. 023[6]; and different employees who reported "work-related aches and pains to a company doctor" and fell down at work, respectively, Add. 034–037[7]. ER 0035–36 and n.13. The Decision also cited a FAQ response and additional interpretive letters that, while not geared to any fact pattern, necessarily concerned physical injuries. The FAQ response titled "Question 7-10a" stated that, "once medical treatment is provided for a work-related injury or illness, or days away from work or work restriction have occurred, the case is recordable," Add. 038[8], which can occur only in cases of physical injuries. Following up on Question 7-10a, the May 15, 2007 letter the Decision cited proposed three times that employers seek any second opinion "the same day as the injury or illness," Add. 032[9], which also can occur only for physical ailments.

No reasonably informed employer would have understood that these materials addressed whether a mental illness is work-related. That is because the

---

[5] OSHA Apr. 3, 2007 Interpretive Letter, *available at* https://www.osha.gov/laws-regs/standardinterpretations/2007-04-03-0.

[6] OSHA Mar. 19, 2003 Interpretive Letter, *available at* https://www.osha.gov/laws-regs/standardinterpretations/2003-03-19.

[7] OSHA Feb. 22, 2011 Interpretive Letter, *available at* https://www.osha.gov/laws-regs/standardinterpretations/2011-02-25.

[8] OSHA Question 7-10a, *available at* https://www.osha.gov/recordkeeping/resources#q7-10a.

[9] OSHA May 15, 2007 Interpretive Letter, *available at* https://www.osha.gov/laws-regs/standardinterpretations/2007-05-15.

agency had acknowledged that "recording work-related mental illnesses involves several unique issues, including the difficulty of detecting, diagnosing and verifying mental illnesses; and the sensitivity and privacy concerns raised by mental illnesses." 66 Fed. Reg. at 5953. OSHA therefore applied different rules to mental illnesses than to physical injuries. *See id.* Given the clear distinction the agency drew between mental and physical illnesses, there was no reason for ExxonMobil's team of professionals to look to documents addressing physical injuries in ascertaining the company's obligation to record an alleged mental illness.

Second, the materials the Decision cited were irrelevant for the separate reason that they address a different regulation from the one at issue here. The question in this case is whether a work-related illness even exists for purposes of Section 1904.5 by virtue of Employee 2's provision of an opinion "that the employee has a mental illness that is work-related." 29 C.F.R. § 1904.5(b)(2)(ix); *see* 66 Fed. Reg. at 5950 (preamble addressing Section 1904.5). But the Decision looked to agency guidance about Section 1904.7, which asks whether a *concededly* work-related injury satisfies "recording criteria," which are essentially severity metrics requiring the result of "death, days away from work, restricted work or transfer to another job, medical treatment beyond first aid, or loss of consciousness." *Id.* § 1904.7(a). FAQ Question 7-10a and the March 2003 and May 2007 letters explicitly interpret Section 1904.7 and are organized on the agency's website in conjunction with Section 1904.7, such that someone looking for guidance on Section 1904.5 would not find them. *See* Add. 023, 030; *see*

*also* OSHA, OSHA Injury and Illness Recordkeeping Rule Regulatory Text and Resources by Provision (1904.7 General recording criteria).[10] While the April 2007 letter mentions Section 1904.5, it focuses on Section 1904.7 in addressing whether days away from work were necessary (the proper subject of § 1904.7). Especially where the April 2007 letter is decidedly focused on a physical injury, this "isolated and ambiguous statement … does not suffice for the fair notice required." *Fox II*, 567 U.S. at 257.

The difference in regulations is significant because employers would have no way to know that guidance demarcated as construing Section 1904.7 would be applied to Section 1904.5. The agency acknowledged the distinct steps of the analysis by prefacing the regulatory scheme with a visual "decision tree":

---

[10] *Available at* https://www.osha.gov/recordkeeping/resources (stating that the "information and resources provided [on this website, including preamble excerpts, FAQs, and Letters of Interpretation] are intended to assist employers … in understanding OSHA injury and illness recordkeeping requirements").



29 C.F.R. § 1904.4(b)(2). As shown, the question whether "general recording criteria" were met (Section 1904.7) comes two steps after the question whether a "work-related" injury or illness arose at all (Section 1904.5). Where the agency provided a clear ordering, employers at earlier steps of the inquiry cannot reasonably be expected to look for guidance addressing later steps.

## II.    The Decision Fails the APA's Standard of Reasoned Decision-Making

The Decision fails the bedrock standards governing all agency action. Under the APA, courts must "'hold unlawful and set aside' agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Univ. of Texas M.D.*, 985 F.3d at 475 (quoting 5 U.S.C. § 706(2)). This standard requires that agency action be the product of "reasoned analysis."

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). "[I]n order to permit meaningful judicial review, an agency must 'disclose the basis" of its action.'" *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (citation omitted). Courts, in turn, "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *State Farm*, 463 U.S. at 43 (citation omitted). The APA obligates an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (citation omitted). The Decision fails this test in several interrelated respects.

## A.    The Decision Is Illogical and Incompatible with the Agency's Own Stated Position on Second Opinions

The Decision imposes illogical dictates that are incompatible with the agency's own position on second opinions in mental-illness cases—which it has never rescinded. "Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1016 (5th Cir. 2019) (quoting *U.S. Chamber of Com. v. DOL*, 885 F.3d 360, 382 (5th Cir. 2018)).

Here, citing factors "unique" to mental illnesses, the agency fashioned "a second opinion" opportunity for mental-disorder cases. 66 Fed. Reg. at 5953. But the Decision imposes contradictory dictates that eliminate that option. First, the Decision applied a strict rule against reliance on a second opinion after "medical treatment is provided for a work-related injury or illness, or days away

from work or work restriction have occurred." Add. 038; ER 0037. But, as applied to mental illnesses, an employer cannot meet that standard because an employee will almost certainly miss work and receive care before a diagnosis and before the employer is even aware of the mental illness. Indeed, the agency has informed employers that they are "under no obligation to seek out information on mental illnesses from its employees." 66 Fed. Reg. at 5953. The agency had recognized that "the difficulty of detecting, diagnosing and verifying mental illnesses" justifies the second-opinion opportunity, *id.*, but the Decision ignored those factors in issuing directly contrary directives.

This is a case in point. The incident allegedly causing Employee 2's PTSD occurred on December 23, 2021, but no diagnosis of PTSD was even possible for at least a month because PTSD is clinically defined by symptoms persisting at least that long. *See* ER 0033–34. In fact, Dr. McCann did not render such a diagnosis until March 8, by which time Employee 2 had missed work and had received medical treatment in the form of prescription medication.[11] *Id.* at 0020, 0037–38. According to OSHA, Employee 2's "mental illness diagnosis became recordable the moment ExxonMobil received the" diagnosis, *id.* at 0034 (quoting Post-Hearing Brief of the Secretary of Labor at 26), and the ALJ endorsed that position, *id.* at 0036–37. By consequence, ExxonMobil was denied any right to a second opinion.

---

[11] This is typical of mental illnesses. A second illness at issue for another employee in this case, Generalized Anxiety Disorder (GAD), requires at least six months of symptoms before a valid diagnosis can issue. ER 0049–50.

Second, the Decision contradicts a second-opinion opportunity further by imposing a requirement that the qualified professional meet with the employee claiming a mental illness. *Id.* at 0037. But neither the regulation nor any agency pronouncement requires the employee to meet with the qualified professional. The Decision faulted Dr. Joppich for having only "conducted a document review," *id.*, but that was only because "Employee 2 declined to make himself available," *id.* at 0023. By deeming that fact dispositive, the ALJ granted Employee 2 a unilateral veto power against ExxonMobil's long-recognized prerogative to seek a second opinion. Under that construction, no opportunity for a second opinion is likely to arise in the future because employees have a unilateral right to deprive such an opinion of "authoritative" status.

Such contradictions have doomed past agency decisions. For example, a regulation permitting workers' entry in a mine before safety inspections concluded was rejected as incompatible with the agency's prior finding that entering mines during inspections created safety risks. *See United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019). An agency ruling that it was "unjust and unreasonable" for a shipping company to impose contractual charges for the late return of equipment when the relevant port was closed was rejected because its rationale—that the charges would create logjams by incentivizing a rush to return equipment—contradicted the agency's prior finding that such charges had no incentivizing effect at all. *Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*, 106 F.4th 1113, 1118 (D.C. Cir. 2024). And this Court rejected a securities rule requiring issuers to report share

repurchase data because the agency at once claimed the rule promoted disclosure of "useful" information and that such disclosures "would *not* contain valuable information." *Chamber of Com. of United States v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023); *see also MCR Oil Tools, L.L.C. v. DOT*, 110 F.4th 677, 699–700 (5th Cir. 2024); *Sw. Elec. Power*, 920 F.3d at 1021; *Chamber of Com. v. DOL*, 885 F.3d at 382. In a similar contradiction, the Decision gives a second-opinion opportunity with one hand, based on specific considerations, and takes it away with the other hand, ignoring those considerations.

### B. The Agency Failed to Consider Important Aspects of the Problem Before It

Along the same lines, the agency failed in its duty to address "important aspect[s] of the problem" of mandated recording in mental-illness cases. *State Farm*, 463 U.S. at 43. This standard requires agencies to address "relevant factors" within its decision. *State v. Biden*, 10 F.4th 538, 552 (5th Cir. 2021); *see also, e.g.*, *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 624–25 (D.C. Cir. 2022) (describing requirement that agencies address "important aspect[s] of the problem" before them).

The Decision addresses none of the factors relevant to recording mental-health-related illnesses. An easy starting point is that OSHA had already identified "issues" "unique" to "recording work-related mental illnesses," such as "the difficulty of detecting, diagnosing and verifying mental illnesses" and "the sensitivity and privacy concerns raised by mental illnesses." 66 Fed. Reg. at 5953. It stands to reason that, when fashioning rules related to mental

illnesses, the agency should address at least those factors. *See Evergreen Shipping*, 106 F.4th at 1117 (faulting agency for not considering factors it "acknowledged" were important). But the Decision is completely silent about them, even though this case presented examples of how important they are. The difficulty of diagnosing and verifying PTSD was exemplified by the fact that PTSD could not be verifiably diagnosed for more than a month after the incident. The privacy problems were likewise present because Employee 2 declined to meet with Dr. Joppich. The Decision, however, completely ignored the timing problem, and it explicitly ignored the privacy problem—overtly "not[ing]" competing positions about Employee 2's recalcitrance and stating it did not "bear[] on its analysis." ER 0037 n.14.

Stepping back, an obvious question for the agency was whether the strictures it imposed would ever work. As shown, the Decision's framework cannot be implemented without abrogating the second-opinion opportunity. *See supra* § II.A. Even if coherent responses are available to the agency in litigation, the Decision is deficient for failing to address the issues. *Louisiana v. Dep't of Energy*, 90 F.4th at 469. Notably, if the guidance documents the Decision cited were somehow sufficient to place ExxonMobil on notice of the standards, *but see supra* § I, these too did not consider workability or the issues related to mental illness identified in the preamble. For example, FAQ 7-10a announces that, "once medical treatment is provided for a work-related injury or illness, or days away from work or work restriction have occurred, the case is recordable," without mentioning mental illnesses, the difficulty in diagnosing them, or the

incompatibility of that standard with a second opinion in any case. Add. 038. Likewise, in advising employers to seek a second opinion "the same day as the injury or illness," the May 2007 letter is silent about mental illnesses and how its advice could ever apply to them. Add. 032. As explained, this is because all the cited guidance concerns physical injuries. But even if the cited guidance provided notice about mental illnesses, their failure to consider factors related to mental illnesses only adds layers of error in the agency's failure to consider important factors.

The Decision erred further by failing to consider obvious alternatives to the framework it imposed. In justifying its exercise of power, an agency must address readily apparent "alternative[s]" that it has necessarily ruled out in making its choice. *Louisiana v. Dep't of Energy*, 90 F.4th at 476; *Off. of Commc'n of United Church of Christ v. FCC,* 707 F.2d 1413, 1424 (D.C. Cir. 1983) (explaining that arbitrary-and-capricious review "will demand that the [agency] consider reasonably obvious alternative[s] … and explain its reasons for rejecting alternatives in sufficient detail to permit judicial review"); *Clarke v. CFTC*, 74 F.4th 627, 641 (5th Cir. 2023) (same); *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013). For example, in rescinding a requirement that new automobiles include both automatic seatbelts and airbags, after concluding that the seatbelt requirement was not justified, the Secretary of Transportation acted arbitrarily in failing to consider "an airbags-only alternative." *State Farm*, 463 U.S. at 50. Similarly, in rescinding a policy extending both enforcement discretion and benefits to unlawfully present persons after concluding the

benefits piece was illegal, the Department of Homeland Security acted arbitrarily in failing to consider a policy that extended only enforcement discretion but not benefits. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 27–30 (2020).

Here, the agency's concern that "unlimited second-opinions or those well after the initial diagnosis" could not be allowed, ER 0035, could have been resolved in many different ways—including ways accounting for unique mental-illness factors—but the agency considered *no* alternatives. For example, the agency might apply a rule requiring a second opinion in mental-illness cases to be obtained within a reasonable time of the initial opinion as judged by professional practice (like one or two weeks). Alternatively, the agency might measure the opportunity as compared to the time it took the employee to obtain the initial assessment. The Decision did not explain how allowing *no* time for a second opinion could be better than obvious alternatives. Likewise, the problem of Employee 2's refusal to meet with Dr. Joppich could have been resolved in multiple ways. The agency might identify alternative means of diagnosis through professionally appropriate factors, impose an adverse inference against an employee who makes such a choice, or even require employees to submit to an evaluation in this setting. Nothing in the Decision—or anywhere else—explains why giving employees a unilateral veto right was preferable to such options. In this respect, too, the Decision is inadequately reasoned.

**C. The Agency Failed to Acknowledge or Explain Its Departure from Its Prior Position**

An additional, interrelated deficiency in the Decision was its failure to acknowledge departure from the agency's past position. Although agency "change" is not "subject to more searching review" than other agency decisions, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (*Fox I*). "An agency may not, for example, depart from a prior policy *sub silentio*," but rather "must show that there are good reasons for the new policy." *Id.*; *see also Jupiter Energy Corp. v. FERC*, 407 F.3d 346, 349 (5th Cir. 2005) (requiring "a reasoned analysis for any departure from other agency decisions" (citation omitted)); *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008) ("[A]n agency's unexplained departure from precedent must be overturned as arbitrary and capricious."). Here, the agency's longstanding policy permitted a second opinion in mental-illness cases, and the Decision effectively abrogates it. *See supra* § II.A. The Decision neither admitted the abrogation nor justified it with any rationale. For this reason, too, the Decision cannot stand.

**III. The Decision's Alternative Framework Suffers All Defects of Its Principal Framework**

In the Decision, the ALJ appeared to believe she applied a belt-and-suspenders approach in finding that, "[e]ven if the Court were to entertain ExxonMobil's argument that Employee 2's mental illness diagnosis was incorrect, it still finds, for the following reasons … PTSD was work-related and

therefore recordable." ER 0038. In case it is not apparent from the foregoing discussion (*see supra* §§ I and II), this section briefly explains why that approach fails.

To begin, ExxonMobil argued that it was not on notice of the strictures the agency would apply in assessing whether an employer properly invokes the second-opinion opportunity. *See id.* at 27 ("ExxonMobil contends the Secretary failed to provide fair notice of any restrictions or requirements for a second opinion was properly invoked."). Accordingly, the ALJ's subsequent analysis of which competing opinions was more persuasive—under a novel burden-shifting framework—did nothing to cure the defect in the Decision's primary rationale. *See id.* at 30–33.

ExxonMobil had no notice of the burden-shifting framework or the prospect of an ALJ's review of the persuasiveness of competing professional opinions. The regulation and preamble spoke objectively in terms of opinions and professional qualifications. The regulation sets a threshold condition that the employee furnish "an opinion from a physician or other licensed health care professional with appropriate training and experience … stating that the employee has a mental illness that is work-related." 29 C.F.R. § 1904.5(b)(2)(ix). The preamble addresses the ambiguity (i.e., of what other conditions follow) by allowing the employer to "refer the case to a physician or other licensed health care professional for a second opinion." 66 Fed. Reg. at 5953. Both agency directives set qualifying conditions for an opinion and indicate an employer's basis for reliance on an opinion. They do not set up a contest between opinions,

require any determination of which one is more persuasive, provide notice that an ALJ will decide in hindsight which seems more persuasive, or indicate that it will be the employer's burden to prove the second opinion is more persuasive than the first. The notice failing of the principal holding equally plagues the alternative.

So does the failure to engage in reasoned decision-making: all deficiencies in the principal holding described above apply here as well. *See supra* § II. The Decision does not acknowledge the substantial shift from the agency's past position, much less justify it (*supra* § II.C); explain how the framework accords with the factors the agency had previously identified as unique to mental illnesses (*supra* § II.B); or show workability (*supra* § II.A).

Additional questions, specific to the burden-shifting approach, abound. One question is why an administrative trial is a proper way to implement the statutory and regulatory recording requirements, which appear intended to guide employers in ascertaining whether they have a duty to record rather than to reach an adjudicative determination of whether a work-related mental illness actually exists. Recall that the question here is not whether Employee 2 is entitled to compensation for the December 23, 2021 incident, but simply whether ExxonMobil must make certain notations in log books. *See* ER 0041 n.17. Does it make more sense to conduct lengthy evidentiary hearings on competing professional reports rather than (as the guidance currently indicates) to set a basic objective framework that yields an ascertainable (if imperfect) answer that employers may implement? *See* 66 Fed. Reg. at 5950 ("the

determination of work-relatedness is best made by the employer"). The Decision says nothing about this question. Another question is what metrics should govern how to assess which of several competing opinions is most persuasive. Should the employer look principally to qualifications (such that a psychiatrist's report might trump a physician's), the persuasiveness of an opinion (such that an opinion discussing factors in depth might trump a more cryptic opinion), or something else (such as the number of opinions favoring one conclusion over another)? On this too, the Decision is silent.[12]

## IV. The OSH Act Does Not Authorize OSHA to Require Recording of Mental Disorders

The Decision is "not in accordance with law," 5 U.S.C. § 706(2)(A), because it applies a regulation that contravenes the governing statute. In evaluating this question, the Court "shall decide all relevant questions of law,

---

[12] The Decision erred in treating the opinions of two additional professionals (Sydney Adams-Ordonio and Rachel Brown, both licensed clinical social workers) as qualifying opinions under the standard of 29 C.F.R. § 1904.5(b)(2)(ix). To qualify, a professional must be "a physician or other licensed health care professional with appropriate training and experience (psychiatrist, psychologist, psychiatric nurse practitioner, etc.)." *Id.* Mses. Adams-Ordonio and Brown, however, are licensed clinical social workers (LCSWs), not psychiatrists, psychologists, or psychiatric nurse practitioners. Nor are LCSWs the functional equivalent of psychiatrists, psychologists, or psychiatric nurse practitioners. LCSWs have less training in diagnosis assessment, and ExxonMobil presented expert opinion that their diagnoses are less accurate than those of enumerated providers. This error, however, does not affect the outcome here because, even if three opinions supported Employee 2's diagnosis, nothing in the established framework provided notice that the number of opinions makes a difference in the recording requirement or justifies such a rule. The Court need not reach this issue.

interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," 5 U.S.C. § 706, without deference to the agency, *see Loper Bright*, 603 U.S. at 369. The OSH Act entitles OSHA to require records and reports on "work-related deaths, injuries and illnesses other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job." 29 U.S.C. § 657(c)(2). The agency erred in extending recording obligations to mental illnesses where this text speaks only of physical conditions.

1.      The term "injuries" is plainly physical, as in "[d]amage or hurt done to or suffered by a person or thing." Webster's Second New International Dictionary 1280 (1957) (Webster's Second). And an "illness" is a "disease; ailment; malady; disorder of health" or "sickness." *Id.* at 1241; *see also* 7 Oxford English Dictionary 657 (2d ed. 1989) (a "[b]ad or unhealthy condition of the body (or … some part of it)"). Read according to their "ordinary, popular meaning," *United States v. Rainey*, 757 F.3d 234, 242 (5th Cir. 2014) (citation omitted), these terms speak only to physical ailments, not mental disorders.

To be sure, the term "mental illness" is common in recent vintage, and some dictionaries post-dating the enactment of the OSH Act in 1970 include this broader meaning in defining the unmodified term "illness." *See* Webster's Third New International Dictionary 1127 (1990) (Webster's Third) ("an unhealthy condition of the body or mind"). But that broad meaning of "illnesses," which lacks the modifier "mental" in the statute, does not work here. *See Bostock v.*

*Clayton Cnty.*, 590 U.S. 644, 674–75 (2020) ("Because the law's ordinary meaning at the time of enactment usually governs, we must be sensitive to the possibility a statutory term that means one thing today or in one context might have meant something else at the time of its adoption or might mean something different in another context.").

This is a case where "a word may be known by the company it keeps." *See United States v. Koutsostamatis*, 956 F.3d 301, 307 (5th Cir. 2020) (applying *noscitur a sociis* canon) (citation omitted). The text clarifies that "injuries and illnesses" refer to conditions that can cause "restriction of work or motion" and require "first aid treatment" and "medical treatment," *see* Webster's Second 1527 (noting that the term "[r]equiring medical treatment" is "said of certain diseases"); *cf. id.* at 476 ("disease" means "[a] condition in which bodily health is seriously attacked" or "an alteration of the human body"); *id.* at 1527 ("medicine" is "[t]he science and art dealing with the prevention, cure, and alleviation of disease"). Forcing psychological problems into this text is unnatural.

Moreover, the text treats "illness" and "injury" as close synonyms, requiring recording of "injuries and illnesses other than minor injuries"— without repeating the word "illnesses." The statute is drafted so that "injuries" covers both terms, and the term "injuries" remained solely a physical term as of 1990. *See* Webster's Third 1164 ("to inflict bodily hurt on"). Taken as a whole, the operative sentence speaks of physical conditions in a manner that excludes the concept of a mental illness. *See Babb v. Wilkie*, 589 U.S. 399, 406 (2020)

("What really matters for present purposes is the way [the] terms relate to each other"); *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (explaining how context can exclude possible meaning to which words might be "amenable" taken "[in] complete isolation"); *see also Houston Aquarium, Inc.*, 965 F.3d at 440 (faulting OSHRC for "focusing on [a] single term" rather than read regulation "as a whole").

 **2.** A broader take on context reveals the same point. The operative recording and reporting text appears as subsection (c)(2) in § 657 of U.S. Code Title 29 (§ 8 of the OSH Act), which establishes an inspection procedure in which OSHA may enter a work site "to inspect and investigate … all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials," 29 U.S.C. § 657(a). These are the types of things that cause physical harm. Subsection (c)(2) stands in service to the overarching inspection function. Moreover, the inspections stand in service of OSHA's core mission of setting "occupational safety or health standard[s]." *Id.* § 655(b). This is a power "to set workplace safety standards," *NFIB*, 595 U.S. at 117, not to address sweeping societal psychological problems. The agency has indeed set workplace safety standards, and none address mental health. *See* 29 C.F.R. part 1910. The statute's references to health, safety, and illness reference workers' physical state, not their psychological state. *See, e.g.*, 29 U.S.C. § 670(c). It is hard to see why one recording requirement, buried in subsection (c)(2) of § 8 would use "illnesses" in an entirely different sense.

Accordingly, OSHA administered the OSH Act for decades under regulations and guidance defining an "occupational illness" as "an abnormal condition or disorder … caused by exposure to environmental factors associated with employment," such as "acute and chronic illnesses or diseases which may be caused by inhalation, absorption, ingestion, or direct contact." *Johnson Controls, Inc.*, 1990 CCH OSHD ¶ 29097 (No. 89-2614, 1990) (quoting applicable guidance); *see also Sun Ship, Inc. Respondent & Loc. 802*, 1981 WL 95816, at *8 (describing requirement to record to "a description of the illness and part of the body affected, the cause of the illness, the date of initial diagnosis of the illness and whether the employee died"); 36 Fed. Reg. at 12613–15 (initial regulations not requiring recording of mental illnesses).

**3.**     In shifting gears in 2001, the agency made many assertions that cut against that choice. It emphasized that "[j]ob stress is perhaps the most pervasive occupational health problem in the workplace today," creating "a number of emotional and behavioral results and manifestations of job stress, including depression and anxiety." 66 Fed. Reg. at 5952. This is an accurate statement, as lawyers and judges know as well as anyone. But it proves too much. Where the agency (fairly) understood work-related mental illness to include job stress, it must be outside a recording requirement reaching the types of "injuries and illnesses" that require "first aid treatment." 29 U.S.C. § 657(c)(2). While work can and does impose mental distress on innumerable Americans in all walks of life, rendering that recordable would render the statute unworkable and

absurd—a point the agency implicitly recognized in defining the recording requirement according to qualifying expert opinions.

Indeed, the Supreme Court held that the OSH Act's mandate that OSHA regulate "'occupational' hazards and the safety and health of 'employees'" did not authorize it to regulate "the risk of contracting COVID–19," which is a "kind of universal risk … no different from the day-to-day dangers that all face from crime, air pollution, or any number of communicable diseases." *NFIB*, 595 U.S. at 118. OSHA's regulation of mental illnesses fails for similar reasons. Although job stress is real, it is no different from the types of stress Americans feel for a variety of reasons, and efforts of OSHA to restructure workplaces to account for mental-health factors would fare no better than a nationwide vaccine mandate. OSHA's effort to require mental-illness recordkeeping fares no better and is at odds with the statutory scheme.

The agency did not adopt "the best reading of the statute." *Loper Bright*, 603 U.S. at 400. In fact, it never read the statute; it provided no meaningful interpretive analysis. 66 Fed. Reg. at 5950–53. The only textual point it offered was that the congressional statement of purpose for the OSHA Act referenced "psychological factors." *Id.* at 5953. But it ripped those words from context. The statute references a purpose of "providing for research in the field of occupational safety and health, including the psychological factors involved." 29 U.S.C. § 651(b)(5). That sheds no light on 29 U.S.C. § 657 (i.e., § 8), which is not a research provision. *Contrast* 29 U.S.C. § 669 ("Research and related activities"). And it references psychological factors in relation to "occupational

safety and health," not in any independent sense. That lone reference cannot overcome the weight of text and context limiting the recording requirement to physical injuries.

**4.** In any event, even assuming diagnosable mental illnesses could be deemed recordable in some instances under the OSH Act, a second-opinion opportunity is essential for its proper administration, particularly under the circumstances OSHA has created with its sweeping definition. Without a second-opinion opportunity, any employee could provide a diagnosis asserting that "stress" resulted from "high workload demands coupled with low job control," and required counselling, and thereby create a recordable incident from the quotidian (but regrettable) condition of work-related dissatisfaction. 66 Fed. Reg. at 5950–53. The statute certainly requires more than that for a recordable incident to arise. At a minimum, a second-opinion opportunity, as the agency long ago recognized, is necessary to implement the statutory text. Moreover, any framework must be set out through proper advance notice and be a rational response to the realities of mental-illness diagnosis.

## CONCLUSION

The Court should grant the petition for review and reverse the citation.

Dated: June 26, 2025

Respectfully submitted,

/s/ Micah R. Smith

MICAH R. SMITH
RICHARD B. RAILE
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 861-1638
msmith@bakerlaw.com

*Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I certify that on June 26, 2025, I filed the foregoing with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ Micah R. Smith*
Micah R. Smith
Baker & Hostetler LLP
1050 Connecticut Ave., N.W.,
Suite 1100
Washington, D.C. 20036
(202) 861-1638
msmith@bakerlaw.com

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7) because it contains 10,800 words according to the count of Microsoft Word. I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Calisto MT.

Dated: June 26, 2025

/s/ Micah R. Smith
Micah R. Smith
Baker & Hostetler LLP
1050 Connecticut Ave., N.W.,
Suite 1100
Washington, D.C. 20036
(202) 861-1638
msmith@bakerlaw.com

**ADDENDUM**

# ADDENDUM CONTENTS

29 U.S.C. § 657................................................................. 2

29 C.F.R. § 1904.5 ............................................................ 6

29 C.F.R. § 1904.7 ............................................................ 10

66 Fed. Reg. 5916, 5950–54 (2001) ........................................ 15

OSHA March 19, 2003 Letter.............................................. 23

OSHA April 3, 2007 Letter................................................. 26

OSHA May 15, 2007 Letter................................................ 30

OSHA February 25, 2011 Letter .......................................... 34

OSHA FAQ, Question 7-10a................................................ 38

United States Code Annotated
  Title 29. Labor
    Chapter 15. Occupational Safety and Health (Refs & Annos)

29 U.S.C.A. § 657

§ 657. Inspections, investigations, and recordkeeping

Currentness

**(a) Authority of Secretary to enter, inspect, and investigate places of employment; time and manner**

In order to carry out the purposes of this chapter, the Secretary, upon presenting appropriate credentials to the owner, operator, or agent in charge, is authorized--

**(1)** to enter without delay and at reasonable times any factory, plant, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer; and

**(2)** to inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein, and to question privately any such employer, owner, operator, agent, or employee.

**(b) Attendance and testimony of witnesses and production of evidence; enforcement of subpoena**

In making his inspections and investigations under this chapter the Secretary may require the attendance and testimony of witnesses and the production of evidence under oath. Witnesses shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of a contumacy, failure, or refusal of any person to obey such an order, any district court of the United States or the United States courts of any territory or possession, within the jurisdiction of which such person is found, or resides or transacts business, upon the application by the Secretary, shall have jurisdiction to issue to such person an order requiring such person to appear to produce evidence if, as, and when so ordered, and to give testimony relating to the matter under investigation or in question, and any failure to obey such order of the court may be punished by said court as a contempt thereof.

**(c) Maintenance, preservation, and availability of records; issuance of regulations; scope of records; periodic inspections by employer; posting of notices by employer; notification of employee of corrective action**

**(1)** Each employer shall make, keep and preserve, and make available to the Secretary or the Secretary of Health and Human Services, such records regarding his activities relating to this chapter as the Secretary, in cooperation with the Secretary of Health and Human Services, may prescribe by regulation as necessary or appropriate for the enforcement of this chapter or for developing information regarding the causes and prevention of occupational accidents and illnesses. In order to carry out the provisions of this paragraph such regulations may include provisions requiring employers to conduct periodic inspections. The Secretary shall also issue regulations requiring that employers, through posting of notices or other appropriate means, keep their employees informed of their protections and obligations under this chapter, including the provisions of applicable standards.

Add. 002

**(2)** The Secretary, in cooperation with the Secretary of Health and Human Services, shall prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job.

**(3)** The Secretary, in cooperation with the Secretary of Health and Human Services, shall issue regulations requiring employers to maintain accurate records of employee exposures to potentially toxic materials or harmful physical agents which are required to be monitored or measured under section 655 of this title. Such regulations shall provide employees or their representatives with an opportunity to observe such monitoring or measuring, and to have access to the records thereof. Such regulations shall also make appropriate provision for each employee or former employee to have access to such records as will indicate his own exposure to toxic materials or harmful physical agents. Each employer shall promptly notify any employee who has been or is being exposed to toxic materials or harmful physical agents in concentrations or at levels which exceed those prescribed by an applicable occupational safety and health standard promulgated under section 655 of this title, and shall inform any employee who is being thus exposed of the corrective action being taken.

**(d) Obtaining of information**

Any information obtained by the Secretary, the Secretary of Health and Human Services, or a State agency under this chapter shall be obtained with a minimum burden upon employers, especially those operating small businesses. Unnecessary duplication of efforts in obtaining information shall be reduced to the maximum extent feasible.

**(e) Employer and authorized employee representatives to accompany Secretary or his authorized representative on inspection of workplace; consultation with employees where no authorized employee representative is present**

Subject to regulations issued by the Secretary, a representative of the employer and a representative authorized by his employees shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of any workplace under subsection (a) for the purpose of aiding such inspection. Where there is no authorized employee representative, the Secretary or his authorized representative shall consult with a reasonable number of employees concerning matters of health and safety in the workplace.

**(f) Request for inspection by employees or representative of employees; grounds; procedure; determination of request; notification of Secretary or representative prior to or during any inspection of violations; procedure for review of refusal by representative of Secretary to issue citation for alleged violations**

**(1)** Any employees or representative of employees who believe that a violation of a safety or health standard exists that threatens physical harm, or that an imminent danger exists, may request an inspection by giving notice to the Secretary or his authorized representative of such violation or danger. Any such notice shall be reduced to writing, shall set forth with reasonable particularity the grounds for the notice, and shall be signed by the employees or representative of employees, and a copy shall be provided the employer or his agent no later than at the time of inspection, except that, upon the request of the person giving such notice, his name and the names of individual employees referred to therein shall not appear in such copy or on any record published, released, or made available pursuant to subsection (g) of this section. If upon receipt of such notification the Secretary determines there are reasonable grounds to believe that such violation or danger exists, he shall make a special inspection in accordance with the provisions of this section as soon as practicable, to determine if such violation or danger exists. If the Secretary determines there are no reasonable grounds to believe that a violation or danger exists he shall notify the employees or representative of the employees in writing of such determination.

Add. 003

**(2)** Prior to or during any inspection of a workplace, any employees or representative of employees employed in such workplace may notify the Secretary or any representative of the Secretary responsible for conducting the inspection, in writing, of any violation of this chapter which they have reason to believe exists in such workplace. The Secretary shall, by regulation, establish procedures for informal review of any refusal by a representative of the Secretary to issue a citation with respect to any such alleged violation and shall furnish the employees or representative of employees requesting such review a written statement of the reasons for the Secretary's final disposition of the case.

**(g) Compilation, analysis, and publication of reports and information; rules and regulations**

**(1)** The Secretary and Secretary of Health and Human Services are authorized to compile, analyze, and publish, either in summary or detailed form, all reports or information obtained under this section.

**(2)** The Secretary and the Secretary of Health and Human Services shall each prescribe such rules and regulations as he may deem necessary to carry out their responsibilities under this chapter, including rules and regulations dealing with the inspection of an employer's establishment.

**(h) Use of results of enforcement activities**

The Secretary shall not use the results of enforcement activities, such as the number of citations issued or penalties assessed, to evaluate employees directly involved in enforcement activities under this chapter or to impose quotas or goals with regard to the results of such activities.

CREDIT(S)

(Pub.L. 91-596, § 8, Dec. 29, 1970, 84 Stat. 1598; Pub.L. 96-88, Title V, § 509(b), Oct. 17, 1979, 93 Stat. 695; Pub.L. 105-198, § 1, July 16, 1998, 112 Stat. 640.)

VALIDITY

<The United States Supreme Court has held Section 8 of the Occupational and Health Safety Act of 1970 (section 8 of Pub.L. 91-56), unconstitutional insofar as it purports to authorize inspections of certain business premises without warrant or its equivalent. Marshall v. Barlow's, Inc., U.S.Idaho 1978, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305. >

Notes of Decisions (303)

**O'CONNOR'S CROSS REFERENCES**
See also www.osha.gov/data (searchable inspection data).

**O'CONNOR'S ANNOTATIONS**
*Marshall v. Barlow's, Inc.*, 436 U.S. 307, 315 (1978). "The Government inspector … is not an employee [and without] a warrant he stands in no better position than a member of the public. … The owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny

of Government agents. That an employee is free to report, and the Government is free to use, any evidence of noncompliance with [the OSH Act] that the employee observes furnishes no justification for federal agents to enter a place of business from which the public is restricted and to conduct their own warrantless search."

*Brock v. Gretna Mach. & Ironworks, Inc.*, 769 F.2d 1110, 1112 (5th Cir.1985). "An administrative warrant will pass constitutional muster if it issues pursuant to a plan based on sufficient specific neutral criteria and the warrant application adequately explains why an inspection of the particular establishment is within the program. The magistrate, and the district court upon challenge, must determine whether the Secretary has prepared a reasonable inspection program and, if so, whether the desired inspection fits within that program. The judicial function is a dual one. It is first incumbent upon the court to review the plan itself to ensure that it contains the specific neutral criteria [referenced above]. [¶] The second and coequally important function of the court is the determination that the particular establishment was appropriately selected under the plan. This requires a consideration of the plan's industry rank list for the state in question and the methodology used in the selection of the particular establishment. The court should also be informed of the Secretary's perception of the desired frequency of inspections of companies on the establishment list and the actual inspection history of the business in question." *But see National Eng'g & Contracting Co. v. OSHRC*, 45 F.3d 476, 480 (D.C.Cir.1995) (OSHA establishes probable cause by attesting that worksite fits within program).

29 U.S.C.A. § 657, 29 USCA § 657
Current through P.L. 119-18. Some statute sections may be more current, see credits for details.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Add. 005

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter XVII. Occupational Safety and Health Administration, Department of Labor
                Part 1904. Recording and Reporting Occupational Injuries and Illnesses (Refs & Annos)
                    Subpart C. Recordkeeping Forms and Recording Criteria (Refs & Annos)

29 C.F.R. § 1904.5

§ 1904.5 Determination of work-relatedness.

Currentness

(a) Basic requirement. You must consider an injury or illness to be work-related if an event or exposure in the work environment either caused or contributed to the resulting condition or significantly aggravated a pre-existing injury or illness. Work-relatedness is presumed for injuries and illnesses resulting from events or exposures occurring in the work environment, unless an exception in § 1904.5(b)(2) specifically applies.

(b) Implementation.

(1) What is the "work environment"? OSHA defines the work environment as "the establishment and other locations where one or more employees are working or are present as a condition of their employment. The work environment includes not only physical locations, but also the equipment or materials used by the employee during the course of his or her work."

(2) Are there situations where an injury or illness occurs in the work environment and is not considered work-related? Yes, an injury or illness occurring in the work environment that falls under one of the following exceptions is not work-related, and therefore is not recordable.

| 1904.5(b)(2) | You are not required to record injuries and illnesses if . . . |
| --- | --- |
| (i)...................................... | At the time of the injury or illness, the employee was present in the work environment as a member of the general public rather than as an employee. |
| (ii)...................................... | The injury or illness involves signs or symptoms that surface at work but result solely from a non-work-related event or exposure that occurs outside the work environment. |
| (iii)...................................... | The injury or illness results solely from voluntary participation in a wellness program or in a medical, fitness, or recreational activity such as blood donation, physical examination, flu shot, exercise class, racquetball, or baseball. |
| (iv)...................................... | The injury or illness is solely the result of an employee eating, drinking, or preparing food or drink for personal consumption (whether bought on the employer's premises or brought in). For example, if the employee is injured by choking on a sandwich while in the employer's establishment, the case would not be considered work-related. |

Add. 006

|  | Note: If the employee is made ill by ingesting food contaminated by workplace contaminants (such as lead), or gets food poisoning from food supplied by the employer, the case would be considered work-related. |
|---|---|
| (v)...................................... | The injury or illness is solely the result of an employee doing personal tasks (unrelated to their employment) at the establishment outside of the employee's assigned working hours. |
| (vi)...................................... | The injury or illness is solely the result of personal grooming, self medication for a non-work-related condition, or is intentionally self-inflicted. |
| (vii)...................................... | The injury or illness is caused by a motor vehicle accident and occurs on a company parking lot or company access road while the employee is commuting to or from work. |
| (viii)...................................... | The illness is the common cold or flu (Note: contagious diseases such as tuberculosis, brucellosis, hepatitis A, or plague are considered work-related if the employee is infected at work). |
| (ix)...................................... | The illness is a mental illness. Mental illness will not be considered work-related unless the employee voluntarily provides the employer with an opinion from a physician or other licensed health care professional with appropriate training and experience (psychiatrist, psychologist, psychiatric nurse practitioner, etc.) stating that the employee has a mental illness that is work-related. |

(3) How do I handle a case if it is not obvious whether the precipitating event or exposure occurred in the work environment or occurred away from work? In these situations, you must evaluate the employee's work duties and environment to decide whether or not one or more events or exposures in the work environment either caused or contributed to the resulting condition or significantly aggravated a pre-existing condition.

(4) How do I know if an event or exposure in the work environment "significantly aggravated" a preexisting injury or illness? A preexisting injury or illness has been significantly aggravated, for purposes of OSHA injury and illness recordkeeping, when an event or exposure in the work environment results in any of the following:

(i) Death, provided that the preexisting injury or illness would likely not have resulted in death but for the occupational event or exposure.

(ii) Loss of consciousness, provided that the preexisting injury or illness would likely not have resulted in loss of consciousness but for the occupational event or exposure.

(iii) One or more days away from work, or days of restricted work, or days of job transfer that otherwise would not have occurred but for the occupational event or exposure.

(iv) Medical treatment in a case where no medical treatment was needed for the injury or illness before the workplace event or exposure, or a change in medical treatment was necessitated by the workplace event or exposure.

(5) Which injuries and illnesses are considered pre-existing conditions? An injury or illness is a preexisting condition if it resulted solely from a non-work-related event or exposure that occurred outside the work environment.

Add. 007

(6) How do I decide whether an injury or illness is work-related if the employee is on travel status at the time the injury or illness occurs? Injuries and illnesses that occur while an employee is on travel status are work-related if, at the time of the injury or illness, the employee was engaged in work activities "in the interest of the employer." Examples of such activities include travel to and from customer contacts, conducting job tasks, and entertaining or being entertained to transact, discuss, or promote business (work-related entertainment includes only entertainment activities being engaged in at the direction of the employer).

Injuries or illnesses that occur when the employee is on travel status do not have to be recorded if they meet one of the exceptions listed below.

| 1904.5(b)(6) | If the employee has . . . | You may use the following to determine if an injury or illness is work-related |
|---|---|---|
| (i)....................................checked into a hotel or motel for one or more days | | When a traveling employee checks into a hotel, motel, or into an other temporary residence, he or she establishes a "home away from home." You must evaluate the employee's activities after he or she checks into the hotel, motel, or other temporary residence for their work-relatedness in the same manner as you evaluate the activities of a non-traveling employee. When the employee checks into the temporary residence, he or she is considered to have left the work environment. When the employee begins work each day, he or she re-enters the work environment. If the employee has established a "home away from home" and is reporting to a fixed worksite each day, you also do not consider injuries or illnesses work-related if they occur while the employee is commuting between the temporary residence and the job location. |
| (ii)....................................taken a detour for personal reasons........................ | | Injuries or illnesses are not considered work-related if they occur while the employee is on a personal detour from a reasonably direct route of travel (e.g., has taken a side trip for personal reasons). |

(7) How do I decide if a case is work-related when the employee is working at home? Injuries and illnesses that occur while an employee is working at home, including work in a home office, will be considered work-related if the injury or illness occurs while the employee is performing work for pay or compensation in the home, and the injury or illness is directly

Add. 008

related to the performance of work rather than to the general home environment or setting. For example, if an employee drops a box of work documents and injures his or her foot, the case is considered work-related. If an employee's fingernail is punctured by a needle from a sewing machine used to perform garment work at home, becomes infected and requires medical treatment, the injury is considered work-related. If an employee is injured because he or she trips on the family dog while rushing to answer a work phone call, the case is not considered work-related. If an employee working at home is electrocuted because of faulty home wiring, the injury is not considered work-related.

SOURCE: 66 FR 6122, Jan. 19, 2001; 66 FR 52034, Oct. 12, 2001; 80 FR 49904, Aug. 18, 2015; 80 FR 78977, Dec. 18, 2015; 81 FR 91809, Dec. 19, 2016; 82 FR 20548, May 3, 2017; 84 FR 21457, May 14, 2019, unless otherwise noted.

AUTHORITY: 29 U.S.C. 657, 658, 660, 666, 669, 673, Secretary of Labor's Orders No. 3–2000 (65 FR 50017) and 1–2012 (77 FR 3912), as applicable, and 5 U.S.C. 553.

Notes of Decisions (3)

Current through June 24, 2025, 90 FR 26770. Some sections may be more current. See credits for details.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Add. 009

THOMSON REUTERS
WESTLAW PRECISION

Enter terms, citations,

All content          All State & Federal

Parallel Search
Advanced

Sign out

**§ 1904.7 General recording criteria.**

Code of Federal Regulations  •  Title 29. Labor   (Approx. 11 pages)

Document   Notes of Decisions (1)   History (1   Citing References (476   Context & Analysis (5

Fullscreen

§

Notes

Outlines

Code of Federal Regulations
   Title 29. Labor
      Subtitle B. Regulations Relating to Labor
         Chapter XVII. Occupational Safety and Health Administration, Department of Labor
            Part 1904. Recording and Reporting Occupational Injuries and Illnesses (Refs & Annos)
               Subpart C. Recordkeeping Forms and Recording Criteria (Refs & Annos)

29 C.F.R. § 1904.7

## § 1904.7 General recording criteria.

Currentness

(a) Basic requirement. You must consider an injury or illness to meet the general recording criteria, and therefore to be recordable, if it results in any of the following: death, days away from work, restricted work or transfer to another job, medical treatment beyond first aid, or loss of consciousness. You must also consider a case to meet the general recording criteria if it involves a significant injury or illness diagnosed by a physician or other licensed health care professional, even if it does not result in death, days away from work, restricted work or job transfer, medical treatment beyond first aid, or loss of consciousness.

(b) Implementation—

(1) How do I decide if a case meets one or more of the general recording criteria? A work-related injury or illness must be recorded if it results in one or more of the following:

(i) Death. See § 1904.7(b)(2).

(ii) Days away from work. See § 1904.7(b)(3).

(iii) Restricted work or transfer to another job. See § 1904.7(b)(4).

(iv) Medical treatment beyond first aid. See § 1904.7(b)(5).

(v) Loss of consciousness. See § 1904.7(b)(6).

(vi) A significant injury or illness diagnosed by a physician or other licensed health care professional. See § 1904.7(b)(7).

(2) How do I record a work-related injury or illness that results in the employee's death? You must record an injury or illness that results in death by entering a check mark on the OSHA 300 Log in the space for cases resulting in death. You must also report any work-related fatality to OSHA within eight (8) hours, as required by § 1904.39.

(3) How do I record a work-related injury or illness that results in days away from work? When an injury or illness involves one or more days away from work, you must record the injury or illness on the OSHA 300 Log with a check mark in the space for cases involving days away and an entry of the number of calendar days away from work in the number of days column. If the employee is out for an extended period of time, you must enter an estimate of the days that the employee will be away, and update the day count when the actual number of days is known.

(i) Do I count the day on which the injury occurred or the illness began? No, you begin counting days away on the day after the injury occurred or the illness began.

✦ CoCounsel

Add. 010

(ii) How do I record an injury or illness when a physician or other licensed health care professional recommends that the worker stay at home but the employee comes to work anyway? You must record these injuries and illnesses on the OSHA 300 Log using the check box for cases with days away from work and enter the number of calendar days away recommended by the physician or other licensed health care professional. If a physician or other licensed health care professional recommends days away, you should encourage your employee to follow that recommendation. However, the days away must be recorded whether the injured or ill employee follows the physician or licensed health care professional's recommendation or not. If you receive recommendations from two or more physicians or other licensed health care professionals, you may make a decision as to which recommendation is the most authoritative, and record the case based upon that recommendation.

(iii) How do I handle a case when a physician or other licensed health care professional recommends that the worker return to work but the employee stays at home anyway? In this situation, you must end the count of days away from work on the date the physician or other licensed health care professional recommends that the employee return to work.

(iv) How do I count weekends, holidays, or other days the employee would not have worked anyway? You must count the number of calendar days the employee was unable to work as a result of the injury or illness, regardless of whether or not the employee was scheduled to work on those day(s). Weekend days, holidays, vacation days or other days off are included in the total number of days recorded if the employee would not have been able to work on those days because of a work-related injury or illness.

(v) How do I record a case in which a worker is injured or becomes ill on a Friday and reports to work on a Monday, and was not scheduled to work on the weekend? You need to record this case only if you receive information from a physician or other licensed health care professional indicating that the employee should not have worked, or should have performed only restricted work, during the weekend. If so, you must record the injury or illness as a case with days away from work or restricted work, and enter the day counts, as appropriate.

(vi) How do I record a case in which a worker is injured or becomes ill on the day before scheduled time off such as a holiday, a planned vacation, or a temporary plant closing? You need to record a case of this type only if you receive information from a physician or other licensed health care professional indicating that the employee should not have worked, or should have performed only restricted work, during the scheduled time off. If so, you must record the injury or illness as a case with days away from work or restricted work, and enter the day counts, as appropriate.

(vii) Is there a limit to the number of days away from work I must count? Yes, you may "cap" the total days away at 180 calendar days. You are not required to keep track of the number of calendar days away from work if the injury or illness resulted in more than 180 calendar days away from work and/or days of job transfer or restriction. In such a case, entering 180 in the total days away column will be considered adequate.

(viii) May I stop counting days if an employee who is away from work because of an injury or illness retires or leaves my company? Yes, if the employee leaves your company for some reason unrelated to the injury or illness, such as retirement, a plant closing, or to take another job, you may stop counting days away from work or days of restriction/job transfer. If the employee leaves your company because of the injury or illness, you must estimate the total number of days away or days of restriction/job transfer and enter the day count on the 300 Log.

(ix) If a case occurs in one year but results in days away during the next calendar year, do I record the case in both years? No, you only record the injury or illness once. You must enter the number of calendar days away for the injury or illness on the OSHA 300 Log for the year in which the injury or illness occurred. If the employee is still away from work because of the injury or illness when you prepare the annual summary, estimate the total number of calendar days you expect the employee to be away from work, use this number to calculate the total for the annual summary, and then update the initial log entry later when the day count is known or reaches the 180–day cap.

(4) How do I record a work-related injury or illness that results in restricted work or job transfer? When an injury or illness involves restricted work or job transfer but does not involve death or days away from work, you must record the injury or illness on the OSHA 300 Log by placing a check mark in the space for job transfer or restriction and an entry of the number of restricted or transferred days in the restricted workdays column.

(i) How do I decide if the injury or illness resulted in restricted work? Restricted work occurs when, as the result of a work-related injury or illness:



Add. 011

(A) You keep the employee from performing one or more of the routine functions of his or her job, or from working the full workday that he or she would otherwise have been scheduled to work; or

(B) A physician or other licensed health care professional recommends that the employee not perform one or more of the routine functions of his or her job, or not work the full workday that he or she would otherwise have been scheduled to work.

(ii) What is meant by "routine functions"? For recordkeeping purposes, an employee's routine functions are those work activities the employee regularly performs at least once per week.

(iii) Do I have to record restricted work or job transfer if it applies only to the day on which the injury occurred or the illness began? No, you do not have to record restricted work or job transfers if you, or the physician or other licensed health care professional, impose the restriction or transfer only for the day on which the injury occurred or the illness began.

(iv) If you or a physician or other licensed health care professional recommends a work restriction, is the injury or illness automatically recordable as a "restricted work" case? No, a recommended work restriction is recordable only if it affects one or more of the employee's routine job functions. To determine whether this is the case, you must evaluate the restriction in light of the routine functions of the injured or ill employee's job. If the restriction from you or the physician or other licensed health care professional keeps the employee from performing one or more of his or her routine job functions, or from working the full workday the injured or ill employee would otherwise have worked, the employee's work has been restricted and you must record the case.

(v) How do I record a case where the worker works only for a partial work shift because of a work-related injury or illness? A partial day of work is recorded as a day of job transfer or restriction for recordkeeping purposes, except for the day on which the injury occurred or the illness began.

(vi) If the injured or ill worker produces fewer goods or services than he or she would have produced prior to the injury or illness but otherwise performs all of the routine functions of his or her work, is the case considered a restricted work case? No, the case is considered restricted work only if the worker does not perform all of the routine functions of his or her job or does not work the full shift that he or she would otherwise have worked.

(vii) How do I handle vague restrictions from a physician or other licensed health care professional, such as that the employee engage only in "light duty" or "take it easy for a week"? If you are not clear about the physician or other licensed health care professional's recommendation, you may ask that person whether the employee can do all of his or her routine job functions and work all of his or her normally assigned work shift. If the answer to both of these questions is "Yes," then the case does not involve a work restriction and does not have to be recorded as such. If the answer to one or both of these questions is "No," the case involves restricted work and must be recorded as a restricted work case. If you are unable to obtain this additional information from the physician or other licensed health care professional who recommended the restriction, record the injury or illness as a case involving restricted work.

(viii) What do I do if a physician or other licensed health care professional recommends a job restriction meeting OSHA's definition, but the employee does all of his or her routine job functions anyway? You must record the injury or illness on the OSHA 300 Log as a restricted work case. If a physician or other licensed health care professional recommends a job restriction, you should ensure that the employee complies with that restriction. If you receive recommendations from two or more physicians or other licensed health care professionals, you may make a decision as to which recommendation is the most authoritative, and record the case based upon that recommendation.

(ix) How do I decide if an injury or illness involved a transfer to another job? If you assign an injured or ill employee to a job other than his or her regular job for part of the day, the case involves transfer to another job. Note: This does not include the day on which the injury or illness occurred.

(x) Are transfers to another job recorded in the same way as restricted work cases? Yes, both job transfer and restricted work cases are recorded in the same box on the OSHA 300 Log. For example, if you assign, or a physician or other licensed health care professional recommends that you assign, an injured or ill worker to his or her routine job duties for part of the day and to another job for the rest of the day, the injury or illness involves a job transfer. You must record an injury or illness that involves a job transfer by placing a check in the box for job transfer.

(xi) How do I count days of job transfer or restriction? You count days of job transfer or restriction in the same way you count days away from work, using § 1904.7(b)(3)(i) to (viii), above. The only difference is that, if you permanently assign

the injured or ill employee to a job that has been modified or permanently changed in a manner that eliminates the routine functions the employee was restricted from performing, you may stop the day count when the modification or change is made permanent. You must count at least one day of restricted work or job transfer for such cases.

(5) How do I record an injury or illness that involves medical treatment beyond first aid? If a work-related injury or illness results in medical treatment beyond first aid, you must record it on the OSHA 300 Log. If the injury or illness did not involve death, one or more days away from work, one or more days of restricted work, or one or more days of job transfer, you enter a check mark in the box for cases where the employee received medical treatment but remained at work and was not transferred or restricted.

(i) What is the definition of medical treatment? "Medical treatment" means the management and care of a patient to combat disease or disorder. For the purposes of part 1904, medical treatment does not include:

(A) Visits to a physician or other licensed health care professional solely for observation or counseling;

(B) The conduct of diagnostic procedures, such as x-rays and blood tests, including the administration of prescription medications used solely for diagnostic purposes (e.g., eye drops to dilate pupils); or

(C) "First aid" as defined in paragraph (b)(5)(ii) of this section.

(ii) What is "first aid"? For the purposes of part 1904, "first aid" means the following:

(A) Using a non-prescription medication at nonprescription strength (for medications available in both prescription and non-prescription form, a recommendation by a physician or other licensed health care professional to use a non-prescription medication at prescription strength is considered medical treatment for recordkeeping purposes);

(B) Administering tetanus immunizations (other immunizations, such as Hepatitis B vaccine or rabies vaccine, are considered medical treatment);

(C) Cleaning, flushing or soaking wounds on the surface of the skin;

(D) Using wound coverings such as bandages, Band–Aids $^{TM}$, gauze pads, etc.; or using butterfly bandages or Steri–Strips $^{TM}$ (other wound closing devices such as sutures, staples, etc., are considered medical treatment);

(E) Using hot or cold therapy;

(F) Using any non-rigid means of support, such as elastic bandages, wraps, non-rigid back belts, etc. (devices with rigid stays or other systems designed to immobilize parts of the body are considered medical treatment for recordkeeping purposes);

(G) Using temporary immobilization devices while transporting an accident victim (e.g., splints, slings, neck collars, back boards, etc.).

(H) Drilling of a fingernail or toenail to relieve pressure, or draining fluid from a blister;

(I) Using eye patches;

(J) Removing foreign bodies from the eye using only irrigation or a cotton swab;

(K) Removing splinters or foreign material from areas other than the eye by irrigation, tweezers, cotton swabs or other simple means;

(L) Using finger guards;

(M) Using massages (physical therapy or chiropractic treatment are considered medical treatment for recordkeeping purposes); or

(N) Drinking fluids for relief of heat stress.

(iii) Are any other procedures included in first aid? No, this is a complete list of all treatments considered first aid for part 1904 purposes.

(iv) Does the professional status of the person providing the treatment have any effect on what is considered first aid or medical treatment? No, OSHA considers the treatments listed in § 1904.7(b)(5)(ii) of this part to be first aid regardless of the

professional status of the person providing the treatment. Even when these treatments are provided by a physician or other licensed health care professional, they are considered first aid for the purposes of part 1904. Similarly, OSHA considers treatment beyond first aid to be medical treatment even when it is provided by someone other than a physician or other licensed health care professional.

(v) What if a physician or other licensed health care professional recommends medical treatment but the employee does not follow the recommendation? If a physician or other licensed health care professional recommends medical treatment, you should encourage the injured or ill employee to follow that recommendation. However, you must record the case even if the injured or ill employee does not follow the physician or other licensed health care professional's recommendation.

(6) Is every work-related injury or illness case involving a loss of consciousness recordable? Yes, you must record a work-related injury or illness if the worker becomes unconscious, regardless of the length of time the employee remains unconscious.

(7) What is a "significant" diagnosed injury or illness that is recordable under the general criteria even if it does not result in death, days away from work, restricted work or job transfer, medical treatment beyond first aid, or loss of consciousness? Work-related cases involving cancer, chronic irreversible disease, a fractured or cracked bone, or a punctured eardrum must always be recorded under the general criteria at the time of diagnosis by a physician or other licensed health care professional.

Note to § 1904.7: OSHA believes that most significant injuries and illnesses will result in one of the criteria listed in § 1904.7(a): death, days away from work, restricted work or job transfer, medical treatment beyond first aid, or loss of consciousness. However, there are some significant injuries, such as a punctured eardrum or a fractured toe or rib, for which neither medical treatment nor work restrictions may be recommended. In addition, there are some significant progressive diseases, such as byssinosis, silicosis, and some types of cancer, for which medical treatment or work restrictions may not be recommended at the time of diagnosis but are likely to be recommended as the disease progresses. OSHA believes that cancer, chronic irreversible diseases, fractured or cracked bones, and punctured eardrums are generally considered significant injuries and illnesses, and must be recorded at the initial diagnosis even if medical treatment or work restrictions are not recommended, or are postponed, in a particular case.

SOURCE: 66 FR 6122, Jan. 19, 2001; 66 FR 52034, Oct. 12, 2001; 80 FR 49904, Aug. 18, 2015; 80 FR 78977, Dec. 18, 2015; 81 FR 91809, Dec. 19, 2016; 82 FR 20548, May 3, 2017; 84 FR 21457, May 14, 2019, unless otherwise noted.

AUTHORITY: 29 U.S.C. 657, 658, 660, 666, 669, 673, Secretary of Labor's Orders No. 3–2000 (65 FR 50017) and 1–2012 (77 FR 3912), as applicable, and 5 U.S.C. 553.

| Notes of Decisions (1) |
| --- |

Current through June 24, 2025, 90 FR 26770. Some sections may be more current. See credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Loading, please wait.**

Contact us · Live chat · Training and support · Improve Westlaw Precision/Report an error · Transfer My Data · Pricing guide · Search Tips · Sign out

1-800-REF-ATTY (1-800-733-2889)



Westlaw Precision. © 2025 Thomson Reuters    Accessibility · Privacy · Supplier terms

*Thomson Reuters is not providing professional advice*



Add. 014

Work-Related Injuries and Illnesses are not necessarily eligible for Workers Compensation or other insurance benefits. Listing a case on the Log does not mean that the employer or worker was at fault or that an OSHA standard was violated."

**The Alternative Tests for Work-Relationship Will Likely Lead Both to Inconsistent Determinations and to Underreporting of Cases**

Under the first two alternative tests for work-relationship described in the proposal, the decision on work-relationship would depend upon the degree to which the injury or illness resulted from distinctly occupational causes. Whether labeled "sole cause," "predominant cause," or "significant cause," these alternative tests would require the employer, in each case, to distinguish between the occupational and non-occupational causal factors involved, and to weigh the contribution of the occupational factor or factors. Requiring the occupational cause to be quantified in this way creates practical problems militating against the use of these alternative tests in the final recordkeeping rule.

The most serious problem is that there is no reliable, objective method of measuring the degree of contribution of occupational factors. The absence of a uniform methodology for assessing the extent of work contribution caused several industry commenters to endorse the former rule's position on work-relationship. For example, the American Automobile Manufacturers Association (AAMA) noted that an ideal system would focus on cases in which the work environment was a major contributor to the injury or illness. Nevertheless, the AAMA argued against adopting the predominant cause test, stating: "until a system is developed in which employers can measure objectively and consistently whether or not the work environment is a major contributor to a workplace injury or illness, we favor continuing the definition of work-relationship as it currently exists" (Ex. 15: 409). The Ford Motor Co. also argued in favor of continuing the existing definition:

Ford feels that the work environment should be a major contributor to an injury or illness for the case to be considered work-related. However, we are unsure how employers can measure objectively, consistently and equally whether the work environment is a major contributor. The use of a checklist by a health care provider to determine whether the work environment was a major contributor for a case to be considered work-related would be overly burdensome and subjective. Until a system is developed by which employers can measure objectively, consistently and equally whether or not the work environment is a major contributor to a workplace injury or illness, we favor continuing the definition of work relationship as it currently exists (Ex. 15: 347).

Based on a review of the record, OSHA agrees with those commenters who supported a continuation of the Agency's prior practice with regard to reliance on the geographic presumption for determinations of work-relatedness. OSHA finds that this approach, which includes all cases with a tangible connection with work, better serves the purposes of recordkeeping. Accordingly, the final rule relies on the geographic presumption, with a few limited exceptions, as the recordkeeping system's test for work-relationship.

**Who Makes the Determination?**

In addition to the definition of work-relatedness, commenters addressed the issue of who should make the determination of work-relatedness in a given case (see, e.g., Exs. 15: 27, 35, 102, 105, 127, 193, 221, 281, 305, 308, 324, 325, 341, 345, 347, 385, 387, 390, 392, **\*5950** 397, 420). Some commenters believed that a trained medical professional should make this determination, while others argued that the employer should make the ultimate decision about the work-relatedness of occupational injuries and illnesses. Some supported the use of the work-relatedness checklist for specific disorders included by OSHA in the proposal. For example, the American Public Health Association (Ex. 15: 341) commented:

We also believe that work-relatedness should only be established by the documented determination of a qualified health care provider with specific training related to the type of case reported. OSHA's checklist for determining work-relatedness. . . .should be used and expanded to include potentially recordable cases, i.e., excluding first aid treatment.

Add. 015

The Dow Corning Corporation (Ex. 15: 374) argued that the employer should make the determination, albeit with the assistance of a health care professional:

This assessment process should include interviews with knowledgeable people regarding the duties and hazards of the employee's job tasks in addition to the employee interview. If inaccurate or misleading information is given to the health care provider improper or inaccurate conclusions may be reached with regard to the incident cause. A health care provider's assessment of work-relationship is typically viewed as difficult to overcome, even if it is made with incomplete information. We recommend that the health care provider's checklist be used as only one input in the work-relationship decision and that the final decision should still rest with the employer.

Deere and Company (Ex. 15: 253) opposed leaving the determination of work-relatedness to a health care professional:

We strongly disagree with any provision that would allow a physician to make a final determination of work-relatedness. The only time a physician should have any input into the actual determination of work-relatedness is if they are knowledgeable of the employer's workplace environment and the specific job tasks performed by employees. Frequently, physicians will state that a condition was caused by an employee's job without having any knowledge of the specific tasks being performed by the employee. This is an unacceptable usurpation of employers' rights and we oppose any attempt to codify it in a federal regulation.

However, several participants opposed making any work-relatedness checklist mandatory (such as the one OSHA proposed) (see, e.g., Exs. 15: 68, 170, 201, 283, 434). The American Trucking Association's comment (Ex. 15: 397) was typical of this view:

We do not, however, support a requirement that employers must use a mandatory checklist to determine work-relatedness. . . . Because the checklist asks for medical information, the employer would find itself in conflict with the confidentiality requirements imposed under the Americans With Disabilities Act. 29 C.F.R. § 1630.14. Moreover, a mandatory checklist would be unnecessarily time-consuming and subjective. Finally, we note that inclusion of item 5(b), "possible work contribution," biases the checklist in favor of work-relatedness. In the absence of a clear indication of whether or not the workplace caused or substantially caused the condition, asking a provider or employee if it were "possible" that the workplace contributed to or aggravated the injury/illness invites an affirmative response.

OSHA has concluded that requiring employers to rely on a health care professional for the determination of the work-relatedness of occupational injuries and illnesses would be burdensome, impractical, and unnecessary. Small employers, in particular, would be burdened by such a provision. Further, if the professional is not familiar with the injured worker's job duties and work environment, he or she will not have sufficient information to make a decision about the work-relatedness of the case. OSHA also does not agree that health care professional involvement is necessary in the overwhelming majority of cases. Employers have been making work-relatedness determinations for more than 20 years and have performed this responsibility well in that time. This does not mean that employers may not, if they choose, seek the advice of a physician or other licensed health care professional to help them understand the link between workplace factors and injuries and illnesses in particular cases; it simply means that OSHA does not believe that most employers will need to avail themselves of the services of such a professional in most cases.

Accordingly, OSHA has concluded that the determination of work-relatedness is best made by the employer, as it has been in the past. Employers are in the best position to obtain the information, both from the employee and the workplace, that is necessary to make this determination. Although expert advice may occasionally be sought by employers in particularly complex cases, the final rule provides that the determination of work-relatedness ultimately rests with the employer.

**The Final Rule's Exceptions to the Geographic Presumption**

Paragraph 1904.5(b)(2) of the final rule contains eight exceptions to the work environment presumption that are intended to exclude from the recordkeeping system those injuries and illnesses that occur or manifest in the work environment, but have

Add. 016

been identified by OSHA, based on its years of experience with recordkeeping, as cases that do not provide information useful to the identification of occupational injuries and illnesses and would thus tend to skew national injury and illness statistics. These eight exceptions are the only exceptions to the presumption permitted by the final rule.

(i) Injuries or illnesses will not be considered work-related if, at the time of the injury or illness, the employee was present in the work environment as a member of the general public rather than as an employee. This exception, which is codified at paragraph 1904.5(b)(2)(i), is based on the fact that no employment relationship is in place at the time an injury or illness of this type occurs. A case exemplifying this exception would occur if an employee of a retail store patronized that store as a customer on a non-work day and was injured in a fall. This exception allows the employer not to record cases that occur outside of the employment relationship when his or her establishment is also a public place and a worker happens to be using the facility as a member of the general public. In these situations, the injury or illness has nothing to do with the employee's work or the employee's status as an employee, and it would therefore be inappropriate for the recordkeeping system to capture the case. This exception was included in the proposal, and OSHA received no comments opposing its adoption.

(ii) Injuries or illnesses will not be considered work-related if they involve symptoms that surface at work but result solely from a non-work-related event or exposure that occurs outside the work environment. OSHA's recordkeeping system is intended only to capture cases that are caused by conditions or exposures arising in the work environment. It is not designed to capture cases that have no relationship with the work environment. For this exception to apply, the work environment cannot have caused, contributed to, or significantly aggravated the injury or illness. This exception is consistent with the position followed by OSHA for many years and reiterated in the final rule: that any job-related contribution to the injury or illness makes the incident work-related, and its corollary—that any injury or illness to which work makes no actual contribution is not work-related. An example of this type of injury would be a diabetic incident that occurs while an employee is working. Because no event or exposure at work contributed in any **\*5951** way to the diabetic incident, the case is not recordable. This exception allows the employer to exclude cases where an employee's non-work activities are the sole cause of the injury or illness. The exception was included in the proposal, and OSHA received no comments opposing its adoption.

(iii) Injuries and illnesses will not be considered work-related if they result solely from voluntary participation in a wellness program or in a medical, fitness, or recreational activity such as blood donation, physical, flu shot, exercise classes, racquetball, or baseball. This exception allows the employer to exclude certain injury or illness cases that are related to personal medical care, physical fitness activities and voluntary blood donations. The key words here are "solely" and "voluntary." The work environment cannot have contributed to the injury or illness in any way for this exception to apply, and participation in the wellness, fitness or recreational activities must be voluntary and not a condition of employment.

This exception allows the employer to exclude cases that are related to personal matters of exercise, recreation, medical examinations or participation in blood donation programs when they are voluntary and are not being undertaken as a condition of work. For example, if a clerical worker was injured while performing aerobics in the company gymnasium during his or her lunch hour, the case would not be work-related. On the other hand, if an employee who was assigned to manage the gymnasium was injured while teaching an aerobics class, the injury would be work-related because the employee was working at the time of the injury and the activity was not voluntary. Similarly, if an employee suffered a severe reaction to a flu shot that was administered as part of a voluntary inoculation program, the case would not be considered work-related; however, if an employee suffered a reaction to medications administered to enable the employee to travel overseas on business, or the employee had an illness reaction to a medication administered to treat a work-related injury, the case would be considered work-related.

This exception was included in the proposal, and received support from a number of commenters (see, e.g., Exs. 15: 147, 181, 188, 226, 281, 304, 341, 345, 363, 348, 373). Other commenters supported this proposal but suggested consolidating it with the proposed exception for voluntary activities away from the employer's establishment (see, e.g., Exs. 15-176, 231, 248, 249, 250, 273, 301). OSHA has decided not to combine this exception with another exception because questions are often asked about injuries and illnesses that arise at the employer's establishment and the Agency believes that a separate exception addressing voluntary wellness programs and other activities will provide clearer direction to employers.

Add. 017

(iv) Injuries and illnesses will not be considered work-related if they are solely the result of an employee eating, drinking, or preparing food or drink for personal consumption (whether bought on the premises or brought in). This exception responds to a situation that has given rise to many letters of interpretation and caused employer concern over the years. An example of the application of this exception would be a case where the employee injured himself or herself by choking on a sandwich brought from home but eaten in the employer's establishment; such a case would not be considered work-related under this exception. On the other hand, if the employee was injured by a trip or fall hazard present in the employer's lunchroom, the case would be considered work-related. In addition, a note to the exception makes clear that if an employee becomes ill as a result of ingesting food contaminated by workplace contaminants such as lead, or contracts food poisoning from food items provided by the employer, the case would be considered work-related. As a result, if an employee contracts food poisoning from a sandwich brought from home or purchased in the company cafeteria and must take time off to recover, the case is not considered work related. On the other hand, if an employee contracts food poisoning from a meal provided by the employer at a business meeting or company function and takes time off to recover, the case would be considered work related. Food provided or supplied by the employer does not include food purchased by the employee from the company cafeteria, but does include food purchased by the employer from the company cafeteria for business meetings or other company functions. OSHA believes that the number of cases to which this exception applies will be few. This exception was included in the proposal and received generally favorable comments (see, e.g., Exs. 15: 31, 78, 105, 159, 176, 181, 184, 188, 345, 359, 428).

(v) Injuries and illnesses will not be considered work-related if they are solely the result of employees doing personal tasks (unrelated to their employment) at the establishment outside of their assigned working hours. This exception, which responds to inquiries received over the years, allows employers limited flexibility to exclude from the recordkeeping system situations where the employee is using the employer's establishment for purely personal reasons during his or her off-shift time. For example, if an employee were using a meeting room at the employer's establishment outside of his or her assigned working hours to hold a meeting for a civic group to which he or she belonged, and slipped and fell in the hallway, the injury would not be considered work-related. On the other hand, if the employee were at the employer's establishment outside his or her assigned working hours to attend a company business meeting or a company training session, such a slip or fall would be work-related. OSHA also expects the number of cases affected by this exception to be small. The comments on this exception are discussed in more detail in the section concerning proposed Exception B-5, Personal Tasks Unrelated To Employment Outside of Normal Working Hours, found later in this document.

(vi) Injuries and illnesses will not be considered work-related if they are solely the result of personal grooming, self-medication for a non-work-related condition, or are intentionally self-inflicted. This exception allows the employer to exclude from the Log cases related to personal hygiene, self-administered medications and intentional self-inflicted injuries, such as attempted suicide. For example, a burn injury from a hair dryer used at work to dry the employee's hair would not be work-related. Similarly, a negative reaction to a medication brought from home to treat a non-work condition would not be considered a work-related illness, even though it first manifested at work. OSHA also expects that few cases will be affected by this exception.

(vii) Injuries will not be considered work-related if they are caused by motor vehicle accidents occurring in company parking lots or on company access roads while employees are commuting to or from work. This exception allows the employer to exclude cases where an employee is injured in a motor vehicle accident while commuting from work to home or from home to work or while on a personal errand. For example, if an employee was injured in a car accident while arriving at work or while leaving the company's property at the end of the day, or while driving on his or her lunch hour to run an errand, the case would not be considered work-related. On the other hand, if an employee was injured in a car accident while leaving **\*5952** the property to purchase supplies for the employer, the case would be work-related. This exception represents a change from the position taken under the former rule, which was that no injury or illness occurring in a company parking lot was considered work-related. As explained further below, OSHA has concluded, based on the evidence in the record, that some injuries and illnesses that occur in company parking lots are clearly caused by work conditions or activities—e.g., being struck by a car while painting parking space indicators on the pavement of the lot, slipping on ice permitted to accumulate in the lot by the employer—and by their nature point to conditions that could be corrected to improve workplace safety and health.

(viii) Common colds and flu will not be considered work-related.

Paragraph 1904.5(b)(2)(viii) allows the employer to exclude cases of common cold or flu, even if contracted while the employee was at work. However, in the case of other infectious diseases such as tuberculosis, brucellosis, and hepatitis C, employers must evaluate reports of such illnesses for work relationship, just as they would any other type of injury or illness.

(ix) Mental illness will not be considered work-related unless the employee voluntarily provides the employer with an opinion from a physician or other licensed health care professional with appropriate training and experience (psychiatrist, psychologist, psychiatric nurse practitioner, etc.) stating that the employee has a mental illness that is work-related.

Exception (ix) is an outgrowth of proposed Exception B-11—Mental illness, unless associated with post-traumatic stress. There were more than 70 comments that addressed the issue of mental illness recordkeeping. Two commenters suggested that OSHA postpone any decision on the issue: the National Safety Council (Ex. 15: 359) recommended further study, and the AFL-CIO (Ex. 15: 418) stated that the problem of mental illness in the workplace was so prevalent and so important that it should be handled in a separate rulemaking devoted to this issue.

A few commenters, including NIOSH (Ex. 15: 407), the American Psychological Association (Ex. 15: 411), the AFL-CIO (Ex. 14: 418), the United Steelworkers of America (Ex. 15: 429), and the United Brotherhood of Carpenters Health and Safety Fund of North America (Ex. 15: 350) argued that recording should not be limited to post-traumatic stress as OSHA had proposed but should instead include a broader range of mental disorders. The primary arguments of this group of comments were:

- Workers are afflicted with a number of mental disorders caused or exacerbated by work, and the statistics should include those disorders just as they include physical disorders;

- If the records include only post-traumatic stress as a mental disorder, many work-related cases of mental illness will go unreported (6,000 mental illness cases are reported to the BLS and involve days away from work, but less than 10% of these are post-traumatic stress cases), and the statistics will be skewed and misinterpreted;

- Workers' compensation does not restrict compensable mental illnesses to post-traumatic stress cases;

- Employers are recording and reporting all mental disorders now and thus would not be burdened by continuing the practice.

Arguments in support of treating mental illnesses no differently from any other injury or illness were made by the American Psychological Association (Ex. 15: 411):

The American Psychological Association strongly opposes OSHA's proposal to consider a mental illness to be work related only if it is "associated with post-traumatic stress." We feel that this proposal disregards an accumulating body of research showing the relationship between mental health/illness and workplace stressors. Mental illness associated with post traumatic stress is only one form of mental illness and use of this singular definition would exclude much of the mental illness affecting our nation's workforce.

Job stress is perhaps the most pervasive occupational health problem in the workplace today. There are a number of emotional and behavioral results and manifestations of job stress, including depression and anxiety. These mental disorders have usually been captured under the "mental illness" category but would no longer be recognized if the proposed reporting guidelines were enacted.

The 1985 National Health Interview Survey (Shilling & Brackbill, 1987) indicated that approximately 11 million workers reported health-endangering levels of "mental stress" at work. A large and growing body of literature on occupational stress has

Add. 019

identified certain job and organizational characteristics as having deleterious effects on the psychological and physical health of workers, including their mental health. These include high workload demands coupled with low job control, role ambiguity and conflict, lack of job security, poor relationships with coworkers and supervisors, and repetitive, narrow tasks (American Psychological Association, 1996). These include role stressors and demands in excess of control. More precise analyses reveal that specific occupations and job factors present particular risks. For example, machine-paced workers (involving limited worker control of job demands) have one of the highest levels of anxiety, depression, and irritation of 24 occupations studied (Caplan et al., 1975). Health professionals (e.g., physicians, dentists, nurses, and health technologists) have higher than expected rates of suicide which is most often related to depression (Milham, 1983) and of alcohol and drug abuse (Hoiberg, 1982). Nurses and other health care workers have increased rates of hospitalizations for mental disorders (Gundersson & Colcord, 1982; Hoiberg, 1982). This information about specific risks within different occupations provides important information for possible intervention and training to improve conditions while at the same time, indicating the possibility of specific stressors that need to be addressed within the job. This type information would be lost with the proposed reporting guidelines.

Fourteen commenters opposed having to record mental illness cases of any kind (Exs. 15: 78, 133, 184, 248, 249, 250, 304, 348, 378, 395, 406, 409, 412, 424). Their primary arguments were:

- The diagnosis of mental illnesses is subjective and unreliable;

- It is often impossible, even for a health care professional, to determine objectively which mental disorders are work-related and which are not;

- Workers have a right to privacy about mental conditions that should not be violated; employers fear the risk of invasion of privacy lawsuits if they record these cases on "public records"; because of confidentiality concerns, workers are unlikely to disclose mental illnesses, and employers will therefore be unable to obtain sufficient information to make recordability determinations;

- Mental illnesses are beyond the scope of the OSHA Act; Congress intended to include only "recognized injuries or illnesses";

- Recording mental disorders opens the door to abuse; workers may "fake" mental illnesses, and unions may encourage workers to report mental problems as a harassment tactic; and

- No useful statistics will be generated by such recording.

The American Iron and Steel Institute (AISI) (Ex.15: 395) expressed the concerns of the group of employers opposed to any recording of mental conditions:

OSHA should eliminate its proposed recording requirements for mental illness. OSHA's proposed rule includes changes in an employee's psychological condition as an "injury or illness," and [proposed] Appendix A presumes that mental illness "associated with post-traumatic stress" is work related. Employers, employees, and OSHA have been wrestling for 25 years with the proper recording of fairly simple injuries like back  **\*5953**  injuries, sprains, and illnesses caused by chemical exposures. Requiring employers to record something as vague as psychological conditions will impose impossible burdens on employers (and compliance officers) and thus will create an unworkable recordkeeping scheme.

Moreover, too little is known about the etiology of most mental conditions to justify any presumption or conclusion that a condition that surfaces at work was "caused" by something in the work environment. It is hard to imagine a mental illness appearing at work that is not a manifestation of a preexisting condition or predisposition. Thus, the only sensible approach is to exclude all mental illnesses from recording requirements.

Add. 020

Many commenters from business and trade associations either agreed with OSHA's proposal or recommended an even stricter limitation on recordable mental disorders (see, e.g., Exs. 33, 15: 27, 31, 38, 46, 79, 122, 127, 132, 153, 170, 176, 181, 199, 203, 226, 230, 231, 273, 277, 289, 301, 305, 307, 308, 313, 325, 332, 352, 353, 368, 384, 387, 389, 392, 410, 427, 430, 434). Points raised by these commenters included recommendations that OSHA should require:

- Recording only of those mental illnesses that arise from a single, work-related traumatic or catastrophic event, such as a workplace explosion or an armed robbery;

- Recording only of those mental illnesses that are directly and substantially caused by a workplace incident;

- Recording only of diagnosed mental illnesses resulting from a single workplace event that is recognized as having the potential to cause a significant and severe emotional response;

- Recognition only of post-traumatic stress cases or related disorders that include physical manifestations of illness and that are directly related to specific, objectively documented, catastrophic work-related events; and

- Recording only of diagnosed conditions directly attributable to a traumatic event in the workplace, involving either death or severe physical injury to the individual or a co-worker.

Several commenters suggested the use of a medical evaluation to determine diagnosis and/or work-relationship in cases of mental illness (see, e.g., Exs. 15: 65, 78, 105, 127, 170, 181, 184, 226, 230). For example, the Aluminum Company of America (Ex. 15: 65) stated that:

OSHA should define mental health conditions for recordkeeping purposes as conditions diagnosed by a licensed physician or advanced health care practitioner with specialized psychiatric training (i.e., psychiatric nurse practitioner). Work-relatedness of the mental health condition should be determined by a psychiatric independent medical evaluation.

A comment from the Department of Energy (Ex. 15: 163) stated that any diagnosis of mental illness should be made by at least two qualified physicians, and CONSOL Inc. (Ex. 15: 332) and Akzo Nobel (Ex. 15: 387) wanted the rule to require that any such diagnosis meet the criteria of the Diagnostic and Statistical Manual, Version IV (DSM-IV). Commenters had different opinions about the minimum qualifications necessary for a health care professional to make decisions about mental health conditions; specifically, some commenters urged OSHA to exclude "counselors" (Ex. 15: 226) or to include "only psychiatrists and Ph.D. psychologists" (Ex. 15: 184).

A number of commenters suggested excluding from the requirement to record any mental illness related to personnel actions such as termination, job transfer, demotions, or disciplinary actions (see, e.g., Exs. 15: 68, 127, 136, 137, 141, 176, 184, 224, 231, 266, 273, 278, 301, 395, 424). The New York Compensation Board (Ex. 15: 68) noted that New York's workers' compensation law excludes such cases by specifying that mental injuries are compensable with the exception of injuries that are the "direct consequence of a lawful personnel decision involving a disciplinary action, work evaluation, job transfer, demotion, or termination taken in good faith by the employer."

Finally, several employers raised the issues of the privacy of an employee with a mental disorder, the need to protect doctor-patient confidentiality, and the potential legal repercussions of employers breaching confidentiality in an effort to obtain injury and illness information and in recording that information (see, e.g., Exs. 15: 78, 153, 170, 195, 260, 262, 265, 277, 348, 392, 401, 406, 409). Some of these commenters suggested that an employer should only have the obligation to record after the employee has brought the condition to the attention of the employer, either directly or through medical or workers' compensation claims, and in no case should doctor-patient confidentiality be breached. (Issues related to confidentiality of the Log are discussed in detail in the summary and explanation of § 1904.35, Employee Involvement.)

Add. 021

After a review of the comments and the record on this issue, OSHA has decided that the proposed exception, which would have limited the work-relatedness (and thus recordability) of mental illness cases to those involving post-traumatic stress, is not consistent with the statute or the objectives of the recordkeeping system, and is not in the best interest of employee health. The OSH Act is concerned with both physical and mental injuries and illnesses, and in fact refers to "psychological factors" in the statement of Congressional purpose in section 2 of the Act (29 U.S.C. 651(b)(5)).

In addition, discontinuing the recording of mental illnesses would deprive OSHA, employers and employees, and safety and health professionals of valuable information with which to assess occupational hazards and would additionally skew the statistics that have been kept for many years. Therefore, the final rule does not limit recordable mental disorders to post traumatic stress syndrome or any other specific list of mental disorders. OSHA also does not agree that recording mental illnesses will lead to abuse by employees or others. OSHA has required the recording of these illnesses since the inception of the OSH Act, and there is no evidence that such abuse has occurred.

However, OSHA agrees that recording work-related mental illnesses involves several unique issues, including the difficulty of detecting, diagnosing and verifying mental illnesses; and the sensitivity and privacy concerns raised by mental illnesses. Therefore, the final rule requires employers to record only those mental illnesses verified by a health care professional with appropriate training and experience in the treatment of mental illness, such as a psychiatrist, psychologist, or psychiatric nurse practitioner. The employer is under no obligation to seek out information on mental illnesses from its employees, and employers are required to consider mental illness cases only when an employee voluntarily presents the employer with an opinion from the health care professional that the employee has a mental illness and that it is work related. In the event that the employer does not believe the reported mental illness is work-related, the employer may refer the case to a physician or other licensed health care professional for a second opinion.

OSHA also emphasizes that work-related mental illnesses, like other illnesses, must be recorded only when they meet the severity criteria outlined in § 1904.7. In addition, for mental illnesses, the employee's identity must be protected by omitting the employee's name from the OSHA 300 Log and instead entering "privacy concern case" as required by § 1904.29. **\*5954**

**Exceptions Proposed but Not Adopted**

The proposed rule contained eleven exceptions to the geographic presumption. Some of these exceptions are included in the final rule, and therefore are discussed above, while others were rejected for various reasons. The following discussion addresses those proposed exemptions not adopted in the final rule, or not adopted in their entirety.

Proposed Exception B-5. Personal Tasks Unrelated To Employment Outside of Normal Working Hours. The proposed rule included an exception for injuries and illnesses caused solely by employees performing personal tasks at the establishment outside of their normal working hours. Some aspects of this proposed exception have been adopted in the final, but others have not. Almost all the comments on this proposed exception supported it (see, e.g., Exs. 15: 31, 78, 105, 121, 159, 281, 297, 336, 341, 350), and many suggested that the exception be expanded to include personal tasks conducted during work hours (see, e.g., Exs. 15: 176, 184, 201, 231, 248, 249, 250, 273, 301, 335, 348, 374). Caterpillar, Inc. (Ex. 15: 201) offered an opinion representative of the views of these commenters: "We agree with this exception but it should be expanded to include any personal tasks performed during work hours if the work environment did not cause the injury or illness. Expanding this exemption will be consistent with the exemptions for voluntary wellness program participation and eating, drinking, and preparing one's own food."

One commenter disagreed with the proposed exception (the Laborers Safety and Health Fund of North America (Ex. 15: 310)) and cited as a reason the difficulty of determining the extent to which, for example, a case involving an employee misusing a hazardous chemical after hours because he or she did not receive the necessary Right-to-Know training from the employer would qualify for this exception.

Add. 022

## Occupational Safety and Health Administration

- **Standard Number:** <u>1904</u> , <u>1904.7</u>

> OSHA requirements are set by statute, standards and regulations. Our interpretation letters explain these requirements and how they apply to particular circumstances, but they cannot create additional employer obligations. This letter constitutes OSHA's interpretation of the requirements discussed. Note that our enforcement guidance may be affected by changes to OSHA rules. Also, from time to time we update our guidance in response to new information. To keep apprised of such developments, you can consult OSHA's website at <u>https://www.osha.gov</u>.

March 19, 2003

Ms. Marcia Seeler
Health and Safety Consultant
Post Office Box 3154
Wellfleet, Massachusetts 02667

Dear Ms. Seeler:

Thank you for your January 6, 2003 letter to the Occupational Safety and Health Administration (OSHA) regarding the Injury and Illness Recording and Reporting requirements contained in 29 CFR Part 1904. You state that an employee who sustained a work-related bruise on his knee was told by a physician not to return to work until undergoing an MRI, and that the employee was off work for some days before the procedure could be performed. You recorded the case based on the days away from work, and ask whether the entry may now be lined out because the MRI showed that no OSHA recordable injury occurred.

The case was properly recorded based on the physician's recommendation that the employee not

Submit Feedback

return to work before undergoing an MRI for his bruised knee. Paragraph 1904.7(b)(3) contains the requirements for recording work-related injuries and illnesses that result in days away from work and for counting the total number of days away associated with a given case. In addition, paragraphs 1904.7(b)(3)(ii) and 1904.7(b)(3)(iii) direct employers how to record days away cases when a physician or other licensed health care professional (HCP) recommends that the injured or ill worker stay at home or that he or she return to work but the employee chooses not to do so. As these paragraphs make clear, OSHA requires employers to follow the physician's or HCP's recommendation when recording a case. For purposes of OSHA recordkeeping, the case met the criteria in section 1904.7 at the time of recording because the employee had sustained a work-related injury—a bruised knee—involving one or more days away from work. The subsequent MRI results do not change these facts. Accordingly, the MRI results are not a basis to line out the entry.

Thank you for your interest in occupational safety and health. We hope you find this information helpful. OSHA requirements are set by statute, standards and regulations. Our interpretation letters explain these requirements and how they apply to particular circumstances, but they cannot create additional employer obligations. This letter constitutes OSHA's interpretation of the requirements discussed. Note that our enforcement guidance may be affected by changes to OSHA rules. Also, from time to time we update our guidance in response to new information. To keep appraised of such developments, you can consult OSHA's website at http://www.osha.gov. If you have any further questions, please contact the Division of Recordkeeping Requirements at 202-693-1702.

Sincerely,


John L. Henshaw
Assistant Secretary

Submit Feedback



**U.S. DEPARTMENT OF LABOR**

Occupational Safety and Health Administration
200 Constitution Ave NW
Washington, DC 20210
📞 1-800-321-OSHA
1-800-321-6742
www.osha.gov

**FEDERAL GOVERNMENT**⊞    **OCCUPATIONAL SAFETY & HEALTH**⊞

White House                          Frequently Asked Questions

Benefits.gov                         A - Z Index

Coronavirus Resources                Freedom of Information Act - OSHA

Disaster Recovery Assistance Read The OSHA Newsletter

DisasterAssistance.gov               Subscribe to the OSHA Newsletter

USA.gov                              OSHA Publications

Notification of EEO ViolationsOffice of Inspector General

No Fear Act Data

U.S. Office of Special Counsel

**ABOUT THE SITE**⊞

Freedom of Information Act

Disclaimers

Plug-ins Used on DOL.gov

Accessibility Statement

Submit Feedback

# Occupational Safety and Health Administration

**Standard**
- **Number:**  1904 , 1904.5

OSHA requirements are set by statute, standards and regulations. Our interpretation letters explain these requirements and how they apply to particular circumstances, but they cannot create additional employer obligations. This letter constitutes OSHA's interpretation of the requirements discussed. Note that our enforcement guidance may be affected by changes to OSHA rules. Also, from time to time we update our guidance in response to new information. To keep apprised of such developments, you can consult OSHA's website at https://www.osha.gov.

April 3, 2007

Mr. Orpha B. Thomas, President
Thomas Safety & Health Consulting, Inc.
1612 North Belmont Ave.
Arlington Heights, IL 60004

Dear Mr. Thomas:

Thank you for your July 1, 2005 letter regarding clarification of the Injury and Illness Recording and Reporting requirements contained in 29 CFR Part 1904. In your letter, you state that an employee tripped on the stairs and had a work-related injury. Your question is whether the plant can line out the lost workdays even though the initial medical evaluation at the Emergency Room released her to return to work with restrictions. You also stated that an independent medical review (third-party physician) performed on May 8th (24 days after the injury) was not in agreement with the initial medical opinion and stated that the employee could have been working with restrictions from the date of injury.

Submit Feedback

**Scenario:** On April 14, 2005, an employee fell on the steps at work and was diagnosed by an emergency room physician with an acute right wrist scaphoid fracture and acute left knee contusion. The employee was released from the emergency room and told she could return to work the following day (with restrictions) and referred to an orthopedic physician for follow-up. On April 18, 2005, the employee complained at work of pain in her left wrist. She had not complained of the wrist pain on April 14, and no x-rays of the left wrist had been taken during her initial visit to the emergency room.

On April 19, 2005, an orthopedic physician recommended "days away from work" until a bone scan could be conducted on April 26, 2005. The bone scan was conducted on April 26 and revealed no fracture of the left wrist. Later, on May 5, 2005 the orthopedic physician released the employee to return to work with restrictions. The company doctor provided medical documentation to a third-party physician on May 8, 2005, and that physician concluded that the protocol for treatment was not appropriate and that the employee could have been working since the onset of the injury.

**Response:** Under 1904.5 an employer must consider an injury or illness to be work-related if an event or exposure in the work environment either caused or contributed to the resulting condition or significantly aggravated a pre-existing injury or illness. Work-relatedness is presumed (presumption of work-relationship) for injuries and illnesses resulting from events or exposures occurring in the work environment, unless an exception in Section 1904.5(b)(2) specifically applies.

When making an injury or illness recordkeeping decision, an employer may use the opinion of a contemporaneous second provider if the employer believes the second opinion is more authoritative. However, once the employee was given "Days away from work" by the treating physician, this becomes a recordable injury. Even though the bone scan on 4/26 showed no fracture occurred, this must be treated as "Days away from work." This is consistent with OSHA's Frequently Asked Question 7-10a and OSHA's Letter of Interpretation dated March 19, 2003 — Results of an MRI do not negate the recordability of a physician's recommendation.

This injury should have first been recorded on 4/14/05 as a "Job transfer or restriction" under Column (I) and the day count should be recorded under Column (L). Once the employee received "Days away from work", you need to "remove or line out" Column (I) and check Column (H) "Days away from work." The employer should stop count for Column (L) "On job transfer or restriction" on 4/19/05 and start counting for Column (K) "Away from work." Once the employee is returned to restricted work on 5/3/05, you need to stop the count for "Away from work" and resume counting for "On the job transfer or restriction" until the employee is able to resume all of their job functions.

Please note the following Frequently Asked Question addressing conflicting medical recommendations:

Question 7-10a - If a physician or other licensed health care professional recommends medical treatment, days away from work or restricted work activity as a result of a work-related injury or illness can the employer decline to record the case based on a contemporaneous second provider's opinion that the recommended medical treatment, days away from work or work restriction are unnecessary, if the employer believes the second opinion is more authoritative?

Yes. However, once medical treatment is provided for a work-related injury or illness, or days away from work or work restriction have occurred, the case is recordable. If there are conflicting contemporaneous recommendations regarding medical treatment, or the need for days away from work or restricted work activity, but the medical treatment is not actually provided and no days away from work or days of work restriction have occurred, the employer may determine which recommendation is the most authoritative and record on that basis. In the case of prescription medications, OSHA considers that medical treatment is provided once a prescription is issued.

Thank you for your interest in occupational safety and health. We hope you find this information helpful. OSHA requirements are set by statute, standards, and regulations. Our interpretation letters explain these requirements and how they apply to particular circumstances, but they cannot create additional employer obligations. This letter constitutes OSHA's interpretation of the requirements discussed. Note that our enforcement guidance may be affected by changes to OSHA rules. Also, from time to time we update our guidance in response to new information. To keep apprised of such developments, you can consult OSHA's website at http://www.osha.gov. If you have any further questions, please contact OSHA's Recordkeeping Section at (202) 693-1875.

Sincerely,


Keith L. Goddard, Director
Directorate of Evaluation and Analysis

Submit Feedback



**U.S. DEPARTMENT OF LABOR**

Occupational Safety and Health Administration
200 Constitution Ave NW
Washington, DC 20210
☏ 1-800-321-OSHA
1-800-321-6742
www.osha.gov

**FEDERAL GOVERNMENT⊞     OCCUPATIONAL SAFETY & HEALTH⊞**

White House                     Frequently Asked Questions

Benefits.gov                    A - Z Index

Coronavirus Resources           Freedom of Information Act - OSHA

Disaster Recovery Assistance    Read The OSHA Newsletter

DisasterAssistance.gov          Subscribe to the OSHA Newsletter

USA.gov                         OSHA Publications

Notification of EEO Violations  Office of Inspector General

No Fear Act Data

U.S. Office of Special Counsel

**ABOUT THE SITE⊞**

Freedom of Information Act

Disclaimers

Plug-ins Used on DOL.gov

Accessibility Statement

Submit Feedback

**Occupational Safety and Health Administration**

**Standard**
- **Number:** <u>1904</u> , <u>1904.7</u>

> OSHA requirements are set by statute, standards and regulations. Our interpretation letters explain these requirements and how they apply to particular circumstances, but they cannot create additional employer obligations. This letter constitutes OSHA's interpretation of the requirements discussed. Note that our enforcement guidance may be affected by changes to OSHA rules. Also, from time to time we update our guidance in response to new information. To keep apprised of such developments, you can consult OSHA's website at <u>https://www.osha.gov</u>.

May 15, 2007

Mr. David F. Coble, CSP, President
CTJ Safety Associates
113 Cambay Court
Cary, NC 27513

Dear Mr. Coble:

This is in response to your February 2, 2006 letter to the Occupational Safety and Health Administration (OSHA) requesting an interpretation of the term "contemporaneous" as used in Frequently Asked Question 7-10a to the injury and illness recordkeeping regulation at 29 CFR Part 1904.

FAQ 7-10a states:

Submit Feedback

> If a physician or other licensed health care professional recommends medical treatment, days away from work or restricted work activity as a result of a work-related injury or illness can the employer decline to record the case based on a contemporaneous second provider's opinion that the recommended medical treatment, days away from work or work restriction are unnecessary, if the employer believes the second opinion is more authoritative?
>
> Yes. However, once medical treatment is provided for a work-related injury or illness, or days away from work or work restriction have occurred, the case is recordable. If there are conflicting contemporaneous recommendations regarding medical treatment, or the need for days away from work or restricted work activity, but the medical treatment is not actually provided and no days away from work or days of days of work restriction have occurred, the employer may determine which recommendation is the most authoritative and record on that basis. In the case of prescription medications, OSHA considers that medical treatment is provided once a prescription is issued.

In general, FAQ 7-10a provides that, when making a determination as to how to record a specific work-related injury or illness, an employer may choose to rely on a second conflicting medical recommendation from a physician or other licensed health care professional, provided the subsequent recommendation is contemporaneous to, and more authoritative (best documented, best reasoned or most persuasive) than the first recommendation. However, once medical treatment has been provided, or days away from work or restricted work activity have occurred, the employer must record the medical treatment, days away from work or restricted work activity on the OSHA 300 Log. In other words, the employer may not consider a conflicting recommendation once medical treatment, days away from work or restricted work activity have taken place, even if the subsequent recommendation is more authoritative.

For purposes of FAQ 7-10a, the term "contemporaneous" is used in determining whether an employer may consider conflicting medical recommendations from two or more physicians or other licensed health care professionals when making certain Part 1904 recordkeeping decisions. Neither the Part 1904 regulation, nor the preamble to the 2001 Part 1904 final rule, provides an exact definition of "contemporaneous." However, OSHA intends that for two or more conflicting recommendations to be considered contemporaneous, they must be conducted within a time

frame so that an injury or illness can be evaluated when the signs or symptoms are in the same stage of development, same degree of severity, and this can be viewed in a similar context for analysis. Of course, whether conflicting medical opinions/recommendations are contemporaneous may depend on the specific circumstances surrounding a given case, such as the type and severity of an injury or illness.

In most instances, medical recommendations provided on the day of the injury or illness would be considered "contemporaneous." For example, because Part 1904 does not require employers to count days away from work or restricted work activity on the day of the injury or illness, the employer should be able to consider conflicting recommendations issued on the day the employee was injured or became ill. Also, medical recommendations issued on the same day as the injury or illness are likely to have been developed when signs and symptoms are in the same stage of development and same degree of severity. Likewise, recommendations issued on the same day as an injury or illness involving medical treatment would typically be considered contemporaneous. However, please keep in mind that once medical treatment is provided to an employee, the case must be recorded, and regardless of when it is made the employer may not consider a subsequent conflicting recommendation.

On the other hand, a medical recommendation provided during a year-end review of injuries and illnesses recordkeeping information would almost never be considered "contemporaneous." In such circumstances, the second physician or other licensed health care professional would be evaluating an injury or illness when signs or symptoms are not in the same stage of development, not in the same degree of severity, and in a different context for analysis. Again, the facts and circumstances surrounding a given injury or illness will determine whether differing medical recommendations may be considered contemporaneous.

Section 8 (c)(2) of the Occupational Safety and Health Act of 1970 (OSH Act) authorizes OSHA to issue regulations requiring employers to make and maintain accurate records of work-related injuries and illnesses. Employer decisions regarding conflicting medical recommendations are likely to be accurate if such recommendations are contemporaneous.

Thank you for your interest in occupational safety and health. We hope you find this information helpful. OSHA requirements are set by statute, standards and regulations. Our interpretation letters explain these requirements and how they apply to particular circumstances, but they cannot create additional employer obligations. This letter constitutes OSHA's interpretation of the requirements discussed. Note that our enforcement guidance may be affected by changes to OSHA rules. In addition, from time to time we update our guidance in response to new

information. To keep appraised of such developments, you can consult OSHA's website at http://www.osha.gov. If you have any further questions, please contact OSHA's Recordkeeping Section at (202) 693-1876.

Sincerely,

Keith L. Goddard, Director
Directorate of Evaluations and Analysis

---

**OSHA**     **Standards**     **Enforcement**     **Topics**     **Media Center**     **Contact Us**



**U.S. DEPARTMENT OF LABOR**

Occupational Safety and Health Administration
200 Constitution Ave NW
Washington, DC 20210
📞 1-800-321-OSHA
1-800-321-6742
www.osha.gov

**FEDERAL GOVERNMENT⊞**     **OCCUPATIONAL SAFETY & HEALTH⊞**

White House                        Frequently Asked Questions

Benefits.gov                       A - Z Index

Coronavirus Resources              Freedom of Information Act - OSHA

Submit Feedback

# Occupational Safety and Health Administration

**Standard Number:** <u>1904</u> , <u>1904.5</u> , <u>1904.5(b)(2)(ii)</u> , <u>1904.6</u> , <u>1904.6(b)(3)</u>

> OSHA requirements are set by statute, standards and regulations. Our interpretation letters explain these requirements and how they apply to particular circumstances, but they cannot create additional employer obligations. This letter constitutes OSHA's interpretation of the requirements discussed. Note that our enforcement guidance may be affected by changes to OSHA rules. Also, from time to time we update our guidance in response to new information. To keep apprised of such developments, you can consult OSHA's website at <u>https://www.osha.gov</u>.

February 25, 2011

Mr. William K. Principe
Constangy Brooks & Smith, LLP
Suite 2400
230 Peachtree Street, NW
Atlanta, GA 30303

Dear Mr. Principe:

Thank you for your recent letter to the Occupational Safety and Health Administration (OSHA) regarding the recordkeeping regulation contained in 29 CFR Part 1904 - Recording and Reporting Occupational Injuries and Illnesses. In an effort to provide the public with prompt and accurate responses, we developed and continue to refine a set of Frequently Asked Questions (FAQ), in addition to maintaining a log of Letters of Interpretation (LOI) on the OSHA Recordkeeping website.

**Scenario 1:** An employee reports subjective, work-related aches and pains to the company

doctor, who treats the employee with 400 mg of ibuprofen and returns the employee to full duty. The employee then goes to a doctor who writes a prescription for pain relief and puts the employee out of work for a few days.

**Question:** Can the employer rely on the first provider's opinion above, assuming that the first provider's opinion is more authoritative, about the need for both "medical treatment" and "days away from work," and not record the case?

**Response:** The concept of "most authoritative" conflicting medical opinion is intended to ensure that the severity of an occupational injury or illness is accurately recorded. OSHA's Frequently Asked Question (FAQ) 7-10a, which states:

> If a physician or other licensed health care professional recommends medical treatment, days away from work or restricted work activity as a result of a work-related injury or illness can the employer decline to record the case based on a contemporaneous second provider's opinion that the recommended medical treatment, days away from work or work restriction are unnecessary, if the employer believes the second opinion is more authoritative?
>
> Yes. However, once medical treatment is provided for a work-related injury or illness, or days away from work or work restriction have occurred, the case is recordable. If there are conflicting contemporaneous recommendations regarding medical treatment, or the need for days away from work or restricted work activity, but the medical treatment is not actually provided and no days away from work or days of work restriction have occurred, the employer may determine which recommendation is the most authoritative and record on that basis. In the case of prescription medications, OSHA considers that medical treatment is provided once a prescription is issued.

OSHA considers evaluations to be contemporaneous if they are conducted within a time frame so that the underlying condition does not change. In other words, it is important for the physicians or licensed health care professionals involved in the examination of the injured or ill employee to evaluate the same condition. If the employee's condition either improves or worsens between the examinations, they would not be evaluating the same condition. In most cases, medical recommendations provided on the day of the injury or illness would be "contemporaneous." See, OSHA's May 15, 2007, Letter of Interpretation addressing "Clarification of the term 'contemporaneous' as used in recordkeeping FAQ 7-10a."

Submit Feedback

Some factors an employer might consider when determining whether physicians or licensed health care professionals are examining the same condition might include, for example: whether the examination of the injured or ill employee is in person (i.e., review of documents only is generally not a substitute for a physical examination); whether the examinations were conducted on the same day; whether the employee was subjected to additional events or exposures between the examinations; and, whether medical treatment, restricted work activity, or days away from work occurred between the examinations.

Based on the information described in your letter, the two physical examinations were conducted in person; it appears that the physicians evaluated the injury on the same day (day of injury) and in the same condition; and, the employee was not subjected to additional events or exposures between the examinations. Also, no medical treatment was provided or days away from work or work restriction occurred between the two examinations. Accordingly, the employer in your scenario may rely on the first medical opinion if they determine the opinion is the most authoritative. OSHA considers a contemporaneous medical opinion that is best documented, best reasoned and most persuasive as the most authoritative. See, Section 1904.6(b)(3), and OSHA's May 15, 2007, letter of interpretation noted above. Finally, please be aware that OSHA would consider the medical treatment and days away from work directed by the second physician as necessary unless the employer can document that the first opinion is most authoritative.

**Scenario 2:** An employee who is 5'7" and weighs 385 pounds is walking to the lunch room during a work day when his left knee buckles and he falls down, resulting in "medical treatment" and days away from work. Assume the MRI results show significant, pre-existing degenerative conditions in the employee's left knee.

**Question:** Do these facts fit within Exception 2 of Section 1904.5(b)(2)(ii) for an injury that involves "signs or symptoms that surface at work but result solely from a non-work-related event or exposure that occurs outside the work environment?"

**Response:** See OSHA's Letter of Interpretation dated January 13, 2004, Determining work-relatedness when the work event or exposure is only one of the discernable causes; not the sole or predominant cause.

Thank you for your interest in occupational safety and health. We hope you find this information helpful. Our interpretation letters explain these requirements and how they apply to particular circumstances, but they cannot create additional employer obligations. This letter constitutes OSHA's interpretation only of the requirements discussed and may not be applicable to any

question not delineated within your original correspondence. Note that our enforcement guidance may be affected by changes to OSHA rules. Also, from time to time we update our guidance in response to new information. To keep apprised of such developments, you can consult OSHA's website at http://www.osha.gov.

Sincerely,

Keith Goddard, Director
Directorate of Evaluation and Analysis

---

**OSHA**      **Standards**      **Enforcement**      **Topics**      **Media Center**      **Contact Us**



**U.S. DEPARTMENT OF LABOR**

Occupational Safety and Health Administration
200 Constitution Ave NW
Washington, DC 20210
📞 1-800-321-OSHA
1-800-321-6742
www.osha.gov

**FEDERAL GOVERNMENT⊞**      **OCCUPATIONAL SAFETY & HEALTH⊞**

White House                  Frequently Asked Questions

Benefits.gov                 A - Z Index

Coronavirus Resources        Freedom of Information Act - OSHA

Disaster Recovery Assistance Read The OSHA Newsletter

Submit Feedback

Question 7-10a - If a physician or other licensed health care professional recommends medical treatment, days away from work or restricted work activity as a result of a work-related injury or illness can the employer decline to record the case based on a contemporaneous second provider's opinion that the recommended medical treatment, days away from work or work restriction are unnecessary, if the employer believes the second opinion is more authoritative?

Yes. However, once medical treatment is provided for a work-related injury or illness, or days away from work or work restriction have occurred, the case is recordable. If there are conflicting contemporaneous recommendations regarding medical treatment, or the need for days away from work or restricted work activity, but the medical treatment is not actually provided and no days away from work or days of work restriction have occurred, the employer may determine which recommendation is the most authoritative and record on that basis. In the case of prescription medications, OSHA considers that medical treatment is provided once a prescription is issued.