UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Case No. 25-60108

**EXXON MOBIL CORPORATION,**

Petitioner,

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION;
LORI CHAVEZ-DEREMER, SECRETARY, U.S. DEPARTMENT OF
LABOR;**

Respondents.

On Review from the Decision of the Occupational Safety & Health Review
Commission, OSHRC Docket No. 22-0809

### <u>BRIEF OF RESPONDENT SECRETARY OF LABOR</u>

JONATHAN L. SNARE
Acting Solicitor of Labor

EDMUND C. BAIRD
Associate Solicitor of Labor for
Occupational Safety and Health

HEATHER R. PHILLIPS
Counsel for Appellate Litigation

SHEILA EILEEN NAUGHTON
Attorney
U.S. Department of Labor
200 Constitution Ave., NW, Suite S4004
Washington, DC  20210
(202) 693-5499
naughton.sheila.e@dol.gov

AUGUST 27, 2025

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Respondent, U.S. Department of Labor:**

Lori Chavez-Deremer, Secretary of Labor

Amanda Wood Laihow, Acting Assistant Secretary for Occupational Safety and Health Administration

Jonathan L. Snare, Acting Solicitor of Labor

Edmund C. Baird, Associate Solicitor for Occupational Safety and Health

Heather R. Phillips, Counsel for Appellate Litigation, Occupational Safety and Health Division

Sheila Eileen Naughton, Attorney

Lindsay A. Wofford, Counsel for Occupational Safety and Health, Region VI (Dallas)

John M. Bradley, Senior Trial Attorney

**Occupational Safety and Health Review Commission:**

Sharon D. Calhoun, Administrative Law Judge

John X. Cerveny, Executive Secretary

**Petitioner, Exxon Mobil Corporation:**

Exxon Mobil Corporation, Petitioner

Micah R. Smith, Baker & Hostetler LLP, Counsel for Petitioner

Richard B. Raile, Baker & Hostetler LLP, Counsel for Petitioner

s/ Sheila Eileen Naughton
Sheila Naughton

**STATEMENT REGARDING ORAL ARGUMENT (5TH CIR. R. 28.2.3)**

The Secretary of Labor believes that this petition for review can be decided on the papers and does not request oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................... i

STATEMENT REGARDING ORAL ARGUMENT (5TH CIR. R. 28.2.3)...... iii

TABLE OF CONTENTS................................................................................. iv

TABLE OF AUTHORITIES ........................................................................ vii

STATEMENT OF JURISDICTION ..................................................................1

STATEMENT OF THE ISSUES .......................................................................1

STATEMENT OF THE CASE ..........................................................................2

   I.   Procedural History ................................................................................2

   II.   Statutory and Regulatory Background ..................................................4

      A.   The OSH Act ....................................................................................4

      B.   OSHA's Recordkeeping Regulations ...............................................5

   III.   Statement of Facts ................................................................................6

      A.   After an Explosion at Baytown Refinery, Employee 2 Seeks Mental Health Treatment.................................................................................6

      B.   Employee 2 Provides Exxon Documentation from Licensed Medical Professionals Supporting a Work-Related PTSD Diagnosis. .........10

C.   Exxon Ignores the PTSD Diagnoses Instead Relying on a
Subsequently Obtained Opinion from a Healthcare Professional Who Never
Met with Employee 2. .......................................................................................15

D.   OSHA Conducts an Investigation and Issues a Citation for Exxon's
Failure to Record Employee 2's Work-Related Mental Health Diagnosis. ......18

E.   The ALJ Holds a Hearing and Affirms Exxon's Violation of 29 C.F.R.
§ 1904.29(b)(3) for Failing to Record Employee 2's Work-Related Mental
Illness. 18

SUMMARY OF THE ARGUMENT ..................................................................20

STANDARD OF REVIEW ...............................................................................22

ARGUMENT ....................................................................................................23

I.   The OSH Act Authorizes OSHA Regulations Requiring Accurate
Recordkeeping of Work-Related Physical and Mental Illnesses. ........................24

II.   The ALJ Correctly Determined that Exxon Violated 29 C.F.R. §
1904.29(b)(3) when It Failed to Record Employee 2's Work-Related PTSD
Diagnosis. .......................................................................................................31

A.   Employee 2's Submission of Documentation of Work-Related PTSD
Triggered Exxon's Duty to Record. .................................................................32

B.    Substantial Evidence Supports the Healthcare Providers' Opinions that Employee 2 Had Work-Related PTSD.............................................................36

C.    The ALJ Correctly Found Exxon's Reliance on Dr. Joppich's Opinion Did Not Relieve It of the Duty to Record.......................................................39

D.    Exxon Had Fair Notice that It Was Not Entitled to Seek Unlimited and Unrestricted "Second" Opinions......................................................................45

CONCLUSION..................................................................................................49

CERTIFICATE OF SERVICE...........................................................................51

CERTIFICATE OF COMPLIANCE .................................................................52

# TABLE OF AUTHORITIES

## Cases

*Amoco Chems. Corp.*,
  1986 WL 53497 (OSHRC June 19, 1986) ............................................................ 48

*Austin Com. v. Occupational Safety & Health Rev. Comm'n*,
  610 F.2d 200 (5th Cir. 1979) ............................................................................ 47

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ........................................................................................ 29

*Cent. Fla. Equip. Rentals*,
  2016 WL 4088876 (July 26, 2016) .................................................................... 37

*Chao v. Occupational Safety & Health Rev. Comm'n*,
  401 F.3d 355 (5th Cir. 2005) ............................................................................ 23

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ........................................................................................ 48

*Diamond Roofing Co. v. Occupational Safety and Health Rev. Comm'n.*,
  528 F.2d 645 (5th Cir. 1976) ............................................................................ 49

*Dole v. Phoenix Roofing, Inc.*,
  922 F.2d 1202 (5th Cir. 1991) ............................................................................ 1

*Dravo Corp.*,
  1980 WL 10731 (OSHRC Jan. 8, 1980) ............................................................ 47

*Echo Powerline, L.L.C. v. Occupational Safety & Health Rev. Comm'n*,
  968 F.3d 471 (5th Cir. 2020) ................................................................ 45, 46, 48

*Employer Solutions Staffing Group II, L.L.C. v. Office of Chief Administrative
  Hearing Officer*,
  833 F.3d 480 (C.A.5, 2016) .............................................................................. 49

*Excel Modular Scaffold & Leasing Co. v. Occupational Safety & Health Rev. Comm'n*,
    943 F.3d 748 (5th Cir. 2019) ............................................................... 38

*ExxonMobil Pipeline Co. v. Dep't of Transportation*,
    867 F.3d 564 (5th Cir. 2017) ............................................................... 49

*F.C.C. v. Fox Television Stations*, Inc.,
    567 U.S. 239 (2012) .......................................................................... 49

*Gates & Fox Co. v. Occupational Safety and Health Rev. Comm'n.*,
    790 F.2d 154 (D.C. Cir. 1986) ............................................................ 49

*Gen. Elec. Co. v. U.S. E.P.A.*,
    53 F.3d 1324 (D.C. Cir. 1995) ........................................................... 49

*General Motors Corp.*,
    1980 WL 10653 (OSHRC Aug. 29, 1980) ................................... 28, 30

*H. E. Wiese, Inc., & Indus. Elec. Constr. Co.*,
    1982 WL 22605 (OSHRC Mar. 31, 1982) ........................................... 47

*Hern Iron Works, Inc.*,
    1993 WL 132975 (OSHRC Apr. 27, 1993) .......................................... 28

*Lynd v. Reliance Standard Life Ins. Co.*,
    94 F.3d 979 (5th Cir. 1996) ............................................................... 30

*Marion Power Shovel Co., Inc.*,
    1980 WL 10690 (OSHRC Oct. 31, 1980) ........................................... 47

*Medina County Envtl. Action Assoc. v. Surface Transp. Bd.*,
    602 F.3d 687 (5th Cir. 2010) ............................................................. 22

*Mejia-Velasquez v. Garland*,
    26 F.4th 193 (4th Cir. 2022) ............................................................. 46

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................... 43

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
595 U.S. 109 (2022) ........................................................................... 31

*Peabody Twentymile Mining, LLC v. Sec'y of Lab.*,
931 F.3d 992 (10th Cir. 2019) .......................................................... 46

*Phoenix Roofing, Inc. v. Dole*,
874 F.2d 1027 (5th Cir. 1989) ..................................................... 23, 37

*Sanderson Farms, Inc. v. Occupational Safety & Health Rev. Comm'n*,
964 F.3d 418 (5th Cir. 2020) ............................................................ 35

*Shaw Global*,
2012 WL 3776358 (Aug. 27, 2012) ................................................... 48

*Southern Hens, Inc. v. Occupational Safety & Health Rev. Comm'n*,
930 F.3d 667 (5th Cir. 2019) ....................................................... 22, 23

*Texas v. Trump*,
127 F.4th 606 (5th Cir. 2025) ........................................................... 29

*Tunnel Elec. Constr. Co.*,
1980 WL 10644 (OSHRC Aug. 11, 1980) ........................................ 47

*U.S. v. First City Nat'l Bank of Houston*,
386 U.S. 361 (1967) .......................................................................... 37

*United States v. Pitt-Des Moines, Inc.*,
168 F.3d 976 (7th Cir. 1999) ............................................................ 46

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
165 F.3d 43 (D.C. Cir. 1999) ........................................................... 46

## Statutes

29 U.S.C. § 651(a) ................................................................................. 4

29 U.S.C. § 651(b) ........................................................................... 4, 31

29 U.S.C. § 651(b)(5) ..................................................................... 26, 28

29 U.S.C. § 651(b)(12) ........................................................ 4

29 U.S.C. § 657 .............................................................. 30, 31

29 U.S.C. § 657(c)(1) .................................................... 4, 27, 30

29 U.S.C. § 657(c)(2) .................................................... 4, 24, 31

29 U.S.C. § 659 .................................................................. 1

29 U.S.C. § 660(a) ........................................................... 1, 23

29 U.S.C. § 660(a)-(b) .......................................................... 5

29 U.S.C. § 661(j) ........................................................... 1, 22

29 U.S.C. §§ 651-678 ........................................................... 1

29 U.S.C. §§ 658, 659, 666 .................................................. 4, 5

29 U.S.C. §§ 659(c), 661(a), (j) .............................................. 5

## Regulations

29 C.F.R. § 1904.35(b)(1)(i) .................................................. 40

29 C.F.R. § 1904.46 ........................................................... 34

29 C.F.R. § 1904.5(a) ....................................................... 5, 36

29 C.F.R. § 1904.5(b)(2)(ix) ............................................ Passim

29 C.F.R. § 2200.90(f) ...................................................... 1, 22

29 C.F.R. § 2200.91(a) ......................................................... 5

29 C.F.R. §§ 1904.4(a), 1904.29(a) ............................................ 5

Occupational Injury and Illness Recording and Reporting Requirements, 61 Fed. Reg. 4030 ......................................................................... 27

Occupational Injury and Illness Recording and Reporting Requirements, 66 Fed. Reg. 5916 (Jan. 19, 2001) ............................................... Passim

## **Other Authorities**

116 Cong. Rec. 37325 (1970), *reprinted in Legislative History of the OSH Act of 1970.* ........................................................................... 25

*Occupational Safety and Health Act of 1970: Hearings S. 2193 and S. 2788, Before the Subcomm. on Labor of the S. Comm. on Labor and Public Welfare*, 91st Cong. (1969) ............................................................................. 26

OSHA Letter of Interpretation, April 3, 2007, Recording an injury when employer is provided with different medical opinions. ...................................... 43

OSHA Letter of Interpretation, February 25, 2011, Clarification of the terms most authoritative and pre-existing conditions as used for recordkeeping purposes. . 44

OSHA Letter of Interpretation, May 15, 2007, Clarification of the term "contemporaneous" as used in recordkeeping FAQ 7-10a. ............................... 44

S. Rep. No. 91-1282 (1970), *reprinted in Legislative History of the OSH Act of 1970.* ........................................................................... 25

# STATEMENT OF JURISDICTION

This matter is before the Court on a petition for review of a final order of the Occupational Safety and Health Review Commission (Commission) affirming a citation issued to Petitioner Exxon Mobil Baytown Refinery (Exxon) by the Occupational Safety and Health Administration (OSHA) under the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678 (OSH Act or Act). The Commission had jurisdiction over this proceeding under 29 U.S.C. § 659.[1]

The decision of the Commission administrative law judge (ALJ) became a final order of the Commission on January 2, 2025. 29 U.S.C. § 661(j); 29 C.F.R. § 2200.90(f). Exxon filed its petition for review with the Court on March 3, 2025, within the sixty-day period prescribed by the OSH Act. *See* 29 U.S.C. § 660(a). The Court has jurisdiction over the petition for review under 29 U.S.C. § 660(a).

# STATEMENT OF THE ISSUES

1. Whether the OSH Act grants the Secretary the authority to issue a regulation requiring employers to record work-related mental illness where, in promulgating the Act, Congress's express purpose was to "assure safe and healthful working conditions for working men and women," and Congress

---

[1] The case caption also lists the Commission as a respondent, but the Commission is not an active party; "[l]ike a district court, the Commission has no duty or interest in defending its decision on appeal and it has no stake in the outcome of the litigation." *Dole v. Phoenix Roofing, Inc.*, 922 F.2d 1202, 1209 (5th Cir. 1991) (citation omitted).

mandated that the Secretary prescribe regulations requiring employers to maintain accurate records of "work-related deaths, injuries and illnesses" and assist the investigation of the "psychological factors" that may impact occupational safety and health.

2. Whether the ALJ correctly determined that Exxon violated OSHA's recordkeeping regulation, 29 C.F.R. § 1904.29(b)(3), when it failed to record Employee 2's post-traumatic stress disorder (PTSD) within seven days after receiving opinions from multiple qualified health care professionals stating the PTSD diagnosis was work-related, instead unreasonably relying on another doctor's unsubstantiated "second" opinion.

## STATEMENT OF THE CASE

## I.     Procedural History

Exxon operates an outdoor refinery complex that produces a variety of oil and chemical products in Baytown, Texas. (Dec. 4, Tr. 46, 1066).[2] Following an explosion at the Baytown Refinery in December 2021 that injured four contractors

---

[2] The Secretary cites and abbreviates the following documents from the Commission's certified list, filed on April 11, 2025: Hearing Transcript, Volumes 1-4 (Tr. [Page #]) ; Secretary's Exhibits, Volume 5 (Ex. C- [#] at [pg. #]); Exxon's Exhibits, Volume 5 (Ex. R- [#] at [pg. #]); ALJ Decision, Volume 6, Item 63 (Dec. [pg. #]). The Secretary cites all other documents in the certified list using the format Vol.[#]([Item #]). The Secretary cites Exxon's opening brief as "Pet. Br. [#]."

working at the complex, (Tr. 998-99),[3] OSHA received a referral from the Exxon union alleging Exxon's failure to record work-related illnesses. (Tr. 534-35). Following an investigation, OSHA issued Exxon a citation on June 3, 2022, alleging a three-item, other-than-serious violation of 29 C.F.R. § 1904.29(b)(3) for failure to record within seven days three employees' diagnoses of work-related mental illnesses by licensed health care professionals resulting in days away from work. (Dec. 3).

Exxon contested the citation, and a hearing was held before ALJ Sharon D. Calhoun. On November 22, 2024, the ALJ issued a decision vacating the items related to Exxon Employees 1 and 3 and affirming the item related to Employee 2. The Commission did not grant Exxon's petition for discretionary review of the ALJ's decision, and it became a final decision of the Commission on January 2, 2025. On March 3, 2025, Exxon timely filed the instant petition for review. Only the facts surrounding Exxon's decision not to record Employee 2's work-related PTSD diagnosis are at issue in this case.

---

[3] Exxon's medical team described the incident as "resulting in 4 contractors receiving treatment beyond first aid; no fatalities and no life altering injuries." (R-3, pg. 2).

## II.    Statutory and Regulatory Background

## A. The OSH Act

In 1970 Congress concluded that "personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments." 29 U.S.C. § 651(a). Accordingly, Congress enacted the OSH Act "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b).

In promulgating the OSH Act, Congress noted that appropriate reporting procedures would help effectuate the Act's purpose. *See* 29 U.S.C. § 651(b)(12). Therefore, section 8(c)(2) of the Act instructs the Secretary to "prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on work-related deaths, injuries and illnesses." 29 U.S.C. § 657(c)(2). Employers must keep records in accordance with the Secretary's regulations (*see* 29 U.S.C. § 657(c)(1)); noncompliance can result in citations and monetary penalties. *See* 29 U.S.C. §§ 658, 659, 666.

OSHA enforces the Act by inspecting workplaces and issuing a citation when it believes that an employer has violated a requirement of its standards or regulations. 29 U.S.C. § 658.  OSHA citations "describe with particularity the nature of the violation," require the employer to abate the violation, and, where appropriate,

assess a civil penalty. *Id*. §§ 658-659, 666. A violation of the Act may be classified as "serious," "other-than-serious," "willful," or "repeated." *Id*. § 666. When an employer contests a citation, an ALJ appointed by the Commission adjudicates the dispute, after which an adversely affected party may petition the Commission for discretionary review. 29 U.S.C. §§ 659(c), 661(a), (j); 29 C.F.R. § 2200.91(a). The courts of appeals review Commission final orders. 29 U.S.C. § 660(a)-(b).

## B. OSHA's Recordkeeping Regulations

OSHA's recordkeeping regulations require employers to record certain work-related injuries and illnesses on an OSHA 300 form. *See* 29 C.F.R. §§ 1904.4(a), 1904.29(a). An employer "must consider an injury or illness to be work-related if an event or exposure in the work environment either caused or contributed to the resulting condition or significantly aggravated a pre-existing injury or illness. Work-relatedness is presumed for injuries and illnesses resulting from events or exposures occurring in the work environment, unless an exception in §1904.5(b)(2) specifically applies." 29 C.F.R. § 1904.5(a); *see also* Occupational Injury and Illness Recording and Reporting Requirements, 66 Fed. Reg. 5916, 5958 (Jan. 19, 2001) (noting that the relevant question is whether "it is more likely than not that one or more events or exposures at work caused or contributed to" the injury or illness). Work does not need to be the only, or even the primary, cause of the injury

or illness; a case is work-related "if it results in whole or in part" from a work exposure. *Id.* at 5948.

Section 1904.5(b)(2) governs when a mental illness may be recordable: "[m]ental illness will not be considered work-related unless the employee voluntarily provides the employer with an opinion from a physician or other licensed health care professional with appropriate training and experience (psychiatrist, psychologist, psychiatric nurse practitioner, etc.) stating that the employee has a mental illness that is work-related." 29 C.F.R. § 1904.5(b)(2)(ix). The preamble to the recordkeeping rule notes that, "[i]n the event that the employer does not believe the reported mental illness is work-related, the employer may refer the case to a physician or other licensed health care professional for a second opinion." 66 Fed. Reg. at 5953.

## III. Statement of Facts

### A. After an Explosion at Baytown Refinery, Employee 2 Seeks Mental Health Treatment.

Employee 2 began working as a process technician and operator at Exxon's Baytown complex in 2008. (Tr. 144-45). Exxon's Baytown Refinery is an outdoor facility with about 27 separate units for various stages of chemical processing. (Tr. 146, 1066).

On December 23, 2021, a pipe ruptured causing an explosion in the outdoor hydro-desulfurization unit (HDU), which mixes hydrogen, sulfur, and naphtha. (Tr.

46, 65, 223-24 1052). Employee 2 was about a quarter of a mile away from the HDU, riding in a car with another Exxon employee toward the laboratory, when the explosion occurred. (Tr. 148-49). Employee 2 saw an instant flash that lit the sky, followed by a boom. (Tr. 149). He turned back and saw flames he estimated were more than 150 feet in the air. (Tr. 149). The two employees turned around and drove back toward the HDU. (Tr. 150).

At the time of the explosion, several contractors were working on top of the HDU, about 30-35 feet in the air. (Tr. 52). Because the flames from the explosion reached 20-25 feet in the air, Employee 2 and the other operators did not know if the contractors had gotten out in time. (Tr. 155-56). In the immediate response, a fellow operator told Employee 2 that they could not account for one of these contractors. (Tr. 156). Ultimately, four of these contractors were injured. (Tr. 998-99).

Employee 2 ran to close the valves in the south pipe rack of the HDU. (Tr. 158). Handrails were burning and falling from the upper stories of the unit. (Tr. 157). The cooling tower, up to 400 feet away from the explosion, was aflame. (Tr. 157). Despite his efforts at closing the valves, the fire did not abate. (Tr. 158).

Exxon's firefighters arrived at the HDU and used water to keep equipment cool and prevent the unit's towers, which were full of gas, from collapsing. (Tr. 159). To control the fire, the firefighters needed to block new fuel sources and close valves

within the HDU. (Tr. 1010). Specifically, they needed to manually close a pressure control valve located deep within the HDU to stop the fire. (Tr. 159-160). The firefighters needed an operator to go with them to identify this valve. (Tr. 161). After other employees declined, Employee 2 volunteered to go in with the firefighters. (Tr. 162). Firefighters equipped Employee 2 with firefighting gear. (Tr. 162). This was Employee 2's first time, after over 13 years working for Exxon, donning "full bunker gear," something typically reserved for Exxon's firefighters. (Tr. 243-44). Employee 2 and the firefighters paused to hug each other before entering the HDU. (Tr. 162).

Employee 2 and the firefighters entered the HDU and walked toward the base of the reactor that had blown off in the explosion. (Tr. 162- 63). The unit was dark because the power was "knocked out," and flames were "streaking across the alleyway" between the HDU's structures. (Tr. 163). Employee 2 could not see anything other than these flames. (Tr. 228). He worried that they were not going to come back alive. (Tr. 163). Employee 2 had to point to the valve because the fire "was hot and roaring" and "too loud" to hear one another. (Tr. 163-64). As the firefighters were almost done closing the valve, "the flames . . . started woofing on us" and the firefighters stopped. (Tr. 164). Employee 2 testified to his fear that the flame would go out and the vapor cloud around them would reignite. (Tr. 164). Employee 2 and the firefighters finally closed this valve. (Tr. 164-65, 217-18).

They then walked 20 feet closer to the fire through shin-high water to a second valve. (Tr. 165-66, 219, 228). The firefighters closed this valve and then walked Employee 2 towards the cooling tower, which was still on fire, but Employee 2 motioned there was nothing they could do to keep it from burning. (Tr. 167). They brought Employee 2 out of the HDU to the emergency response team, which checked his blood pressure and heart rate at a waiting ambulance. (Tr. 167-68, 1025-26). Once his vitals lowered to acceptable levels, the firefighters helped Employee 2 re-don his protective bunker gear, and they all went back into the HDU to close a valve that remained open. (Tr. 168, 222). When Employee 2 and the firefighters exited the HDU, there were additional firefighters on-site who could assist with containing the blaze. (Tr. 170).

Employee 2 testified that the ordeal spanned hours: beginning at around 1:00 AM; he then entered the HDU a second time around 3:30AM; and he went home at 5:00 or 5:30AM. (Tr. 170). The explosion and fires made the HDU inoperable. (Tr. 79). Part of the cooling tower collapsed into its basin and other parts were leaning over. (Tr. 80). Exxon took more than five months to rebuild the HDU and began operating it again in June 2022, using a temporary cooling tower through the summer. (Tr. 82).

Within weeks of the explosion, Employee 2 began to sense "something was wrong"; he was having trouble coping with increased anxiety and experiencing

mood swings and disturbing dreams (Tr. 172, 175). Employee 2 met first with Exxon's on-site counselors (Tr. 171-72), then attended Exxon's health clinic. (Tr. 178, 241-42). Employee 2 used Exxon's employee assistance program to find Sydney Adams-Ordonio, a licensed clinical social worker (LCSW). (Tr. 172-73, 468, 470). Employee 2 first met with LCSW Ordonio on January 6, 2022. (Tr. 172). In the course of their work together, LCSW Ordonio first diagnosed Employee 2 with an anxiety disorder and later, after his symptoms persisted for over a month, with post-traumatic stress disorder (PTSD). (Tr. 474). In addition to LCSW Ordonio, Employee 2 also saw his primary care provider, Dr. Cesare Castillo, and a therapist, LCSW Rachel Brown, related to his anxiety and depression. (Tr. 434-35, 496). Dr. Castillo prescribed medication for Employee 2's symptoms. (Tr. 445-46). Dr. Castillo and LCSW Brown also diagnosed Employee 2 with PTSD. (Tr. 437, 498).

### B. Employee 2 Provides Exxon Documentation from Licensed Medical Professionals Supporting a Work-Related PTSD Diagnosis.

Exxon requires employees to report all work-related injuries and illnesses. (Tr. 630). When employees receive care from outside healthcare professionals for a potentially work-related illness or injury, these professionals submit medical information via an Exxon form called an Employee Individual Disability Report ("IDR") (Tr. 607). Employee 2 submitted IDRs and other documentation from four different licensed health care professionals stating that he had PTSD.

### 1. LCSW Ordonio

While treating Employee 2, LCSW Ordonio observed that he had difficulty controlling his emotions and his symptoms included crying, depressed mood, anxiety, hypervigilance, nightmares, avoidance. (Tr. 471). Employee 2 reported fear and distrust in his coworkers had replaced his prior confidence after the explosion, he also expressed feeling withdrawn, isolated, hypervigilant, struggling with nightmares and intrusive thoughts. (Tr.471). LCSW Ordonio formally diagnosed Employee 2 with PTSD and included this diagnosis on an IDR dated March 8, 2022. (Tr. 474-75; Ex. C-15). Her office faxed Employee 2's IDRs[4] to Exxon, and she also provided a clinical history and opinion stating her diagnosis of PTSD under the DSM-5 Criteria. (Tr. 476-81; Ex. C-14 at 2).

Per the Texas Behavioral Health Executive Council, LCSW Ordonio is qualified to diagnose and treat mental health conditions. (Tr. 485). She has 22 years of experience in mental health counselling. (Tr. 485). LCSW Ordonio also has a bachelor's degree in interdisciplinary studies and a master's degree in social work, with a concentration in mental health. (Tr. 468.) She opened Kingwood Counseling Center in 2006, where she treats and diagnoses mental illnesses. (Tr. 469-70).

---

[4] LCSW Ordonio had previously submitted two additional IDRs diagnosing Employee 2 with anxiety related to the explosion because symptoms must persist for a month or more to diagnose PTSD. (Tr. 174, 177, 473-74; Tr. 476; Ex. C-12; Ex. C-14 at 2).

## 2. LCSW Brown

LCSW Brown also diagnosed Employee 2 with PTSD pursuant to the criteria in the DSM-5. (Tr 498). LCSW Brown described the basis for her diagnosis, applying the DSM-5 criteria and finding that Employee 2 had what she called a "textbook case of PTSD." (Tr. 498-99, 507). Employee 2 described to LCSW Brown his symptoms, including an inability to eat and sleep well, inability to work, hypervigilance, state of fearfulness, anxiety, flashbacks and avoidance of anything related to work. (Tr. 496-97). She recorded the diagnosis on an IDR and sent it to Exxon. (Tr. 189, 497-98, 506; Ex. C-16.)

LCSW Brown is authorized under Texas law to make mental health diagnoses, including PTSD. (Tr. 494, 502). LCSW Brown has a Master of Social Work, trained in clinical social work, including mental health therapy, and has worked in the mental health field since at least 2013. (Tr. 494). She specializes in trauma and trauma related disorders. (Tr. 495).

## 3. Dr. Castillo

Employee 2's primary care physician, Dr. Cesare Castillo, also diagnosed Employee 2 with PTSD. (Tr. 437). Dr. Castillo testified Employee 2 was "in tears, upset with what had happened," and "very anxious, was having issues with sleep, some insomnia." (Tr. 437). Employee 2 also reported difficulty concentrating, recurrent thoughts of the explosion and anxiety about returning to the same job

where the explosion occurred. (Tr. 437-38). Dr. Castillo concluded the explosion had triggered these symptoms. (Tr. 438-39). He documented the PTSD diagnosis for Employee 2 to give to Exxon. (Tr. 435-36, 445-46, 459; Ex. C-15.)

Dr. Castillo's Texas medical license allows him to diagnose mental health disorders, such as PTSD. (Tr. 440). He has been a board-certified family physician since 2001. (Tr. 433). Dr. Castillo has been treating patients with PTSD for over 20 years. (Tr. 433, 441). Dr. Castillo began his career as a physician for the military where he treated veterans from Iraq and Afghanistan with PTSD. (Tr. 433, 438-39). During his three-year residency, Dr. Castillo trained under a psychiatrist for one month and under a family medical doctor at a drug rehabilitation facility for two months. (Tr. 454-55). Psychiatry was also generally incorporated into his family medicine rotation and practice. (Tr. 453).

### 4. Dr. McCann

When Exxon receives an IDR from a healthcare professional with a diagnosis of work-related mental illness, it will investigate the professional to determine whether the provider's qualifications satisfy the requirements for a provider rendering a work-related mental illness opinion under 29 C.F.R. § 1904.5(b)(2)(ix). (Tr. 806-07). Exxon believed LCSW Ordonio, LCSW Brown, and Dr. Castillo were

not qualified under the standard to diagnose recordable mental illnesses.[5] (Tr. 620). As such, after receiving their IDRs, Exxon told Employee 2 that he would need to see to see someone with different credentials to obtain a qualifying diagnosis. (Tr. 178). Employee 2 then used Exxon's employee assistance program (EAP) to find psychologist Dr. Chelsea McCann, who was listed in the EAP portal. (Tr. 179, 238-39, 323).

Employee 2 visited Dr. McCann for the first time in early February 2022. (Tr. 323, 356). During the first appointment Dr. McCann conducted a clinical interview, and Employee 2 shared his relevant medical and family histories. (Tr. 323-24.) The interview questions were designed to create a baseline for his functioning prior to the incident. (Tr. 354.) During the second appointment, Dr. McCann conducted personality tests, IQ tests, and asked approximately 700 questions about his symptoms and feelings. (Tr. 180-81.) Dr. McCann applied the DSM-TR-5 criteria for PTSD and based upon her clinical interview and assessments, diagnosed Employee 2 with PTSD. (Tr. 325-26, 332; Ex. C-14, pg. 1). She completed and submitted an IDR on March 8, 2022, to Exxon diagnosing Employee 2 with PTSD

---

[5] Exxon did not contact any of these providers about their qualifications. (Tr. 447, 486, 504-05, 758). However, Exxon stated that LCSWs were not one of the enumerated providers. (Tr. 709-10, 758, 826-27.), and Dr. Castillo did not have a board certification in psychiatry, a mental health fellowship, or extensive PTSD training (Tr. 843.) The Exxon employee who made this assessment was not aware Dr. Castillo regularly treats veterans suffering from PTSD. (Tr. 844.).

stemming from his work in the aftermath of the explosion. (Ex. C-14, pg. 1).

During a third appointment, which was in March, Dr. McCann discussed and

handed to Employee 2 the written psychological evaluation results, as well as an

evaluation letter. (Tr. 325, 357). This nine-page evaluation "include[d] the clinical

interview, the assessment measures, any diagnoses that were rendered and

treatment recommendations." (Tr. 357). The letter summarized her interactions

with Employee 2, symptoms, treatment with other providers, and his work status.

(Ex.C-21; Tr. 329, 359). Dr. McCann transmitted the evaluation and letter to Exxon

in March 2022. (Tr. 329, 358-59).

### C. Exxon Ignores the PTSD Diagnoses Instead Relying on a Subsequently Obtained Opinion from a Healthcare Professional Who Never Met with Employee 2.

After receiving Dr. McCann's diagnosis and IDR submission, Exxon asked

Employee 2 to see another healthcare professional chosen by the company. (Tr.

194). Although Exxon acknowledged that Dr. McCann, as an enumerated provider,

was qualified to render a mental illness opinion, Exxon had questions about the

work-relatedness of this diagnosis it felt necessitated a second opinion. (Tr. 620-22,

715-16). Exxon offered several rationales for seeking another opinion, questioning

Dr. McCann's recommendation that Employee 2 take six months away from work

(Tr. 732-33), asserting she did not know the scope of Employee 2's involvement

during the explosion and fire (Tr. 715, 834-35), and believing, incorrectly, that

Employee 2 had only met Dr. McCann once (Tr. 731-32, 836-38). Employee 2 told Exxon he would not see another provider because Dr. McCann's diagnosis was, in his view, a second opinion after Exxon told him LCSW Ordonio did not qualify to render a diagnosis. (Tr. 194).

After Employee 2 declined to see another provider, Exxon sought a "second opinion" based on a review of Employee 2's medical records and Exxon's characterization of the explosion as "routine." (Tr. 573, 574-75, 580; *see also* Dec. 32). Exxon contacted Dr. Heather Joppich, a psychologist, and asked her to review Employee 2's medical records, including some unidentified subset of the IDRs and summaries of clinical visits, to determine whether Employee 2 suffered from PTSD stemming from the explosion.[6] (Tr. 565-567, 579-80, 589-90, 714, 718-19; Ex. C-22 at 1). Dr. Joppich did not meet with Employee 2; she only reviewed the records Exxon provided. (Tr. 567-68). Exxon asked Dr. Joppich to determine whether Employee 2 had PTSD stemming from the incident. (*Id.*; Ex. C-22 at 1).

Dr. Joppich concluded there was insufficient evidence in the records she reviewed to find Employee 2 suffered from work-related PTSD and memorialized her determination in two reports. (Tr. 574; C-24, R-1). Notably, however, the records and additional information provided to her by Exxon did not describe the

---

[6] The Secretary notes that Dr. Joppich testified to only receiving documentation from one LCSW, suggesting that she did not receive LCSW Brown or Dr. McCann's IDRs. (Tr. 569-572).

explosion as a traumatic event. (Tr. 573). In fact, Dr. Lee, the intermediary communicating with Dr. Joppich, specifically told her that a traumatic event did not occur. (Tr. 580). According to the summary of the incident Exxon provided Dr. Joppich, "a release and fire occurred at the facility where [Employee 2] works," and his "activities assisting the fire team with isolations is [sic] within his training experience." (Ex.C-22 at 2). In her March 24, 2022 report, Dr. Joppich noted, "[p]er the employee's business line, the employee has performed these activities 'many times.'" (Ex. C-24 at 1). In the second report, prepared at the request of Dr. Lee and dated June 20, 2022, Dr. Joppich added the events of that night did "not qualify as a traumatic event," and, in any event, the supporting records she received did not contain evidence of intrusion symptoms. (Ex. R-1 at 1-2; Tr. 593). Dr. Joppich did not consider her conclusion to be a "second opinion," rather just the result of a simple document review. (Tr. 576). Dr. Joppich acknowledged that someone who had given a clinical evaluation to Employee 2 would be better able to diagnose PTSD than she. (Tr. 583-84).

Exxon's internal review process ultimately concluded that Employee 2's PTSD was not work-related. (Tr. 624). Even so, Dr. Zaman, an Exxon employee involved with this internal review, acknowledged that Dr. Joppich's conclusions had not "closed any gaps" left by Dr. McCann. (Tr. 719).

**D. OSHA Conducts an Investigation and Issues a Citation for Exxon's Failure to Record Employee 2's Work-Related Mental Health Diagnosis.**

OSHA Compliance Safety and Health Officer (CSHO) Derek Rusin led an investigation into Exxon's decision not to record Employee 2's PTSD diagnosis on the company's OSHA 300 log. (Tr. 535). CSHO Rusin reviewed documents including medical opinions stating Employee 2 suffered from mental illness (PTSD) resulting in days away from work. (Tr. 535).

During the opening conference with Exxon held on March 21, 2022, CSHO Rusin questioned Exxon's failure to record Employee 2's mental health diagnosis. (Tr. 536). The Exxon representative stated that Exxon was gathering more information. (Tr. 536). Subsequently, during the closing conference, the representative informed CSHO Rusin that Exxon would not be recording Employee 2's mental illness. (Tr. 539).

On June 3, 2022, OSHA cited Exxon for a violation of 29 C.F.R. § 1904.29(b)(3) for failing to record Employee 2's mental illness on its OSHA 300 log. (Citation and Notification of Penalty, Vol.6(1)).

**E. The ALJ Holds a Hearing and Affirms Exxon's Violation of 29 C.F.R. § 1904.29(b)(3) for Failing to Record Employee 2's Work-Related Mental Illness.**

Exxon timely contested the citation, (Notice of Contest, Vol.6(2)), and a hearing took place before ALJ Calhoun from October 31-November 3, 2023. (Transcripts,

Vol 1-4). Employee 2 testified along with the four healthcare professionals who had clinically-evaluated and diagnosed him with PTSD. (Tr. 144, 321, 432, 467, 494). Exxon's Assistant Fire Captain Jared Sanders also testified about the fire and explosion, describing the fire as an "all call" fire because it required fire-fighting resources, apparatuses, and manpower beyond those available on that shift. (Tr. 1038-39). Mr. Sanders also acknowledged that the minimal fire response training received by Employee 2, which amounted to extinguishing a large burning cabinet, was not designed to prepare him for the refinery explosion and fire. (Tr. 1064). Indeed, Mr. Sanders stated that "we're not pretending that I set a 12-foot cabinet on fire [sic] would prepare anybody for this type of event." (Tr. 1064). Exxon called an expert witness, Dr. Joe Etherton (who had not clinically evaluated Employee 2), to argue that Exxon made reasonable recordkeeping determinations.[7] (Tr. 1117-18).

The ALJ affirmed the citation item related to Employee 2's diagnosis, finding that Exxon violated 29 C.F.R. § 1904.29(b)(3) when it failed to record Employee 2's work-related PTSD diagnosis (Dec. 21). The ALJ referenced the text of the mental health exception, creating a test for whether licensed healthcare professionals are qualified to provide a diagnosis. (Dec. 21-25). She found that

---

[7] While Dr. Etherton purported to testify about the reasonableness of Exxon's recordkeeping determinations, he admitted the best source of information for a diagnosis like PTSD is typically the patient (Tr. 11940) and conceded that the diagnosing medical professionals were better positioned to evaluated Employee 2's symptoms (Tr. 1234, 1256).

providers are qualified where they have appropriate training and experience that is "especially suitable" to diagnosing mental illness and compatible with the enumerated providers, and that similarly immerses providers in the treatment and diagnosis of mental illness. (Dec. 21-25).

The ALJ noted that Employee 2 provided an opinion from a psychologist (Dr. McCann), a licensed healthcare professional explicitly enumerated in the standard, and that the record supported that Employee 2 suffered from PTSD and it was work-related. (Dec. 30). The ALJ further found that Dr. Joppich's review did not constitute an authoritative and contemporaneous "second" opinion and thus did not relieve Exxon of its duty to record Employee 2's PTSD diagnosis. (Dec. 30). She also found Exxon's fair notice arguments meritless, given the text of the regulation and abundant OSHA guidance documents and letters of interpretation.

## SUMMARY OF THE ARGUMENT

Section 8 of the OSH Act mandates that the Secretary promulgate regulations requiring employers to "maintain accurate records of . . . work-related deaths, injuries, and illnesses." The unrestricted term "illnesses" includes mental illnesses. This is evidenced by a contemporary dictionary definition of the term, which includes both physical and mental health concerns, and other indications of congressional intent in the statute and the legislative history. The Secretary

therefore had the authority to, and properly promulgated, recordkeeping requirements for work-related mental illnesses.

In this case, four licensed and qualified healthcare professionals provided documentation to Exxon diagnosing Employee 2 with work-related PTSD. The recordkeeping regulations plainly state that when a qualified healthcare professional provides documentation to an employer of an employee's work-related mental illness, that mental illness is recordable. The ALJ therefore correctly found that Exxon violated 29 C.F.R. § 1904.29(b)(3) when the company received documentation of, but then failed to record Employee 2's work-related PTSD diagnosis. Exxon's reliance on Dr. Joppich's second opinion does not undermine this finding, and the ALJ properly rejected that opinion. Dr. Joppich did not clinically evaluate Employee 2, instead relying on a review of medical records and Exxon's downplaying to her of the explosion and mischaracterization of Employee's 2's work response to the explosion as routine.

Substantial record evidence also supports the ALJ 's determination that Employee 2's healthcare providers accurately diagnosed PTSD and that the PTSD was work-related. Employee 2 worked through a devastating explosion and fire at his workplace and was subjected to dangerous and uncertain conditions over a period of several hours when he entered the burning HDU and attempted to assist the firefighters. He described the HDU shutdown as "catastrophic," and at least 80

Exxon emergency responders were called upon to fight the fire early that morning and to contain it in the following days. In the weeks after the explosion, Employee 2 begin experiencing elevated anxiety, intrusive thoughts, hypervigilance, and mood swings and other symptoms, meeting the DSM-5 criteria for PTSD.

The ALJ properly rejected Exxon's baseless claim that it lacked fair notice on what constitutes reasonable reliance on and use of second opinions. The rulemaking preamble references only a "second" (not a third, fourth, or limitless number of) opinion on work-relatedness (and not the mental health diagnosis itself), and OSHA interpretation letters provided additional notice of recording requirements.

## STANDARD OF REVIEW

This Court's review of the Commission's final order[8] is "narrow and highly deferential to the agency." *Medina County Envtl. Action Assoc. v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010); *see Southern Hens, Inc. v. Occupational Safety & Health Rev. Comm'n*, 930 F.3d 667, 675 (5th Cir. 2019) ("The same standards apply to review of ALJ decisions that the Commission declines to review as to decisions of the Commission itself.") (citation omitted). "This [C]ourt must accept findings of fact by the Commission as 'conclusive' if they are supported by

---

[8] The ALJ's decision became a Commission final order when the Commission declined to grant discretionary review. 29 U.S.C. § 661(j); 29 C.F.R. § 2200.90(f).

'substantial evidence on the record considered as a whole.'" *Southern Hens,* 930 F.3d at 674 (citing 29 U.S.C. § 660(a)) (additional citation omitted); *see Chao v. Occupational Safety & Health Rev. Comm'n*, 401 F.3d 355, 362 (5th Cir. 2005) (defining "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"); *Phoenix Roofing, Inc. v. Dole*, 874 F.2d 1027, 1029 (5th Cir. 1989) (the Court does "not reweigh the evidence or independently evaluate evidentiary conflicts"). The Commission's legal conclusions are upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Southern Hens,* 930 F.3d at 675.

## ARGUMENT

The ALJ correctly found that Exxon violated OSHA's recordkeeping regulation, 29 C.F.R. § 1904.29(b)(3), when it failed to record Employee 2's work-related mental health diagnosis. As a preliminary matter, the OSH Act expressly authorizes OSHA to require employers to record work-related illnesses. The term illness is not limited to physical illnesses, and Exxon's attempt to exclude mental illnesses from the OSH Act is inconsistent with the text and purpose of the Act.

On the merits, OSHA's recordkeeping regulations are straightforward: mental illness is recordable when "the employee voluntarily provides the employer with an opinion from a physician or other licensed health care professional with

appropriate training and experience (psychiatrist, psychologist, psychiatric nurse practitioner, etc.) stating that the employee has a mental illness that is work-related." 29 C.F.R. § 1904.5(b)(2)(ix). Employee 2 provided opinions from multiple qualified healthcare professionals (including a psychologist who Exxon concedes squarely fits within the regulation) diagnosing him with work-related PTSD. This triggered Exxon's duty to record, and the ALJ correctly found that substantial record evidence supported the work-related PTSD diagnosis. Exxon also had clear notice that, while it was entitled to seek a second opinion on work-relatedness, OSHA regulations and letters of interpretation provided guidance on the reasonable use of and reliance on such opinions.

## I. The OSH Act Authorizes OSHA Regulations Requiring Accurate Recordkeeping of Work-Related Physical and Mental Illnesses.

The OSH Act authorizes the Secretary to require employers to record work-related mental illnesses. It requires the Secretary of Labor to "prescribe regulations requiring employers to maintain accurate records of . . . work-related deaths, injuries and illnesses other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job." 29 U.S.C. § 657(c)(2). This language contains no distinction between physical and mental illness. This is unsurprising given that a contemporaneous dictionary definition of "illness" includes "an

unhealthy condition of body or mind." *Webster's Third New International Dictionary*, 1127 (1961).[9]

Moreover, the OSH Act's legislative history indicates that the statute arose from concerns about both physical and mental work-related illnesses, explicitly noting congressional concern with "mental and personality disorders attributable to occupational stresses," S. Rep. No. 91-1282, at 20 (1970), *reprinted in Legislative History of the OSH Act of 1970,* at 160, and "long term psychological effects" of occupational exposure to chemicals. 116 Cong. Rec. 37325 (1970), *reprinted in Legislative History of the OSH Act of 1970,* at 413. For example, one document referred to during the Senate Subcommittee on Labor's hearings on Senate bill 2193 (the bill which ultimately became the Occupational Safety and Health Act of 1970) "utilizes... a definition for occupational health" which includes "mental . . . well-being of workers in all occupations." *Occupational Safety and Health Act of 1970: Hearings S. 2193 and S. 2788, Before the Subcomm. on Labor of the S.*

––––––––––––––––––––

[9] It is widely acknowledged, for example, by the CDC and other health organizations that "illness" encompasses both physical and mental illness. *See, e.g., About Mental Health*, U.S. Ctr. for Disease Control & Prevention (June 9, 2025) https://www.cdc.gov/mental-health/about/index.html#print. (noting "Mental health is a key component to overall health and is closely linked to physical health"); *Health and Well-Being,* World Health Org., https://www.who.int/data/gho/data/major-themes/health-and-well-being (last visited Aug. 25, 2025) ("Mental health is an integral part of health; indeed, there is no health without mental health.").

*Comm. on Labor and Public Welfare*, 91st Cong., at 112 (1969). Specifically, in "A

Review of State Occupational Health Legislation," the authors note:

> Occupational health.-In reviewing the statutes and rules and regulations, we utilized as a definition for occupational health one summarized from that accepted at the first session in 1950 of the Joint International Labor Office and World Health Organization Committee on Occupational Health: The promotion and maintenance of the highest degree of physical, mental, and social well-being of workers in all occupations.

*Id.* at 112 (quoting Andrew D. Hosey & Lorice Ede, *Occupational Health*

*Legislation: The Need for Review*, 29 Amer. Ind. Hyg. Assoc. J. 495 (1968).[10]

Further, the OSH Act itself expressly contemplates coverage of mental illnesses.

It provides "for research in the field of occupational safety and health, including

the *psychological factors* involved." 29 U.S.C. § 651(b)(5). (emphasis added); *see*

*also* 669(a)(1) (regarding "research, experiments, and demonstrations relating to

occupational safety and health, including studies of *psychological factors* involved

. . . ."). And facilitating such research is one purpose of the illness and injury

records that the Act requires. 29 U.S.C. § 657(c)(1) (requiring employers to

---

[10] The same article was also referred to and included in the House subcommittee's hearings on H.R. 843, H.R. 3809, H.R. 4294, and H.R. 13373, which were bills about occupational safety and health (including "authoriz[ing] the Secretary of Labor to set standards to assure safe and healthful working conditions for men and women"). *Occupational Safety and Health Act of 1969: Hearings H.R. 843, H.R. 3809, H.R. 4294, and H.R. 13373 Before the Select Subcomm. on Labor of the H. Comm. on Education and Labor*, 91st Cong., at 74 (1969).

maintain "such records . . . as the Secretary . . . may prescribe by regulation as necessary or appropriate for . . . developing information regarding the causes and prevention of occupational accidents and illnesses."); *see also* 66 Fed. Reg. at 5916-17 (highlighting the information-gathering purposes of OSHA's recordkeeping forms).

In keeping with the statutory text and legislative history, OSHA has consistently considered work-related mental illnesses to be recordable incidents under the OSH Act. *See* 66 Fed. Reg. at 5953 ("OSHA has required the recording of [mental] illnesses since the inception of the OSH Act"). Reflective of this longstanding position, OSHA proposed amendments to its recordkeeping regulations in 1996 that would have, in part, *excepted* mental illnesses from the general presumption of work-relatedness in many cases. *See* Occupational Injury and Illness Recording and Reporting Requirements, 61 Fed. Reg. 4030, 4035-36 (proposing regulatory text stating that mental illnesses would not be considered work-related (and thus, would not be recordable) except in cases of post-traumatic stress). In the final rule, OSHA declined to adopt this broad exclusion, explaining that the proposed exception for mental illnesses was "not consistent with the statute or the objectives of the recordkeeping system, and . . . not in the best interest of employee health." 66 Fed. Reg. 5953. *See also id.* ("The OSH Act is concerned with both physical and mental injuries and illnesses, and in fact refers to 'psychological factors' in the

27

statement of Congressional purpose in section 2 of the Act (29 U.S.C. 651(b)(5)"). The agency further concluded that "*discontinuing* the recording of mental illnesses would deprive OSHA, employers and employees, and safety and health professionals of valuable information with which to assess occupational hazards and would additionally skew the statistics that ha[d] been kept for many years" prior to the 1996 proposal. 66 Fed. Reg. at 5953 (emphasis added). This aligns with a clear intent to develop a comprehensive recordkeeping system. *See, e.g., General Motors Corp.*, No. 76-5033, 1980 WL 10653, at *5 (OSHRC Aug. 29, 1980) ("Examination of the legislative history of these provisions shows a clear congressional intent that this reporting requirement be interpreted broadly in order to develop information for future scientific use."); *Hern Iron Works, Inc.*, No. 89-433, 1993 WL 132975, at * 1 (OSHRC Apr. 27, 1993); 66 Fed. Reg. at 5918 ("[i]n revising its recordkeeping rule, [OSHA] also hopes to reduce underreporting and to remove obstacles to complete and accurate reporting by employers and employees.").

Exxon's claim that "the agency erred in extending recordkeeping obligations to mental illnesses where this text speaks only of physical conditions" (Pet. Br. 36) is based on selective references to dictionary definitions that in any event do not support this limitation on the word "illness," which is commonly used and understood to refer to both physical and mental illnesses. Exxon references two

definitions for "illness": "'disease; ailment; malady; disorder of health' or 'sickness[]'" and a "[b]ad or unhealthy condition of the body (or … some part of it)." (Pet. Br. 38). Exxon implies that these definitions speak only to *physical* ailments, not mental disorders, but the definitions Exxon references themselves contain no such distinction. Instead, they refer broadly to the harm done to a person. Indeed, Exxon's attempt to flog more out of these definitions is contradicted by the contemporaneous (to the passage of the OSH Act) definition of "illness" discussed above which expressly includes among "an unhealthy condition of body or mind." *Webster's Third New International Dictionary*, 1127 (1961).

The evidence therefore demonstrates that Congress adopted the broad and unrestricted term "illness." Interpreting that term narrowly, to exclude mental illnesses, would impermissibly add an exception into the statute. *See Bostock v. Clayton County,* 590 U.S. 644, 669 (2020) ([W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."); *s*ee also *Texas v. Trump*, 127 F.4th 606, 614 (5th Cir. 2025), *vacated on other grounds*, No. 23-40671, 2025 WL 968277 (5th Cir. Mar. 28, 2025) (finding the Court cannot "read an exception into Congress's enactment"). Exxon's argument, (Pet. Br. 39), that "psychological problems" cannot be naturally fit into the context of the statute

falls short for similar reasons. It attempts to impose a rigid distinction between physical and mental conditions where it is not supported.[11]

Exxon's attempt to dismiss the OSH Act's reference to "psychological factors" as "shed[ding] no light on 29 U.S.C. § 657 (i.e., § 8) which is not a research provision," Pet. Br. 42, is baseless. This assertion ignores the necessary connection between injury and illness statistics (which come from records) and research,[12] which the OSH Act expressly provides for. 29 U.S.C. § 657(c)(1) (providing that the Secretary may prescribe regulations as necessary to "develop[] information regarding the causes and prevention of occupational accidents and illnesses"). Exxon also overlooks the documented legislative history of the OSH Act as well as Congress's stated overarching purpose of assuring "so far as possible, every

---

[11] This Court has similarly recognized the blurry distinction between physical and mental disorders. *See Lynd v. Reliance Standard Life Ins. Co.*, 94 F.3d 979, 983 (5th Cir. 1996) ("the American Psychiatric Association (APA) acknowledges that there is no bright-line distinction between 'mental' disorders and 'physical" disorders") (citing Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition, 1994)).

[12] OSHA's recordkeeping requirements are foundational to collecting injury and illness statistics, allowing the agency to identify dangerous worksites and hazards, develop knowledge about the scope of particular dangers in the workplace, and decide when the agency needs to pursue rulemaking, compliance assistance, or other interventions. *See* 66 Fed. Reg. at 5952 (rejecting the proposed restriction on mental illness reporting because "information about specific risks within different occupations provides important information for possible intervention and training to improve conditions while at the same time, indicating the possibility of specific stressors that need to be addressed within the job . . . would be lost with the proposed reporting guidelines."); *see also General Motors Corp.*, 1980 WL 10653, at *5 (recognizing that Congress intended to tie the recordkeeping requirement "to develop[ing] information for future scientific use.").

working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). If a worker is unable to work due to a work-related mental illness, this objective cannot be achieved. [13]

## II.    The ALJ Correctly Determined that Exxon Violated 29 C.F.R. § 1904.29(b)(3) when It Failed to Record Employee 2's Work-Related PTSD Diagnosis.

Within weeks of the explosion at his workplace, Employee 2 began to sense "something was wrong," and he started having trouble coping with increased anxiety and experiencing mood swings and disturbing dreams (Tr. 172, 175). Where Employee 2 was once confident, the explosion and his role in the response left Employee 2 unable to trust his coworkers. (Tr. 471). He also reported he lost his trust in the systems and processes at his workplace. (Tr. 195). Employee 2 sought treatment from two LCSWs and his primary care physician to manage these symptoms, and all three diagnosed him with post-traumatic stress disorder. (Tr. 434-35, 474-75, 496). Going through this process and "telling [his] story over and over [was] not fun," but when Exxon told him these PTSD diagnoses from three

---

[13] Exxon's reliance on *NFIB* to argue that OSHA's recordkeeping regulations exceed OSHA's statutory mandate is also misplaced. The OSH Act specifically recognizes recordkeeping as critical to achieving OSHA's purpose. 29 U.S.C. § 657. In *NFIB*, the Supreme Court found OSHA "fail[ed] to account for [the] crucial distinction [] between occupational risk and risk more generally." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 119 (2022) (*NFIB*). Here, the recordkeeping requirements are explicitly tied to occupational hazards: employers are required to record only employee "work-related" mental illnesses. 29 U.S.C. § 657(c)(2); 29 C.F.R. § 1904.5(b)(2)(ix).

different healthcare providers did not suffice, and that he needed to see a psychologist, he complied and met with Dr. McCann, who he found listed in the EAP portal provided by Exxon. (Tr. 178-79). Altogether, Employee 2 voluntarily provided Exxon with documentation from four licensed health care professionals who all came to the same conclusion: Employee 2 was suffering from a work-related mental illness (PTSD).

These four qualified healthcare professionals[14] provided ample evidence that Employee 2's PTSD was work-related. Exxon asserts that it was entitled to disregard this evidence and rely instead on another opinion from Dr. Joppich, who did not examine Employee 2. The ALJ properly rejected this contention, and Exxon's assertion that it somehow lacked fair notice of the reasonable use of and reliance on second opinions is completely without merit.

### A. Employee 2's Submission of Documentation of Work-Related PTSD Triggered Exxon's Duty to Record.

Under 29 C.F.R. § 1904.5(b)(2)(ix), a mental illness is recordable as work-related when the employee voluntarily provides an opinion from a "psychiatrist,

---

[14] The ALJ correctly concluded that the licensed clinical social workers (LCSWs), although not specifically enumerated in the regulation, were qualified under the regulation to provide an opinion. (Dec. 36-38). Notwithstanding the ALJ's opinion to the contrary, (Dec. 38-39), Employee 2's primary care physician was likewise qualified under the regulation because his medical license permitted him to treat and diagnose patients with PTSD, (Tr. 440), he received training to do so, (Tr. 453-55), and he had extensive experience diagnosing and working with veterans with PTSD throughout his career. (Tr. 433, 438-39, 441).

psychologist, psychiatric nurse practitioner, etc.," or a physician or other licensed health care professional "with appropriate training and experience" that verifies the diagnosis and its work-relatedness. *See* 29 C.F.R. § 1904.5(b)(2)(ix). In accordance with this regulation, Employee 2 voluntarily provided opinions from several qualified healthcare professionals stating that his PTSD stemmed from his work during the catastrophic explosion and fire at the Exxon refinery.

Employee 2 provided Exxon documentation of his work-related PTSD from a psychologist (Dr. McCann), two licensed clinical social workers (LCSWs) (Mses. Brown and Ordonio), and a primary care physician (Dr. Castillo). Exxon does not dispute that Dr. McCann is one of the enumerated healthcare professionals within the regulation but contends the other three professionals lack the "appropriate training and experience" to provide a qualifying medical opinion. (Pet. Br. 17, 37). Because there was no dispute regarding Dr. McCann, the ALJ found that resolving this case did not require assessing the other professionals' qualifications under the regulation. (Dec. 36). Nevertheless, the ALJ assessed the experience and training of the two LCSWs and Employee 2's primary care physician and concluded that Employee 2 provided a total of three qualifying medical opinions (the psychologist and the two LCSWs). (Dec. 36-39).[15]

---

[15] The ALJ found that Dr. Castillo was not qualified under regulation because he did not have the immersive training and experience in treating and diagnosing mental illness to satisfy the

With respect to the qualifications of the LCSWs, under the recordkeeping regulations, a "physician or other licensed health care professional" is "an individual whose legally permitted scope of practice (i.e., license, registration, or certification) allows him or her to independently perform, or be delegated the responsibility to perform, the activities described by this regulation." 29 C.F.R. § 1904.46. The mental health exception adds to this definition, requiring that the physician or other licensed health care professional have "appropriate training and experience" diagnosing mental illness. *See* 29 C.F.R. § 1904.5(b)(2)(ix). *See also* 66 Fed. Reg. at 5935 ("[requiring] employers to record only those mental illnesses verified by a health care professional with appropriate training and experience in the treatment of mental illness").

Applying this test, the ALJ concluded that LCSWs Ordonio and Brown had "appropriate training and experience" under the regulation stemming from their "immersive experience in treating and diagnosing and mental illnesses." (Dec. 37-38). This conclusion was supported by substantial evidence on the record,

---

requirement that providers have appropriate training and experience (Dec. 39). The Secretary disagrees with this assessment because the depth of his training and experiences qualified Dr. Castillo to provide diagnoses under the regulation. Dr. Castillo testified to extensive experience working with veterans, beginning his career as a physician with the military where he treated veterans with PTSD and continuing this work in his current practice. (Tr. 433, 438-39). He also received psychiatric training, spending three months of his three-year residency in psychiatric settings. (Tr. 454-55). In any event, the three providers credited by the ALJ provide substantial evidence that Employee 2's PTSD was work-related and therefore recordable under the cited regulation.

including from Dr. Joppich (Exxon's second opinion doctor), who testified as to LCSW's ability to treat mental illness.[16] Both LCSWs Ordonio and Brown received training focused on mental illness and regularly treated and diagnosed mental illness in their practice. (Tr. 468, 485, 494, 503-504).

Exxon argues that the ALJ erred in finding the LCSWs qualified under the regulation because LCSWs are not the functional equivalent of enumerated professionals. (Pet. Br. 37). Exxon pointed to differences in training and that "expert opinion [is] that [LCSWs'] are less accurate than those of the enumerated professionals." (Pet. Br. 37). The ALJ properly rejected Exxon's narrow interpretation of a "qualified provider under recordkeeping regulations, noting that an interpretation requiring a provider have "equivalent training and experience" would "effectively write the 'etc.' providers out of the standard." (Dec. 24). *See, e.g.*, *Sanderson Farms, Inc. v. Occupational Safety & Health Rev. Comm'n*, 964 F.3d 418, 425 (5th Cir. 2020) (favoring the interpretations of statutes and regulations that avoid surplusage by giving effect to each work or provision).

In sum, once Employee 2 voluntarily provided Exxon with documentation from a qualified provider (here, not only Dr. McCann, but also the two LCSWs) of his

---

[16] As the ALJ notes, Dr. Joppich testified that "[LCSWs] are mental health professionals. They should be fully competent to diagnose PTSD." ALJ Decision at 337 (citing Tr. 598).

work-related PTSD, the ALJ correctly found that Exxon was under a duty to record. Exxon's failure to do violated the cited regulation.

## B. Substantial Evidence Supports the Healthcare Providers' Opinions that Employee 2 Had Work-Related PTSD.

Injuries and illnesses are presumed to be work-related if they result from events or exposures occurring the work environment "unless an exception in §1904.5(b)(2) specifically applies.[17] 29 C.F.R. § 1904.5(a). The relevant exception here provides that "[m]ental illness will not be considered work-related unless the employee voluntarily provides the employer with an opinion from a physician or other licensed health care professional with appropriate training and experience (psychiatrist, psychologist, psychiatric nurse practitioner, etc.) stating that the employee has a mental illness that is work-related." 29 C.F.R. § 1904.5(b)(2)(ix). Once an employee voluntarily provides a diagnosis from a qualified health care professional that the mental illness is work-related, the general exception to the work-relatedness for mental illness no longer applies. In this case, because the triggering incident took place at work, Employee 2's resulting PTSD is presumed to be work-related. Exxon therefore had a duty to record this illness, unless it was

---

[17] Employers "must consider an injury or illness to be work-related if an event or exposure in the work environment either caused or contributed to the resulting condition or significantly aggravated a pre-existing injury or illness. Work-relatedness is presumed for injuries and illnesses resulting from events or exposures occurring in the work environment, unless an exception [] specifically applies." 29 C.F.R.§ 1904.5(a).

otherwise established as incorrect.  *See, e.g.*, *Cent. Fla. Equip. Rentals*, No. 08-1656, 2016 WL 4088876, at *3 (July 26, 2016) (finding it was the employer's burden to prove it qualified for an exception when applying the "unless" clause in § 1926.602(a)(3)(i)) (citing *U.S. v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967)). The ALJ correctly found that Exxon failed to rebut the work-related PTSD diagnoses submitted by Employee 2.[18]

In making this finding, the ALJ carefully weighed the evidence supporting the providers' diagnoses of work-related PTSD. He referenced the testimony of Employee 2, his medical providers, and other Exxon employees, in concluding that the events surrounding the refinery explosion and fire constituted a traumatic event for Employee 2. (Dec. 31-33). Employee 2 entered the HDU to identify the valves while the flames were still 75 feet high and deafening. (Tr. 165, 995, 1074). The

---

[18] After rejecting Exxon's argument that Dr. Joppich's opinion justified their decision not to record Employee 2's illness, the ALJ considered and ultimately rejected Exxon's arguments that it did not have the duty to record this diagnosis because the record did not support the PTSD diagnosis was work-related, or that it met the DSM-5 criteria for PTSD. (Dec. 30, 36). Exxon mischaracterizes what is a straightforward application of the regulation's language as an "alternative framework." (Pet. Br.34-35). This contention neglects the well-established recordkeeping principle that illnesses caused by events or exposures that occur in the work environment "must be considered work-related unless an exception to the presumption specifically applies." 66 Fed. Reg. at 5929. This argument also attempts to reframe what are clearly factual issues, whether Employee 2 suffered from PTSD and whether that PTSD was caused by a work incident, as legal issues. The ALJ reviewed and weighed the evidence presented, hearing from Employee 2, his medical team, and Exxon's witnesses, so the question remaining is whether there is substantial evidence to support these findings. *See Phoenix Roofing, Inc.*, 874 F.2d at 1029 (the Court does "not reweigh the evidence or independently evaluate evidentiary conflicts").

night of the explosion was the first time (in over 13 years of working for Exxon) that Employee 2 donned full bunker gear. (Tr. 244). He described the emotional impact of this experience, that never before had he "been on that verge of not knowing if I was going to—if I was going to walk out of that situation . . . . Like that life or death." (Tr. 203). He saw the HDU shutdown as "catastrophic" and that it amounted to "a loss of control." (Tr. 244-45). The explosion and fire were in no way routine events. "[A]t least 80 ExxonMobil emergency responders were required to fight the fire early that morning and contain it the following days." (Dec. 33). It took more than five months for Exxon to rebuild the HDU, and they had to use a temporary cooling tower through the summer. (Dec. 4).

The record also supported Employee 2's PTSD diagnosis under the DSM-5 criteria. (Dec. 36). Employee 2 reported experiencing recurrent distressing dreams (Tr. 175, 364-65, 471), persistent and exaggerated negative beliefs reflected in a "global change in his trust level" following the explosion (Tr. 195, 362, 471, 482), and hypervigilance and exaggerated startle response (Tr. 349, 350-51, 352-53, 480-81, 496-97). The ALJ weighed this evidence against testimony by Exxon employees and an Exxon expert witness (Dr. Etherton) called to discredit the PTSD diagnosis and reasonably concluded that the evidence supported the PTSD diagnosis and its work-relatedness. (Dec. 35-36). *See Excel Modular Scaffold & Leasing Co. v. Occupational Safety & Health Rev. Comm'n*, 943 F.3d 748, 754 (5th

Cir. 2019) (ALJ decisions will be upheld "even if this court could justifiably reach a different result de novo") (citation and quotations omitted). Substantial evidence on the record therefore supported the ALJ's determination that Employee 2 suffered PTSD because of a work-related incident. (Dec. 30).

### C. The ALJ Correctly Found Exxon's Reliance on Dr. Joppich's Opinion Did Not Relieve It of the Duty to Record.

The preamble to the 2001 Final Recordkeeping Rule provides that "[i]n the event that the employer does not believe the reported mental illness is work-related, the employer may refer the case to a physician or other licensed health care professional for a second opinion." 66 Fed. Reg. at 5953. However, as the ALJ noted, "the recordkeeping standard is not so broad or open-ended as to allow unlimited second-opinions or those well after the initial diagnosis." (Dec. 27). The phrase "second opinion" denotes a limit: employers may seek a *second* opinion, not a second, then a third and a fourth. The preamble to the recordkeeping rule states that the "overarching goal of this rulemaking has been to improve the quality of workplace injury and illnesses." 66 Fed. Reg. at 5918. Allowing employers to seek limitless opinions until they obtain a preferred outcome would undoubtedly

impact the accuracy and quality of records and thereby run contrary to the purposes of the Act.[19]

Exxon was unhappy with the first three diagnoses of work-related PTSD that it received from Employee 2. (Tr. 621). The company then told Employee 2 that these three diagnoses were unacceptable, and that he needed an opinion from a psychologist. (Tr. 178-79, 239). Employee 2 then turned to the Exxon EAP portal, where he found a listing for Dr. McCann. (Tr. 179, 238-39). Dr. McCann met with Employee 2, tested and clinically evaluated him, and provided a well-supported opinion diagnosing Employee 2 with work-related PTSD. (Tr. 325-26, Ex. C-21).

Unsurprisingly, Exxon was also unhappy with Dr. McCann's opinion – though they concede she was qualified to render it under the recordkeeping regulations. (Tr. 620, 715). Under the guise of seeking a "second" opinion, Exxon then demanded that Employee 2 see yet another healthcare provider.[20] (Tr. 194).

---

[19] The recordkeeping regulations require employers to design procedures that facilitate accurate recordkeeping. S*ee, e.g.*, 29 C.F.R. § 1904.35(b)(1)(i) ("A [recordkeeping] procedure is not reasonable if it would deter or discourage a reasonable employee from accurately reporting a workplace injury or illness.").

[20] Exxon offered several rationales for seeking another opinion, most recently criticizing Dr. McCann's recommendation that Employee 2 take 6 months medical leave (Pet. Br. 10), but the preamble specifies that employers may seek a second opinion in the event it questions the work-relatedness determination. 66 Fed. Reg. at 5953. The most recent rationale well-exceeds this a review of work-relatedness, and even where Exxon employees contended there were questions about Employee 2's involvement the night of the explosion and fire that could go to the issue of work-relatedness, they offered no information how Dr. Joppich's opinion (based on the selective and seemingly incomplete information Exxon provided her) improved their understanding of work-relatedness. (Tr 719, 725).

Employee 2 understandably refused – he had already seen, and been diagnosed with work-related PTSD, by four healthcare providers. (Tr. 194).

Exxon then asked Dr. Joppich to review Employee 2's medical file. (Tr. 714). In conducting this exercise, Exxon (through Dr. Lee) informed Dr. Joppich that a traumatic event did not occur. (Tr. 580). According to the summary of the incident Exxon provided Dr. Joppich, "a release and fire occurred at the facility where [Employee 2] works," and his "activities assisting the fire team with isolations is [sic] *within his training experience*." (Ex.C-22 at 2) (emphasis added). In her March 24, 2022 report, Dr. Joppich noted, "*[p]er the employee's business line, the employee has performed these activities 'many times.*'" (Ex. C-24 at 1) (emphasis added). But this was not true. In the 13 years that Employee 2 had worked for Exxon, the night of the explosion was the first time he had ever donned the special protective gear. (Tr. 243-44). In the second report, prepared at the request of Dr. Lee and dated June 20, 2022, Dr. Joppich stated that the events of that night did "*not qualify as a traumatic event*" because he was trained to "to respond to the type of event that occurred" and, in any event, the supporting records she received did not contain evidence of intrusion symptoms. (Ex. R-1 at 1-2; Tr. 593) (emphasis added). But Dr. Joppich did not have a full or accurate picture of Employee 2's work history or the triggering event – a catastrophic explosion and fire at the Exxon refinery.

Even Dr. Joppich did not consider her conclusion to be a "sufficient second opinion," rather, just the result of a simple document review. (Tr. 575-57). Even Dr. Zaman, an Exxon employee involved with the company's internal review process, recognized in his letter to Dr. Joppich that this did not constitute a second opinion but rather "a review of our records with respect to the case of" Employee 2. (Ex. C-22 at 1). In addition, Dr. Joppich acknowledged that someone who had given a clinical evaluation to Employee 2 would be better able to diagnose PTSD than she. (Tr. 583-84). In light of these facts, the ALJ correctly found that Dr. Joppich's opinion was insufficient to relieve Exxon of its duty to record Employee 2's reported work-related PTSD. (Dec. 29).

The ALJ also noted an additional reason (aside from weak factual underpinnings) that Exxon was not entitled to rely on Dr. Joppich's opinion and ignore the four contrary opinions it had previously received: at the time Dr. Joppich conducted her record review, Employee 2's care had transitioned from the diagnosing phase to the treatment phase. (Dec. 30). Consequently, even if Dr. Joppich had conducted an examination (which she did not), Employee 2 was no longer in the same condition as when examined by LCSW Ordonio or Dr. McCann. (Dec. 30). Dr. Joppich's document review took place between March 22 and March 24 (Dec. 29-30), Employee 2 began receiving specialized treatment from LCSW Brown on March 15 (Ex. C-16 at 1, Ex. C-17 at 5). This was also well after

Employee 2 met with Dr. McCann, beginning in February 2022 (Tr. 323) and culminating in an IDR dated March 9, 2022 (Ex. C-14 at 1), and Dr. Castillo on March 8, 2022 (Ex. C-16 at 2). Exxon therefore did not "seek or receive an authoritative, contemporaneous second opinion for Employee 2's PTSD diagnosis." (Dec. 29).

In assessing Dr. Joppich's review, the ALJ properly applied existing OSHA guidance for determining recordability where there are conflicting medical opinions (Dec. 27-30).[21] In such cases, OSHA has directed employers to consider whether second opinions are "authoritative" and "contemporaneous."[22] With respect to the meaning of "contemporaneous," the ALJ referenced another OSHA

---

[21] Exxon speciously argues that the ALJ failed to undertake reasoned decision-making. (Pet. Br. 26-34). This assertion is belied by the ALJ's lengthy and detailed opinion and clear recitation of legal precedent and its application to the facts. Dec. 1-45; *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 40 (1983) (requiring an agency consider relevant facts and explain the connection between the facts found and the choice made).
According to Exxon, the ALJ has imposed "illogical dictates that are incompatible with the agency's own position on second opinions in mental-illness cases" and the ALJ applied rules that would effectively eliminate an employer's opportunity to seek second opinions for mental health cases. (Pet. Br. 27). This is patently untrue. OSHA has never articulated a right to seek unlimited "second" opinions. And, contrary to Exxon's contentions, the ALJ expressly assessed Dr. Joppich's opinion in light of OSHA guidance and letters of interpretation. (Dec. 27-29). The ALJ also carefully and meticulously assessed the evidence establishing work-relatedness and the criteria for a PTSD diagnosis. (Dec. 31-36). None of this detailed analysis constituted a so-called "alternative framework," (Pet. Br. 34).

[22] *See* OSHA Letter of Interpretation, April 3, 2007, Recording an injury when employer is provided with different medical opinions, available at https://www.osha.gov/laws-regs/standardinterpretations/2007-04-03-0

Letter of Interpretation that explains that opinions are contemporaneous where "conducted within a time frame so that an injury or illness can be evaluated when the signs or symptoms are in the same stage of development, same degree of severity, and this can be viewed in a similar context for analysis."[23] And, OSHA has identified several factors employers "might consider" when determining whether the providers examined an illness in the same condition, including whether the examination of the employee is in person; when the examinations occur; whether there were additional events or exposures between the examinations; and whether medical treatment or days away from work occurred between the examinations.[24] However, "once medical treatment is provided to an employee, the case must be recorded, and regardless of when it is made the employer may not consider a subsequent conflicting recommendation." (Dec. 29) (quoting Letter of Interpretation, May 15, 2017). The ALJ therefore properly

---

[23] OSHA Letter of Interpretation, May 15, 2007, Clarification of the term "contemporaneous" as used in recordkeeping FAQ 7-10a, available at https://www.osha.gov/laws-regs/standardinterpretations/2007-05-15.

[24] OSHA Letter of Interpretation, February 25, 2011, Clarification of the terms most authoritative and pre-existing conditions as used for recordkeeping purposes, available at https://www.osha.gov/laws-regs/standardinterpretations/2011-02-25.

rejected Exxon's explanation for why Dr. Joppich's opinion was superior to Dr. McCann's.[25]

### D. Exxon Had Fair Notice that It Was Not Entitled to Seek Unlimited and Unrestricted "Second" Opinions.

Exxon complains that it did not have fair notice of any restrictions on the "second opinion opportunity". (Pet. Br. 16). This assertion is meritless and the ALJ properly rejected it. (Dec. 27).

The Fifth Amendment's Due Process Clause requires that OSHA regulations "carry sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Echo Powerline, L.L.C. v. Occupational Safety & Health Rev. Comm'n*, 968 F.3d 471, 476 (5th Cir. 2020) (cleaned up). Here the recordkeeping regulation provided Exxon "sufficiently definite warning" of the conduct required. The regulation plainly states that a mental illness is considered work-related and recordable when "the employee voluntarily provides the employer with an opinion from a physician or other licensed health care professional with appropriate training and experience (psychiatrist, psychologist,

---

[25] Exxon complains of OSHA's so-called "strict rule against reliance on a second opinion after 'medical treatment is provided for a work-related injury or illness, or days away from work or work restriction have occurred" as a applied to mental illness where, as here, an employee misses work and receives care before a diagnosis is made or the employer is aware of that diagnosis. (Pet.Br. 27-28). No such strict rule exists. There must simply be a valid basis for comparing and evaluating competing expert opinions, i.e., that they evaluate the same condition.

psychiatric nurse practitioner, etc.) stating that the employee has a mental illness that is work-related."[26] 29 C.F.R. § 1904.5(b)(2)(ix).

In explaining the requirements of the recordkeeping regulations, OSHA stated in the preamble to the rule that: "In the event that the employer does not believe the reported mental illness is work-related, the employer may refer the case to a physician or other licensed health care professional for a second opinion." 66 Fed. Reg. at 5953. This statement does not, however, alter the text of the regulation, which expressly informs employers of their obligations. *See Echo Powerline*, 968 F.3d at 477 (rejecting an employer's "strained reading" that created vagueness where the provision otherwise specified what was required); *United States v. Pitt-Des Moines, Inc.*, 168 F.3d 976, 987 (7th Cir. 1999) (rejecting vagueness argument where the standard required employers to secure steel beams "with not less than two bolts, or the equivalent at each connection," because the standard permits employers to comply by using the "clear, reasonable method" of securing the

---

[26] Exxon asserts that the preamble controls because the regulation was "facially incomplete" (Pet. Br. 22). This is untrue: the regulation is clear, and while the preamble may add color or guidance, it does not change the regulation's underlying meaning. See *Mejia-Velasquez v. Garland*, 26 F.4th 193, 202 (4th Cir. 2022) ("to the extent there is a conflict between the preamble and the regulation, the regulation must control"); *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) ("language in the preamble of a regulation is not controlling over the language of the regulation itself"); *Peabody Twentymile Mining, LLC v. Sec'y of Lab.*, 931 F.3d 992, 998 (10th Cir. 2019) ("[W]hile the preamble can inform the interpretation of the regulation, it is not binding and cannot be read to conflict with the language of the regulation itself.").

beams with two bolts). A clear and specific standard is not changed to "a broad, general or potentially vague standard" where it provides an alternative option for additional flexibility. *H. E. Wiese, Inc., & Indus. Elec. Constr. Co*., No. 78-204, 1982 WL 22605, at * 10 (OSHRC Mar. 31, 1982) (Cottine, Commissioner, concurring). Even where a standard lists several "alternative ways in which an employer may fulfill its specific duty," the "alternative methods of compliance [do] not alter or diminish the specific duty imposed by the standard, but rather [are] designed to aid employers in fulfilling that duty." *Marion Power Shovel Co., Inc.*, No. 76-4114, 1980 WL 10690, at *4 (OSHRC Oct. 31, 1980).

Further, the preamble text gives employers fair warning that the regulations do not countenance unbridled opinion-seeking until the employer obtains an opinion it likes (i.e., employers may seek a "second" opinion; not a third, fourth, unlimited, etc.). This language is "not vague simply because its application requires the exercise of judgement." *See Tunnel Elec. Constr. Co.,* No. 76-1803, 1980 WL 10644, at * 2 (OSHRC Aug. 11, 1980) (citing *Dravo Corp.,* No. 16317, 1980 WL 10731, at *3 (OSHRC Jan. 8, 1980)). *See also Austin Com. v. Occupational Safety & Health Rev. Comm'n*, 610 F.2d 200, 201 (5th Cir. 1979) (per curiam) (finding a safety and health regulation provided fair notice without "spelling out specific prohibited uses of specifically named materials").

Importantly, "[b]ecause the OSH Act is 'remedial civil legislation' and no First Amendment–protected activity is involved, 'the vagueness charge must be considered in light of the regulation's application.'" *Echo Powerline, L.L.C. v. Occupational Safety & Health Rev. Comm'n*, 968 F.3d at 477 (5th Cir. 2020) (citations omitted). When making a recordkeeping determination, an employer is required to "make a reasonable judgement based on the information and expertise available to it." *Amoco Chems. Corp.*, No. 78-0250, 1986 WL 53497, at *7 (OSHRC June 19, 1986) (finding employer reasonably declined to record asbestosis where conflicting diagnoses from doctors and confounding medical histories made it unclear whether the employees suffered from asbestosis). But an employer's decision not to record would be unreasonable where they "had sufficient information to determine that a recordable illness had occurred" but decided not to record it. *Shaw Global*, No. 09-0555, 2012 WL 3776358, at *5 (Aug. 27, 2012).

Exxon hyperbolically asserts that this case amounts to "precisely the kind of 'unfair surprise' against which [governing] cases have long warned." (Pet. Br. 19, citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012)). According to Exxon, OSHA "never announced restrictions on an employer's prerogative to rely on a 'a second opinion,'" and therefore, Exxon claims, it lacked any "affirmative notice" that its reliance on Dr. Joppich's opinion could be deemed

unreasonable under the standard. (Pet. Br. 20-21). This assertion is belied by the plain language of the regulation and the preamble. which clearly delineate the regulations' requirements, and by the substantial record evidence demonstrating the unreliability of Dr. Joppich's opinion in contrast with the opinions of Employee 2's four healthcare providers.[27]

## CONCLUSION

For the foregoing reasons, the Court should deny the petition for review.

---

[27] Exxon relies on several other inapposite cases in support of its claim it lacked fair notice. For instance, *F.C.C. v. Fox Television Stations*, Inc., 567 U.S. 239, 254 (2012) concerns freedom of speech, not vagueness claims. Similarly, Exxon cites to several other cases where the courts found that the law or regulation at issue created some ambiguity and there was a reasonable alternative reading such that the government had not provided fair notice of the required or proscribed conduct. *E.g.*, *Diamond Roofing Co. v. Occupational Safety and Health Rev. Comm'n.*, 528 F.2d 645 (5th Cir. 1976), *Gates & Fox Co. v. Occupational Safety and Health Rev. Comm'n.*, 790 F.2d 154 (D.C. Cir. 1986), *Gen. Elec. Co. v. U.S. E.P.A.*, 53 F.3d 1324 (D.C. Cir. 1995), as corrected (June 19, 1995). This is not the case here where the text of the regulation and preamble are clear. Likewise, this case is distinguishable from cases where the agency itself produced conflicting directives, and the ALJ's analysis of Dr. Joppich's opinion is consistent with OSHA's stated policy on evaluating second opinions. *E.g.*, *Employer Solutions Staffing Group II, L.L.C. v. Office of Chief Administrative Hearing Officer*, 833 F.3d 480 (C.A.5, 2016); *ExxonMobil Pipeline Co. v. Dep't of Transportation*, 867 F.3d 564 (5th Cir. 2017).

Respectfully submitted,

JONATHAN L. SNARE
Acting Solicitor of Labor

EDMUND C. BAIRD
Associate Solicitor of Labor for
Occupational Safety and Health

HEATHER R. PHILLIPS
Counsel for Appellate Litigation

s/ Sheila Eileen Naughton
SHEILA EILEEN NAUGHTON
Attorney
U.S. Department of Labor
200 Constitution Ave., NW, Suite S4004
Washington, DC 20210
(202) 693-5499
naughton.sheila.e@dol.gov

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 27th day of August, 2025, the foregoing Brief

for Respondent the Secretary of Labor was served on all registered counsel through

the Court's CM/ECF filing system.


s/ Sheila Eileen Naughton
SHEILA EILEEN NAUGHTON
Attorney

August 27, 2025

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, this document contains **12,018** words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

s/ Sheila Eileen Naughton
SHEILA EILEEN NAUGHTON
Attorney

August 27, 2025