# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 21, 2026

Lyle W. Cayce
Clerk

No. 25-60108

_____

Exxon Mobil Corporation,

*Petitioner*,

*versus*

Occupational Safety and Health Review Commission;
Keith Sonderling, *Acting Secretary, U.S. Department of Labor*,

*Respondents*.

_____

Petition for Review of an Order of the
Occupational Safety & Health Review Commission
Agency No. 22-0809

_____

Before Elrod, *Chief Judge*, and Smith and Wilson, *Circuit Judges*.
Cory T. Wilson, *Circuit Judge*:

This case springs from the intersection of a harrowing accident and the laudable societal goal of improving and safeguarding mental health in the workplace. But the case turns on a more pedestrian question of statutory interpretation: Whether the Occupational Safety and Health Administration (OSHA) can require employers to record employees' work-related mental illnesses via the rulemaking authority conferred upon OSHA by § 8 of the Occupational Safety and Health Act (the Act), 29 U.S.C. § 657(c)(2). Based on the text of the statute, the answer is no. Therefore, we grant the petition

No. 25-60108

for review, vacate the agency's rule doing so, 29 C.F.R. § 1904.5(b)(2)(ix), and set aside the citation and penalty issued by OSHA in this case.

**I.**

**A.**

OSHA anchors its claimed authority to require employers to record employees' work-related mental illnesses in § 8 of the Act, Congress's grant of regulatory power to the agency:

> The Secretary [of Labor], in cooperation with the Secretary of Health and Human Services, shall prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and *illnesses* other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job.

29 U.S.C. § 657(c)(2) (emphasis added). Simply put, OSHA contends that the word "illnesses" as used in the statute encompasses both physical and mental illnesses.

Based on this text, OSHA promulgated the rule at issue, codified at 29 C.F.R. § 1904.5(b)(2)(ix). The rule requires employers to record employees' work-related mental illnesses once a qualified health care provider connects the illness with the workplace:

> .... Mental illness will not be considered work-related unless the employee voluntarily provides the employer with an opinion from a physician or other licensed health care professional with appropriate training and experience (psychiatrist, psychologist, psychiatric nurse practitioner, etc.) stating that the employee has a mental illness that is work-related.

2

29 C.F.R. § 1904.5(b)(2)(ix). There are other aspects of the rule, including the right of an employer to obtain a second evaluation of the employee, that are articulated in the rule's text as well as in OSHA's guidance for employer compliance. At bottom, when an employee provides a qualifying opinion that he or she "has a mental illness that is work-related," *id.*, the illness must be recorded on OSHA Form 300 and OSHA Form 301.

Exxon uses an internal form, an Employee Individual Disability Report (IDR), to facilitate reporting and recording of employees' work-related illness and injury diagnoses. These forms encompass both physical and mental diagnoses. Form 300 is OSHA's Log of Work-Related Illnesses and Injuries, which employers must use to record covered injuries at a given work site throughout the year. OSHA Forms for Recording Work-Related Injuries and Illnesses, https://www.OSHA.gov/sites/default/files/OSHA-RK-Forms-Package.pdf (last visited July 15, 2026). For every work-related injury or illness logged on Form 300, an employer must complete Form 301, the Injury and Illness Incident Report. *See id.*

### B.

ExxonMobil (Exxon) operates a large petroleum refinery in Baytown, Texas. The facility contains "27 distinct units, including the hydro-desulfurization unit (HDU), which mixes hydrogen, sulfur, and naphtha." During repairs to the HDU in December 2021, one of its component pipes ruptured. The subsequent hydrocarbon release caused a large explosion and major fire, which burned for eight hours. Multiple workers who were working on the HDU at the time of the explosion were injured. A significant emergency response was required to evacuate the injured, combat the blaze, and shut off fuel to the HDU. The destruction caused by the incident took Exxon five months to remediate.

Employee 2 was an Exxon process technician[1] who responded to the explosion and ensuing fire to assist emergency response efforts. Employee 2 had worked at the Baytown facility since 2008. He was in a truck with another employee about a quarter mile away when the HDU exploded. The employees later testified that they saw flames rising more than 150 feet into the air, towering above the refinery and engulfing the HDU. Immediately, the pair rushed to the HDU to join the rescue efforts.

Once there, though not a member of the facility's emergency response team, Employee 2 volunteered to enter the burning HDU alongside Exxon firefighters and guide them to several valves which needed to be closed to shut off fuel to the fire. The firefighters helped Employee 2 don firefighting gear, and they entered the HDU. Inside, Employee 2 led the firefighters to multiple valves, which they closed before exiting the inferno. While Employee 2 was recovering from this harrowing ordeal in the back of an ambulance, the emergency team was told that there was still at least one bypass open and feeding the fire. Employee 2 was asked to suit back up and again accompany the firefighters into the burning HDU to "ensure no bypasses were open or valves were open or leaking." He did so and helped the firefighters close several more valves. After surviving this second hellish trip into the HDU, Employee 2 left the facility, though the fire would continue to burn for hours.

After the accident, Employee 2 met with Exxon grief counselors to discuss anxiety he felt in the wake of the conflagration. He used Exxon's employee assistance program (EAP) to connect with a licensed clinical social

---

[1] For privacy reasons, the employee at issue has been termed Employee 2 throughout the litigation. The ALJ dismissed OSHA's citations for Exxon's failure to record the mental-illness injury of two other Exxon employees (dubbed Employee 1 and Employee 3) who were also involved in the emergency response and diagnosed with PTSD.

worker (LCSW), Sydney Adams-Ordonio, the owner, clinical director, and psychotherapist at Kingwood Consulting Center. Following a series of visits with Employee 2 in January, February, and March 2022, Adams-Ordonio diagnosed him with post-traumatic stress disorder (PTSD) stemming from the incident. Her office faxed an IDR detailing her diagnosis to Exxon, including a clinical history and her clinical opinion.

Adams-Ordonio also recommended that Employee 2 see another LCSW at her Kingwood clinic, Rachel Brown. After meeting with Employee 2, Brown also diagnosed him with a "textbook case of PTSD" and subsequently sent her diagnosis to Exxon via an IDR.

While seeing the LCSWs, Employee 2 was also evaluated by his primary health provider, Dr. Cesare Castillo. Castillo also diagnosed Employee 2 with PTSD resulting from his experience during the HDU fire. He notated his diagnosis on an IDR and prescribed him medication.

Generally, once Exxon's medical team receives IDRs from medical providers, they are forwarded to Exxon's risk management and business line team. That team then determines whether to record the reported illness on OSHA's Form 300 Log and complete a Form 301 Incident Report. Per 29 C.F.R. § 1904.5(b)(2)(ix), this process encompasses both physical and mental diagnoses that are work related.

Here, after receiving and reviewing Employee 2's IDRs, Exxon determined that neither Castillo nor the two LCSWs had "appropriate training and experience," as provided in 29 C.F.R. § 1904.5(b)(2)(ix), to diagnose recordable work-related mental illnesses. Exxon informed Employee 2 that his providers did not meet the relevant diagnostic criteria. Thereafter, Employee 2 contacted and visited another provider listed in Exxon's EAP portal, Dr. Chelsea McCann. McCann conducted a battery of assessments of Employee 2, leading her also to diagnose him with PTSD

stemming from the HDU fire. She transmitted her diagnosis of Employee 2 and an IDR to Exxon. McCann further recommended that Employee 2 not return to work for an additional six months.

Upon receiving McCann's diagnosis and IDR, Exxon acknowledged that McCann was qualified to give a mental illness opinion under 29 C.F.R. § 1904.5(b)(2)(ix). However, Exxon opted to seek another evaluation, per OSHA guidance that "[i]n the event that the employer does not believe the reported mental illness is work-related, the employer may refer the case . . . for a second opinion." Occupational Injury and Illness Recording and Reporting Requirements, 66 Fed. Reg. 5916, 5953 (Jan. 19, 2001).

When Exxon requested that Employee 2 meet with its designated provider, Dr. Heather Joppich, for another evaluation, Employee 2 refused. He reasoned that Dr. McCann had provided Exxon's second opinion: After all, he found McCann at Exxon's behest after Exxon rejected his three previous providers' diagnoses, and he found her through Exxon's EAP. Notwithstanding Employee 2's refusal to meet with Joppich, Exxon forwarded his file to her, and she examined the records provided. She determined that Employee 2 did not have work-related PTSD. Based on Joppich's opinion, Exxon concluded that Employee 2 did not have a recordable work-related mental illness.[2]

The union representing Exxon's Baytown employees informed OSHA of Exxon's decision. Following an investigation, OSHA issued a Citation and Notification of Penalty to Exxon in June 2022. The citation alleged an "other-than-serious" violation of the Act's recordkeeping

---

[2] Similarly, Exxon declined to record Employee 1's and Employee 3's work-related mental illness diagnoses.

standard for failing to record Employee 2's PTSD diagnosis as a work-related mental illness on Forms 300 and 301.

Exxon challenged the citation before the Occupational Safety and Health Review Commission (OSHRC), which assigned the matter to an administrative law judge (ALJ). *See* How OSHRC Works, https://www.OSHRC.gov/how-OSHRC-works (last visited July 15, 2026) (explaining administrative adjudicatory process). Following a four-day hearing, the ALJ affirmed the citation as to Employee 2. The ALJ also assessed a $691 monetary penalty against Exxon. Exxon petitioned OSHRC for review of the ALJ's decision. OSHRC did not direct the case for review, so the ALJ's decision became the final order of the OSHRC. Exxon then petitioned this court for review.

## II.

Administrative agencies are "creatures of statute." *Nat'l Fed'n of Indep. Bus.(NFIB) v. OSHA*, 595 U.S. 109, 117 (2022). Accordingly, they "must point to explicit Congressional authority justifying their decisions." *Inhance Techs., L.L.C. v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024) (quotation omitted). Courts look to a statute's text to determine whether Congress granted an agency the authority it claims. *Id.*

As the Supreme Court explained in *Loper Bright Enterprises v. Raimondo*, courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 603 U.S. 369, 412 (2024). Where Congress has "clearly delegated discretionary authority to an agency," we discharge our duty by "independently interpret[ing] the statute and effectuat[ing] the will of Congress subject to constitutional limits." *Mayfield v. Dep't of Lab.*, 117 F.4th 611, 617 (5th Cir. 2024) (quoting *Loper Bright*, 603 U.S. at 395). We must "independently identify and respect such delegations of authority, police the outer statutory boundaries of those

delegations, and ensure that agencies exercise their discretion consistent with the APA." *Loper Bright*, 603 U.S. at 404. "Doing so requires using 'all relevant interpretive tools' to determine the 'best' reading of a statute; a merely 'permissible' reading is not enough." *Mayfield*, 117 F.4th at 617 (quoting *Loper Bright*, 603 U.S. at 400). The question is whether the rule "is within the outer boundaries" of Congress's delegation. *Id.* at 617–18.

## III.

We must determine whether the best reading of 29 U.S.C. § 657(c)(2), which grants OSHA authority to "prescribe regulations requiring employers to maintain accurate records of . . . work-related deaths, injuries *and illnesses*," confers upon OSHA the power to promulgate its mental-illness recording rule. Exxon contends that § 657(c)(2) does not delegate OSHA sufficient authority to authorize the rule; OSHA disagrees.[3]

The Act itself leaves "illnesses" undefined. So to ascertain the best reading of that term, we examine its statutory context, consider dictionary definitions contemporaneous with the Act's enactment, and generally appraise the statutory delegation of power from Congress to OSHA.

First, statutory context. "When words have several plausible definitions, context differentiates among them." *United States v. Hansen*, 599 U.S. 762, 775 (2023). And a word is given more precise content by the words with which it is associated. *Fischer v. United States*, 603 U.S. 480, 487 (2024). Here, "illnesses" could plausibly encompass physical or mental

---

[3] Exxon also contends the rule should be vacated under the Administrative Procedure Act and on due process grounds. Because we conclude that § 657(c)(2) does not authorize the mental-illness rule, we do not reach these alternative claims.

diagnoses, or both. But the context in which "illnesses" is deployed in § 657(c)(2) supports a narrower reading, cabined to physical ailments.

Recall that Congress delegated rulemaking authority for OSHA to require employers' recording of "work-related deaths, injuries and illnesses other than minor injuries requiring only first aid treatment and which do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job." 29 U.S.C. § 657(c)(2). The statute conjoins "injuries" and "illnesses," suggesting that the categories should be read similarly, and distinct from "work-related deaths." *Id.*; *see United States v. Koutsostamatis*, 956 F.3d 301, 307 (5th Cir. 2020) (discussing the canon of *noscitur a sociis*); A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 196 (2012) (same). The text then excludes "minor injuries" (without separately referencing minor "illnesses," again suggesting Congress intended one category, not two) from the purview of the statute's recordkeeping and reporting obligations. 29 U.S.C. § 657(c)(2). All the "minor injuries" excluded—those "requiring only first aid" and that "do not involve medical treatment, loss of consciousness, restriction of work or motion, or transfer to another job"— most naturally refer to physical, not mental, harms. *Id.*

OSHA fails to explain how § 657(c)(2)'s carveout of "minor injuries requiring only first aid" squares with its assertion that "injuries and illnesses" encompass both physical and mental conditions. Likewise, OSHA does not explain how mental illnesses fit with the "injuries" excepted from the Act's reporting requirements because mental conditions do not implicate "restriction of work or motion" or "loss of consciousness." To the contrary, OSHA's own articulation of "first aid" bolsters the conclusion that § 657(c)(2) is concerned with physical, not mental, workplace harms:

No. 25-60108

> First aid refers to medical attention that is usually administered immediately after the injury occurs and at the location where it occurred. It often consists of a one-time, short-term treatment and requires little technology or training to administer. First aid can include cleaning minor cuts, scrapes, or scratches; treating a minor burn; applying bandages and dressings; the use of non-prescription medicine; draining blisters; removing debris from the eyes; massage; and drinking fluids to relieve heat stress.

What is First Aid?, https://www.OSHA.gov/medical-first-aid/recognition (last visited July 15, 2026). True enough, as OSHA asserts, § 657(c)(2) "contains no distinction between physical and mental illness." But that is more likely because the statute simply does not include mental illnesses within its sweep, rather than because OSHA's position reflects the best reading of the statutory text.

Adjusting the aperture to look at the forest as well as the trees, the larger recordkeeping framework set forth in § 657(c)(1)–(3) supports our conclusion. Subsection (c)(1) requires employers to maintain records "necessary or appropriate for the enforcement of [the Act] or for developing information regarding the causes and prevention of occupational accidents and illnesses," while subsection (c)(3) directs employers to "maintain accurate records of employee exposures to potentially toxic materials or harmful physical agents." 29 U.S.C. § 657(c). The statute also requires employers to inform employees of exposure to toxic materials or harmful physical agents. *Id.* § 657(c)(3). These recordkeeping requirements, including those in subsection (c)(2), have a simple end: the documentation of accidents, injuries, or illnesses caused by *physical* dangers of the workplace.

These records serve as the jumping-off point for OSHA to fulfill the general mission Congress gave the agency. The recordkeeping and reporting requirements found in Section 8 of the Act are part of a larger inspection

regime that confers on OSHA inspectors the authority to "enter without delay" to "inspect and investigate" any place of employment and examine "all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein." 29 U.S.C. § 657(a). The enumerated objects of OSHA's wide-ranging inspection power are categories of things that risk *physical* harm. This buttresses that a narrower, physical-rather-than-mental understanding of "illnesses" reflects the best reading of § 657(c)(2).

Contemporaneous dictionary definitions of "illness" are consistent with a narrower reading of that term in § 657(c)(2). *See Restaurant Law Ctr. v. Dep't of Lab.*, 120 F.4th 163, 171 (5th Cir. 2024) ("Terms that the statute leaves undefined should be given their ordinary, contemporary, common meaning[,]" often adduced through "contemporary dictionary definitions."). Dictionaries from around 1970, when the Act was legislated, define "illness" as: (1) "A disease or ailment of such a character as to affect the general soundness and healthfulness of the system seriously, and not a mere temporary indisposition," BLACK'S LAW DICTIONARY (4th rev. ed. 1968); (2) "Sickness; disease. For some purposes including of both severe and slight attacks, even attacks of a less grave and serious character than a disease," BALLENTINE'S LAW DICTIONARY 580 (1969 ed.); (3) the "state of being ill; indisposition; sickness," THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 710 (1970 ed.); (4) "a "disease; ailment; malady; disorder of health [or] sickness," WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY 1280 (1957). None of these definitions expressly contemplate non-physical conditions.

Indeed, *Ballentine's* contains a separate entry for "mental illness," but that entry merely points the reader to the definition for "insanity."

No. 25-60108

Ballentine's Law Dictionary 792 (1969 ed.).[4]  And "insanity" is
defined as:  an "unsound, deranged, delirious, or distracted condition *of
mind*"; or a "condition *of mind* so impaired in function, or so deranged, as to
induce a deviation from normal conduct in the person so afflicted"; or "a
degree of *mental incapacity* as renders one unable to understand and deal with
the common affairs of life"; or "sickness [and] physical disease, consisting
of a diseased or disordered condition or malformation of the organs or tissues,
through which the mind receives impressions, and operates, and by which
the will and judgment are impaired, and conduct rendered irrational."  *Id.* at
635 (emphasis added).  If anything, this reference to "mental illness" ranges
well afield of the text, context, and purposes of § 657(c)(2).

By contrast, OSHA proffers only a single contemporaneous
definition of "illness," as an "unhealthy condition of body or mind," to
support its reading of the statute.  *See* Webster's Third New
International Dictionary 1127 (1961).  However, at least one
preeminent authority warns that the source of that definition is "to be used
cautiously because of its frequent inclusion of doubtful, slipshod meanings
without adequate usage notes."  Scalia & Garner, *supra*, at 422 (2012).
Justice Scalia himself addressed a similar situation to the one here in which
the Federal Communications Commission offered up a definition from
*Webster's Third* as sole support for its position that there was "sufficient
ambiguity to entitle the Commission to deference in its acceptance of the
broader meaning."  *Int'l MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512
U.S. 218, 226 (1994).  Writing for the Court, Justice Scalia rejected the
agency's assertion and emphatically noted that "[u]pon its long-awaited

---

[4] The contemporaneous edition of *Black's Medical Dictionary* likewise equates the
"mental illness" with "insanity" as well.  Black's Medical Dictionary 476, 571
(1961) (definition of "Insanity" simply states "see Mental Illness").

appearance in 1961, *Webster's Third* was widely criticized for its portrayal of common error as proper usage." *Id.* at 228 n.3. Given that OSHA "must point to explicit Congressional authority justifying [its] decisions," *Inhance Techs.*, 96 F.4th at 893, we are unpersuaded.

OSHA offers additional extratextual arguments in favor of a broader reading of the statute, but they are also unpersuasive. First, OSHA argues that the Act's legislative history favors its understanding of the statute. OSHA suggests that the Act's "legislative history indicates that [the Act] arose from concerns about both physical and mental work-related illnesses," citing to the Senate Report on the Act and to statements given in Senate subcommittee hearings. *See Occupational Safety and Health Act of 1970: Hearings S. 2193 and S. 2788, Before the Subcomm. on Labor of the S. Comm. on Labor and Public Welfare*, 91st Cong., at 112 (1969); S. Rep. No. 91-1282, at 20 (1970), *reprinted in* Legislative History of the OSH Act of 1970, at 160 (1971); 116 Cong. Rec. 37325 (1970), *reprinted in* Legislative History of the OSH Act of 1970, at 413 (1971). But legislative history is "not law." *Matter of DeBerry*, 945 F.3d 943, 949 (5th Cir. 2019). Even so, the legislative history cited by OSHA would not resolve the statutory question here because nothing in it pertains to the definition of "illnesses" as that term used in § 657(c)(2).

Second, OSHA seeks refuge in Congress's declaration of purpose behind the Act, namely "assur[ing] so far as possible every working man and woman in the Nation safe and healthful working conditions and [preserving] our human resources." 29 U.S.C. § 651(b). Per OSHA, this means that the mental illness recording requirement is fully justified because "[i]f a worker is unable to work due to a work-related mental illness, this objective cannot be achieved." But as the Supreme Court has explained, "it is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, L.L.C. v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)

(quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). Here, the general intent of Congress that employees have "safe and healthful working conditions" yields to the more specific rulemaking authority bestowed by Congress to its agency delegee. And in the context of § 657(c)(2), that rulemaking authority does not allow OSHA to mandate employers' recording work-related mental, as opposed to physical, injuries and illnesses.

## IV.

However commendable OSHA's desire to improve mental health in the workplace, like all agencies, OSHA's authority to regulate toward that end is constrained by the limits of power Congress delegated to the agency. OSHA's reading of 29 U.S.C. § 657(c)(2) to encompass the power to regulate workplace mental illnesses may be plausible. But the best reading of the statute is narrower: that "illnesses," as used there, refers to physical, and not mental, work-related ailments and conditions.

Based on that reading of § 657(c)(2), OSHA exceeded its statutory authority in promulgating 29 C.F.R. § 1904.5(b)(2)(ix) to require employers to record employee-reported work-related mental illnesses. We therefore GRANT Exxon's petition and VACATE both the citation and penalty OSHA imposed in this case as well as the rule itself.